**ARNAUD CAMMAS**

Plaintiff, In Pro Per

201 13th St #32231

Oakland, CA 94612

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **ARNAUD CAMMAS,** | **Case No. 25-cv-10296-LB** |
| Plaintiff, | |
| v. | **PROPOSED FIRST AMENDED COMPLAINT** |
| **CITY OF BERKELEY;** | |
| **ANDREW GREENWOOD;** | |
| **JENNIFER LOUIS;** | |
| **PAUL BUDDENHAGEN;** | **Date:**  March 19, 2026 |
| **JESSE ARREGUIN;** | **Time:**  9:30 a.m. |
| **KAJAHNA FUTCH;** | **Place:**  Courtroom B, 15th Floor |
| **KEVIN PETERS;** | **Judge:**  Magistrate Judge Laurel Beeler |
| **FRANCIS LANDRUM,** | |
| Defendants. | |

## I. INTRODUCTION

1. This case arises from the City of Berkeley's creation and maintenance of a shadow enforcement system in which untrained, unsworn civilians — operating through the Downtown Berkeley YMCA and the Downtown Berkeley Association ("DBA") — were delegated police powers, trained by Berkeley Police Department ("BPD") officers, equipped with BPD radios, and sanctioned to conduct surveillance, detentions, and citizen's arrests of vulnerable individuals in downtown Berkeley. On February 4, 2022, that system produced its foreseeable result: a YMCA Executive Director with a documented history of violent confrontations — and deep institutional ties to both BPD and the DBA — applied a prolonged carotid/vascular chokehold to Plaintiff Arnaud Cammas while BPD officers stood by, failed to intervene, deactivated their body-worn cameras, arrested Plaintiff as the aggressor, and dismissed the accounts of foreign-born witnesses who attempted to report that Plaintiff was the victim.

2. The February 4, 2022 incident was not an isolated failure. It was the culmination of a decade-long municipal policy in which the City of Berkeley, through its police department, its mayor, and its city manager, empowered, funded, supervised, and ratified a civilian enforcement apparatus that repeatedly produced violent confrontations — including a 2014 choking incident at the same YMCA facility, a 2015 ambassador assault that generated international media coverage and a Peace and Justice Commission recommendation to disband the program, and a December 2020 assault on a YMCA tenant — without meaningful oversight, accountability, or reform.

3. After the February 4, 2022 assault, the City compounded its constitutional violations. BPD officers falsified reports, concealed evidence by deactivating body-worn cameras, and listed the chokehold perpetrator as the "victim." When criminal charges were filed against Plaintiff based on these false reports, the Alameda County District Attorney ultimately declined to prosecute on December 6, 2022, confirming the charges lacked merit. BPD and City officials then obstructed Plaintiff's efforts to obtain records, denied public records requests, and concealed the findings of internal affairs investigations — a pattern of cover-up that continues to this day.

4. Plaintiff brings claims under 42 U.S.C. Sections 1983 and 1985, the Americans with Disabilities Act, the Fair Housing Act, Section 504 of the Rehabilitation Act, the Bane Act, and California state law for false imprisonment, intentional infliction of emotional distress, and negligence.

## II. JURISDICTION AND VENUE

1. This Court has federal-question jurisdiction under 28 U.S.C. Section 1331 over Plaintiff's claims arising under 42 U.S.C. Section 1983, 42 U.S.C. Section 1985, Title II of the Americans with Disabilities Act (42 U.S.C. Section 12132), the Fair Housing Act (42 U.S.C. Sections 3604 and 3617), and Section 504 of the Rehabilitation Act (29 U.S.C. Section 794).

2. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. Section 1367, as those claims arise from the same nucleus of operative fact.

3. Venue is proper in this district under 28 U.S.C. Section 1391(b) because the events giving rise to the claims occurred in Berkeley, Alameda County, California, within the Northern District of California.

**III. PARTIES**

1. Plaintiff Arnaud Cammas is a foreign-born Hispanic individual with documented disabilities including respiratory distress, post-traumatic stress disorder, and trauma-related impairments. Plaintiff resided at the Downtown Berkeley YMCA residential facility, Room 307, at 2001 Allston Way, Berkeley, California, beginning in approximately February 2021. Plaintiff's mailing address is 201 13th St #32231, Oakland, CA 94612.

2. Defendant City of Berkeley ("the City") is a municipal corporation organized under the laws of the State of California. The City operates the Berkeley Police Department, funds and administers the Downtown Berkeley Property-Based Improvement District ("PBID"), and maintained contractual and operational relationships with the YMCA of the East Bay and the Downtown Berkeley Association that gave rise to the enforcement system at issue. The City is sued as a municipal entity under 42 U.S.C. Section 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

3. Defendant Paul Buddenhagen served as Deputy City Manager and later City Manager for the City of Berkeley. Buddenhagen referred to YMCA Executive Director Goree and YMCA CEO Gallati as "colleagues" — reflecting an operational relationship, not a passing acquaintance — and was copied on a January 27, 2022 enforcement meeting invitation just eight days before the February 4, 2022 attack. Buddenhagen provided legal and policy counsel to the City regarding the DBA enforcement program and advised on liability shielding for the YMCA-DBA-City partnership structure — including the decision to channel civilian enforcement through the DBA and YMCA rather than directly through BPD, thereby insulating the City from direct liability for the enforcement actions of untrained civilians. After the February 4, 2022 assault, Buddenhagen's office directed and oversaw the suppression of Plaintiff's public records requests, including: (a) denial of Plaintiff's requests for police reports related to the February 4, 2022 incident; (b) denial of requests for body-worn camera footage; (c) denial of requests for documents regarding BPD's relationship with the DBA and YMCA; and (d) concealment of internal affairs investigation findings. This records suppression continued through 2023 and 2024, with Buddenhagen's office invoking overbroad exemptions and failing to produce documents that were subsequently revealed through third-party subpoena production from the City itself. Buddenhagen is sued in his individual and official capacities.

4. Defendant Andrew Greenwood served as Chief of Police for the Berkeley Police Department from approximately 2016 through 2021. During his tenure, Greenwood actively trained and sanctioned the YMCA-DBA civilian enforcement apparatus, including by authorizing BPD officers to provide radios, training, and operational direction to DBA personnel; personally participating in the training and equipping of DBA enforcement staff including Lance Gaylord Goree; and ratifying the delegation of police-type powers to unsworn civilians without adequate oversight, use-of-force policies, or accountability mechanisms. Greenwood is sued in his individual capacity.

5.  Defendant Jennifer Louis has served as Chief of Police for the Berkeley Police Department from approximately 2021 to present. Louis assumed command of a department that had institutionalized the delegation of enforcement powers to YMCA and DBA staff and continued to maintain and ratify the policies, customs, and practices established under her predecessor, including the failure to conduct independent investigations of citizen's arrests made by enforcement partners, the failure to enforce body-worn camera accountability, and the failure to implement witness-intake procedures for foreign-born individuals. After the February 4, 2022 assault, Louis failed to take corrective action, failed to discipline the officers involved, and oversaw the continued obstruction of Plaintiff's records requests and the concealment of internal affairs findings. Louis is sued in her individual and official capacities.

6.  Defendant Jesse Arreguin has served as Mayor of the City of Berkeley since 2016. As Mayor and the City's chief executive, Arreguin exercised final policymaking authority over the City's continued participation in and funding of the DBA enforcement system. Arreguin had actual knowledge of the violent history of the civilian enforcement apparatus: the 2015 ambassador assault scandal — in which a DBA ambassador under Goree's supervision brutally beat an unsheltered individual, Goree signed a false citizen's arrest form, and the victim was wrongfully convicted before exculpatory video surfaced — generated international media coverage and prompted the Berkeley Peace and Justice Commission to formally recommend disbanding the ambassador program. Despite this formal recommendation from the City's own advisory body, Arreguin publicly supported the continued operation of the DBA enforcement system, approved the City's continued PBID funding of the DBA, and took no action to implement oversight, use-of-force policies, or accountability mechanisms for the civilian enforcement personnel the City had empowered. Arreguin is sued in his individual and official capacities.

7. Defendant Sergeant Landrum is a sworn sergeant of the Berkeley Police Department. On February 4, 2022, Sergeant Landrum responded to the YMCA facility as the supervising officer. Upon arrival, Landrum observed Plaintiff being physically restrained and held down by three civilians, yet treated Plaintiff as the "suspect," directed that Plaintiff be detained in handcuffs, referred to Goree as the "victim," and authorized Plaintiff's arrest. Landrum's body-worn camera recording confirms he described Plaintiff as being "held down by three people" and called for medical evaluation of the "suspect." Landrum told Plaintiff there was "a good chance you might get evicted because of what happened" — a threat directed at Plaintiff's housing while Plaintiff was in custody. Landrum approved the decision to transport Plaintiff to Santa Rita Jail rather than cite and release. At all relevant times, Landrum acted under color of state law and within the course and scope of his employment with BPD. Landrum is sued in his individual capacity.

8. Defendant Officer Peters is a sworn officer of the Berkeley Police Department. On February 4, 2022, Officer Peters transported Plaintiff to Santa Rita Jail. During the booking process, Peters falsely reported that Plaintiff had not been choked, directly contradicting the physical evidence and circumstances the officers had observed. Peters's body-worn camera recording confirms he discussed the case as a straightforward "42" (assault charge) against Plaintiff, referred to Goree as "the victim," and coordinated with Landrum on the decision to jail rather than cite Plaintiff. At all relevant times, Peters acted under color of state law and within the course and scope of his employment with BPD. Peters is sued in his individual capacity.

9. Defendant Officer Futch is a sworn officer of the Berkeley Police Department. On February 4, 2022, Officer Futch took statements from witnesses at the scene, including Veronica (Plaintiff's companion) and Rose Acosta (a YMCA employee who participated in the physical restraint of Plaintiff). Futch's body-worn camera recording confirms that he told Veronica — a foreign-born witness — that "she went after Lance" and framed the incident as Plaintiff being the aggressor, effectively dismissing Veronica's account that Plaintiff was being choked. Futch failed to conduct an independent investigation, instead accepting Goree's account and the YMCA staff's framing. At all relevant times, Officer Futch acted under color of state law and within the course and scope of his employment with BPD. Futch is sued in his individual capacity.

10. Plaintiff is unaware of the true names and capacities of Does 1 through 50 and sues them by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Does 1 through 50 include BPD officers, City officials, and other individuals who participated in the acts and omissions alleged herein.

## IV. FACTUAL ALLEGATIONS

### A. The YMCA-DBA-City Enforcement System

1. Beginning no later than 2012, the City of Berkeley created, funded, and maintained a civilian enforcement apparatus through which untrained, unsworn individuals affiliated with the Downtown Berkeley Association and the YMCA of the East Bay were delegated police-type powers in downtown Berkeley.

2. The DBA operated under the City's Property-Based Improvement District ("PBID"), a tax-assessment district established, funded, and overseen by the City with a Year 1 budget of $2,917,537 and projected expenditures exceeding $36 million over ten years (October 2025 Management District Plan). Of that budget, 76.6% ($2,234,962) was allocated to "Clean, Safe and Beautiful" — the enforcement arm of the DBA. YMCA at 2001 Allston Way paid a $25,378 annual PBID assessment that directly funded the DBA enforcement apparatus, and the City of Berkeley itself paid approximately $147,000 per year into the PBID. The City held Contract No. 31900274 with YMCA, valued at $310,000.

3. DBA "ambassadors" — civilians with no law-enforcement training, certification, or oversight — were equipped with BPD radios, trained by BPD officers, and directed to conduct patrols, surveillance operations, detentions, and citizen's arrests of individuals in the downtown Berkeley area. BPD officers, under the direction and knowledge of Chief Greenwood, provided this training, equipment, and operational support.

4. Lance Gaylord Goree served as the DBA's Operations Manager from approximately 2012 through 2018. In that capacity, Goree carried a BPD radio, emailed BPD officers daily, directed surveillance operations, and supervised the DBA ambassador enforcement program. Goree later became Executive Director of the Downtown Berkeley YMCA — the same facility where Plaintiff resided — carrying his enforcement background and BPD relationships with him. In May 2021 — nine months before the attack — Goree applied for the position of Assistant to the City Manager at the City of Berkeley, emailing Kevin Sledge to follow up on "the next steps in the Assistant To The City Manager interview process," demonstrating that Goree was actively seeking to formalize his role within the City's administrative structure. By 2020, DBA Community Engagement Ambassadors under the program Goree helped build were armed with batons, pepper spray, and handcuffs, and trained to "de-escalate violent activity, assist police with arrests and act as a buffer for smaller crimes." In July 2019, Goree announced the YMCA would "transition all of our rooms to Co-Living spaces," and DBA enforcement personnel were placed in YMCA rooms under an Ambassador Housing Program — a fact not disclosed to Plaintiff or other tenants.

5. YMCA CEO Fran Gallati simultaneously served as Vice President of the Board of Directors of the DBA, as reflected in the DBA's 2012 Annual Report. This dual governance role linked the YMCA and the DBA enforcement apparatus at the highest organizational level.

6. Chief Greenwood actively participated in training and equipping DBA enforcement personnel, including Goree. Greenwood was directly involved in designing the pepper spray reporting protocol for DBA ambassadors, suggesting use of the existing Streetplus report with a checkbox for pepper spray use, and expected any pepper spray deployment to be reported to BPD — confirming BPD's direct operational control over the civilian enforcement apparatus. Greenwood privately advised Goree on the use of pepper spray by DBA enforcement staff. Greenwood sanctioned the delegation of police-type enforcement duties to these unsworn civilians, knowing they lacked use-of-force training, de-escalation protocols, or any form of accountability for their enforcement actions.

7. Mayor Arreguin approved and ratified the YMCA-DBA-City partnership structure. Despite the 2015 ambassador assault scandal — in which DBA Block by Block ambassador Jeffrey Bailey, operating under Goree's direct supervision as "lead ambassador," punched unsheltered individual James "Quagmire" Cocklereese at least ten times and continued beating him while he was on the ground; Goree stood by at the scene and signed a false citizen's arrest form; BPD Officer Donovan Edwards wrote a false probable cause statement describing the victim's walking stick as a "6-foot-long pole with a 4-inch blade" constituting a "deadly weapon"; the DA filed seven misdemeanor charges against the two victims (the victims, not the assailants), who pleaded no contest on March 23, 2015 before exculpatory video was known to exist, were sentenced to two years probation, ordered to stay away from CVS, and ordered to pay restitution to Bailey; UC Berkeley student Bryan Hamilton's video went viral internationally (covered by The Guardian, ABC7, NBC Bay Area, CBS San Francisco) on March 25, 2015, leading the DA to review and find the video "contradicted what we had believed were the facts"; both victims had pleas withdrawn, charges dismissed, and the court made factual findings of innocence; yet no charges were filed against Bailey or Goree — and despite the Berkeley Peace and Justice Commission's formal recommendation to disband the ambassador program, Arreguin publicly supported the continued operation of the DBA enforcement system.

8. Deputy City Manager Buddenhagen provided legal and policy counsel regarding the DBA enforcement program, advised on liability shielding for the partnership structure, and facilitated the City's continued authorization of the civilian enforcement apparatus despite its documented history of violence and constitutional violations.

## B. The February 4, 2022 Incident

1. On February 4, 2022, in the YMCA facility cafeteria at 2001 Allston Way, Berkeley, Lance Gaylord Goree — a former DBA Operations Manager with deep BPD ties and a documented history of violent confrontations — punched Plaintiff, threw Plaintiff to the ground, and applied a prolonged carotid/vascular chokehold. A carotid/vascular chokehold constitutes deadly force under California Penal Code Section 835a, and is a technique specifically banned for trained, sworn law enforcement officers under Government Code Section 7286.5 (effective January 1, 2021). The force applied here — by an unsworn, untrained civilian whom the City had delegated enforcement authority — exceeded even the limits imposed on sworn officers.

2. During the chokehold, YMCA employees Rose Acosta and Antonio Acosta physically assisted in restraining Plaintiff. When Plaintiff pleaded "I can't breathe," Goree responded: "I know. That's the point!" When Plaintiff continued to plead for air, Goree stated: "It's too late, Mr. Cammas. It's too late." Goree further told Plaintiff: "You are not getting out of this." Rose Acosta struck Plaintiff's body with a walkie-talkie radio while he was pinned on the ground and choking — a fact Rose later admitted on camera, stating: "I did go up and I hit him with the radio. Like, stop. Leave him alone." Rose Acosta also rushed at Veronica Estudillo (Plaintiff's companion) multiple times, shouting "You want some? You want some?" and "Bitch back up unless you want some" — language memorialized in Officer Futch's own report — and struck Estudillo with her hand. Despite Estudillo's photographs, video, and visible injury, Officer Futch accepted Rose's bare denial of hitting Estudillo, telling her: "You're saying you didn't touch her? I'm going to take your word for that." Antonio Acosta physically assisted Goree in restraining Plaintiff during the prolonged chokehold, yet does not appear anywhere in the police report — not as a witness, not as a suspect, not as an involved party — completely erased from the official record.

3. Plaintiff suffered respiratory distress, physical injuries, and severe psychological trauma as a direct result of the assault. At least ten medical and mental-health letters from eight providers — including eight letters from six treating Kaiser Permanente physicians spanning from April 2022 through at least August 2024, and two Sunset Mental Health Services letters dated September 9, 2024 and November 12, 2024 — documented continuous disability and inability to work for a period exceeding twenty-eight months. The injuries exacerbated and contributed to Plaintiff's ongoing disabilities, including chronic respiratory distress and post-traumatic stress disorder.

**C. BPD's Failure to Intervene and False Arrest**

1. BPD officers, including Sergeant Landrum and Officer Peters, arrived at the scene while Goree's chokehold was still ongoing. Sergeant Landrum acknowledged the severity of what had occurred, stating: "Alright well that guy has been choked out." An officer — on information and belief, Landrum or another responding officer — called an ambulance for Plaintiff, then cancelled it, depriving Plaintiff of medical evaluation despite having been subjected to a prolonged vascular neck restraint.

2. Despite witnessing an ongoing use of deadly force by a civilian against a restrained individual, the responding BPD officers failed to intervene to stop the chokehold. The officers treated Goree — the perpetrator of a prolonged deadly-force chokehold — as the "victim" and arrested Plaintiff as the aggressor.

3. BPD officers at the scene deactivated their body-worn cameras during or shortly after their arrival, in violation of BPD policy and in a manner calculated to prevent creation of an evidentiary record of the incident and BPD's response.

4. BPD officers dismissed and disregarded the accounts of foreign-born witnesses present at the scene. Officer Futch interviewed Veronica Estudillo — Plaintiff's companion and a foreign-born witness who had recorded video of the assault — but rather than taking her account neutrally, Futch told her that Plaintiff "went after Lance" and framed the incident as Plaintiff being the aggressor, effectively overriding and dismissing her eyewitness account that Plaintiff was being choked and restrained. Estudillo described to Futch on camera that three to four people were on top of Plaintiff while he could not breathe, and that Rose Acosta was hitting Plaintiff's body with a walkie-talkie radio while he was pinned on the ground and choking — yet Futch dismissed this account. Estudillo explicitly asked Futch: "Can I press charges or something?" regarding Rose Acosta's assault on her. Futch deflected: "let me talk to her first" — and never followed up, never took a report of the assault on Estudillo, and never pursued charges against Rose Acosta despite Estudillo's photographs, video, and visible injuries. BPD also failed to take statements from Michelle Horner, a disabled eyewitness who described the incident as "attempted murder," and from two French visiting students present at the scene whose names were not even recorded. The officers credited the account of the American-born perpetrator (Goree) and YMCA staff over the foreign-born witnesses, and the final police reports reflected only the YMCA staff's version of events. This discriminatory treatment of foreign-born witnesses — including the refusal to allow a Hispanic victim to press charges — deprived Plaintiff of exculpatory evidence in the official record.

5. Officer Peters transported Plaintiff to Santa Rita Jail and falsely reported that Plaintiff had not been choked, directly contradicting the physical evidence and the circumstances the officers had witnessed.

6. Plaintiff was arrested, booked, and detained at Santa Rita Jail based on the false reports generated by BPD officers. The arrest was without probable cause. The officers had witnessed an ongoing deadly-force chokehold being applied to Plaintiff by a civilian, yet arrested Plaintiff rather than the perpetrator. Notably, BPD did not require Goree to sign a citizen's arrest form. Under California Penal Code Section 836(a)(1), a peace officer may only make a warrantless arrest for a misdemeanor if the offense was committed in the officer's presence. No officer witnessed the alleged battery. Where a misdemeanor is not committed in an officer's presence, the only lawful paths to a warrantless arrest are (1) a private person's arrest under Penal Code Sections 837 and 847, which requires the private person to sign a citizen's arrest form and be identified as the arresting party, or (2) an arrest warrant. BPD obtained neither. In the 2015 CVS assault, Goree signed a citizen's arrest form as the basis for arresting the two homeless victims he and his ambassador had beaten — demonstrating that BPD knew and followed the procedure. Here, no such form was required — BPD simply arrested Plaintiff directly on Goree's word, treating Goree not as a civilian complainant but as a colleague whose word was sufficient to effectuate an arrest.

7. BPD listed Goree as the "VICTIM" in BPD Case No. 2022-00005533.

8. On December 6, 2022, the Alameda County District Attorney declined to prosecute Plaintiff, confirming that the charges arising from the February 4, 2022 incident lacked merit. The favorable termination of the criminal proceedings against Plaintiff establishes the absence of probable cause for the original arrest.

**D. Post-Incident Retaliation and Cover-Up**

1. Following the February 4, 2022 assault and arrest, Goree emailed Officer Futch directly — on February 5, February 9, and February 18, 2022 — regarding "Assault Charges against Mr. Cammas." Goree sent surveillance video to Futch on the day of the assault, writing: "Hopefully you have both angles now." This direct communication between the chokehold perpetrator and the investigating officer — soliciting criminal charges against the victim — demonstrates the coordinated effort to fabricate a case against Plaintiff. The City and BPD then engaged in a campaign of retaliation, intimidation, and cover-up directed at Plaintiff.

2. In the days and weeks following the assault, YMCA staff and BPD officers came to Plaintiff's door at the YMCA facility, banged on the door, and threatened and intimidated Plaintiff. These visits were designed to coerce Plaintiff into silence and discourage him from pursuing legal claims.

3. In July 2022, BPD recommended that YMCA supervisors pursue eviction-focused responses against Plaintiff — reflecting cross-entity coordination between the police department and the YMCA in targeting Plaintiff's housing as retaliation for the legal claims arising from the assault.

4. BPD refused to provide Plaintiff with police reports, body-worn camera footage, and other records related to the February 4, 2022 incident. The City, through City Manager Buddenhagen and his office, denied or obstructed Plaintiff's public records requests seeking documents related to BPD's relationship with the DBA and YMCA, the training and equipping of civilian enforcement personnel, and the internal affairs investigation of the February 4, 2022 incident.

5. BPD concealed the findings of internal affairs investigations related to the February 4, 2022 incident, including findings regarding the officers' failure to intervene, the deactivation of body-worn cameras, the dismissal of foreign-born witnesses' accounts, and Officer Peters's false report that Plaintiff had not been choked.

6. The City's records suppression continued through 2023 and 2024, with repeated denials and obstructions of Plaintiff's records requests. Each denial constitutes a separately accruing act of obstruction and retaliation. The City's pattern of evidence destruction is further illustrated by the "Textgate" scandal (reported by the LA Times in November 2022 and Berkeley Copwatch in January 2024), which revealed that BPD's Downtown Bike Taskforce — operating in the same downtown Berkeley area as the DBA enforcement apparatus — maintained arrest quotas, exhibited racial bias, and harbored anti-homeless sentiment, and that related text messages and records were destroyed.

## E. State-Created Danger

1. The City of Berkeley, through the acts and omissions of Chief Greenwood, Chief Louis, Mayor Arreguin, and City Manager Buddenhagen, created and maintained a state-created danger that directly resulted in harm to Plaintiff.

2. The City affirmatively placed Plaintiff in danger by: (a) creating and maintaining the YMCA-DBA civilian enforcement apparatus that delegated police-type powers to unsworn individuals with documented histories of violence; (b) failing to disclose to YMCA residents, including Plaintiff, that the YMCA facility had a violent history and that YMCA/DBA staff had been delegated enforcement duties and trained by BPD; (c) training, equipping, and sanctioning Goree — a person with a documented history of violent confrontations known to BPD — to exercise enforcement authority over residents; and (d) failing to implement any oversight, accountability, or use-of-force policies for the civilian enforcement personnel they had empowered.

3. The danger was known and obvious to City officials. The City was aware of the following pattern of violence and dysfunction:

(a) **2014 Neck-Grab (Center Street).** On June 25, 2014, City Interim Audit Manager Claudette Biemeret witnessed Goree grab an unsheltered individual by the neck on Center Street in downtown Berkeley. Biemeret reported: "I saw the uniformed person grabbing the homeless man by the neck and I'm certain he shouted at the homeless man, 'I will choke you.'" Goree admitted:

"I am fully aware of the incident, because I was directly involved" and "I made sure that Romanian was not physically injured in any way, although I was angry enough to do so." City Auditor Ann-Marie Hogan investigated, yet the City took no action.

(b) **2015 Bailey Assault.** The DBA ambassador assault described in Section IV.A above demonstrated the identical pattern — false citizen's arrest, false police report, wrongful conviction of the victim — that would recur on February 4, 2022.

(c) **December 2020 Hault Assault.** In December 2020, Goree assaulted YMCA tenant Steven Hault. 911 CAD records documented that Goree used a racial slur against Hault, that Goree "claimed he knows the chief of police and that is why he could 242 him" (Penal Code Section 242 = battery), and that the "VICTIM IS A TENANT" and the perpetrator "IS AN EMPLOYEE." Despite this documented evidence, the City took no action against Goree.

(d) **April 2021 Montoya Chokehold.** On April 6, 2021, YMCA maintenance employee Antonio Acosta assaulted YMCA resident Mauricio Montoya and challenged him to a fight outside the facility — the same Antonio Acosta who would later assist Goree in restraining Plaintiff. On April 27, 2021, Goree choked Montoya for approximately ten minutes until BPD arrived and ordered Goree to release him (BPD Case No. 21-015142). Goree admitted his staff were "not trained in de-escalation" but claimed they were "VERY well versed in NO escalation" and that he would "purposely try redirect [Montoya's] anger towards me."

(e) **Goree's Oct-Nov 2021 Warnings.** In the months preceding the February 4, 2022 attack, Goree himself warned the City that the YMCA was unsafe: on October 11, 2021, Goree told City officials that residents were "mentally unstable," that the YMCA was "not trained or equipped to provide assistance to these residents," and that residents needed "Board and Care, not just board." On November 26, 2021, Goree warned that social-service clients were placed at the YMCA who needed IHSS services that YMCA staff was not trained to provide. These warnings, directed to the City, confirmed that City officials had actual knowledge of dangerous conditions at the facility in the weeks before the attack.

(f) **Deaths at the Facility.** The YMCA facility experienced multiple resident deaths reflecting the dangerous conditions the City knew about and failed to address: on December 20, 2021, Samuel

Mark Schruyer was found dead in a puddle of urine and excrement, his room infested with flies; on July 14, 2022, Brett Elliott Schnaper's decomposing body was retrieved after being deceased for over two weeks, with maggots on the floors; in October 2022, Michael Robert Surryhne died at the facility (BPD Case No. 2022-00049154).

Despite this extensive pattern of violence, warnings, and deaths, the City continued to empower and sanction the enforcement system.

(g) **BFD Fire/EMS Records.** Between 2018 and 2022, the Berkeley Fire Department responded to hundreds of EMS incidents at the YMCA facility, including dual drug overdoses, APS-referred dependent adults unable to walk, residents with congestive heart failure requiring nighttime ER transport, and chronic medical crises requiring repeated ambulance responses. In January 2022 alone — the month before the assault — BFD responded to at least four EMS incidents at the facility, including an APS-referred resident with fecal/urinary incontinence who was unable to walk. The City, through its fire department, had direct and independent knowledge of the dangerous conditions at the YMCA facility it had empowered as an enforcement partner.

1. The City's conduct shocks the conscience. Officials with direct knowledge of a pattern of violent confrontations associated with the civilian enforcement apparatus they created continued to fund, train, equip, and ratify that apparatus without implementing any reforms, oversight, or protections for the individuals subject to its enforcement actions.

## F. Discriminatory Treatment

1. Plaintiff is foreign-born and Hispanic. Plaintiff has documented disabilities including respiratory distress, post-traumatic stress disorder, and trauma-related impairments.

2. BPD officers at the scene of the February 4, 2022 assault dismissed and overrode the accounts of foreign-born witnesses present, including individuals who could have corroborated Plaintiff's account. Officer Futch interviewed a foreign-born witness but actively reframed her account to match Goree's version, telling the witness that Plaintiff "went after Lance" despite the witness's description of Plaintiff being choked. The officers credited the American-born YMCA staff's accounts and excluded the foreign-born witnesses' testimony from the official investigative record. This conduct reflected a pattern and practice of failing to credit the accounts of foreign-born individuals.

3. BPD and the City failed to provide Plaintiff with accommodations for his disabilities in their interactions with him following the February 4, 2022 assault, including during the arrest, detention, and subsequent administrative and records processes.

4. The City, through BPD, subjected Plaintiff to disparate treatment on the basis of his national origin and disability status by: (a) crediting the account of the American-born perpetrator (Goree) over that of the foreign-born victim (Plaintiff); (b) dismissing, overriding, and excluding the testimony of foreign-born witnesses from the official record; (c) arresting the foreign-born victim rather than the American-born perpetrator; and (d) failing to provide disability-related accommodations.

### G. BFD Fire/EMS Records: Concealed Dangerous Conditions at the YMCA Facility

1. Berkeley Fire Department records constitute independent government evidence of the conditions at the YMCA facility. BFD's federal property classification system — the National Fire Incident Reporting System (NFIRS), administered by the U.S. Fire Administration — documented the facility's conversion through contemporaneous classifications assigned by responding fire captains based on direct observation: "Residential board and care" (March 2018) → "Multifamily dwelling" (February 2021 through January 2022) → "Boarding/rooming house, residential hotels" (February 2022) → "Jail, prison (not juvenile)" (October 2022). This reclassification in federal government records precisely tracks the conversion Goree documented in his own emails: July 2019 ("transition all of our rooms to Co-Living spaces"), December 2020 ("We are converting the YMCA Hotel over to Long Term residence"), and October 2021 ("We are not trained or equipped to provide assistance to these residents"). As early as March 2018, a fire officer independently classified the YMCA as a "Residential board and care" facility — the same type of facility Goree himself would later acknowledge residents needed. By October 2022, a Berkeley first responder classified the YMCA as a "Jail, prison" — independent government evidence of how extreme the conditions had become.

2. **Key Incidents Demonstrating Concealed Dangerous Conditions.**

(a) On January 10, 2022 — 25 days before the assault on Plaintiff — BFD responded to a YMCA resident who was defecating and urinating uncontrollably and unable to walk. The call was initiated by Adult Protective Services (APS), which had referred the patient for emergency hospital transport. APS involvement confirms that the City's own protective services agency had identified YMCA residents as dependent adults requiring intervention — a fact the City knew and failed to disclose to Plaintiff or other residents.

(b) On February 14, 2021, BFD responded to a simultaneous dual drug overdose "in the hotel portion" of the YMCA. Three fire apparatus and two medic units responded. YMCA staff's use of the phrase "hotel portion" confirmed the facility's internal distinction between transient and residential areas.

(c) On February 16, 2022 — 12 days after the assault — BFD classified the YMCA as a "Boarding/rooming house, residential hotels." The patient explicitly called the YMCA their "home," confirming long-term residential tenancy.

(d) In the January-May 2022 window surrounding the assault, BFD responded to multiple EMS incidents at 2001 Allston Way, including bowel obstruction (January 1), anxiety (January 3), APS-referred incontinence (January 10), hyperventilation (January 18), elderly shortness of breath requiring ER transport (February 9), weakness (February 16), anxiety/palpitations persisting two days (February 27), and lightheadedness in Plaintiff's building (May 10).

(e) On May 25, 2022, BPD and mental health services jointly responded to the YMCA for a resident experiencing "failure to thrive." This joint BPD-mental health response documents BPD's direct involvement in managing the YMCA's resident population.

(f) On September 15, 2022, BFD responded after a YMCA resident was locked inside the building after closing and could not get out. The fire department accessed the building via Knox code to release the trapped resident.

(g) On December 30, 2022, BFD responded to an elderly resident who suffered a mechanical fall in the YMCA lobby.

(h) On April 1, 2023, a YMCA resident cooking in their room set off the fire alarm. BFD classified the property as "Boarding/rooming house, residential hotels" — confirming that the fire department continued to classify the facility as a boarding house well into 2023.

1. **Discovery Misconduct.** YMCA's May 8, 2023 verified discovery responses (verified by Kelley Maltais) stated "none have ever existed" for requests seeking incident reports, injury records, complaints of unsafe conditions, records regarding habitability, communications regarding resident safety and staffing, and various operational and safety records. BFD incident reports — all generated on YMCA's premises and naming "YMCA ALLSTON DOWNTOWN" as the entity involved — directly contradict these sworn responses.

2. **Relevance to BPD Claims.** The BFD records establish that the City of Berkeley had independent knowledge of the dangerous conditions at the YMCA through its own fire department's repeated emergency responses. The City — through BPD, the Fire Department, and APS — had multiple independent channels of knowledge about the facility's true nature, yet continued to empower Goree and the YMCA-DBA enforcement apparatus and failed to disclose these conditions to residents including Plaintiff.

## V. CLAIMS FOR RELIEF

### COUNT 1 — 42 U.S.C. Section 1983: Excessive Force (Fourth Amendment)
**Against Sergeant Landrum, Officer Peters, Officer Futch, and Does 1-10**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 57.

2. The Fourth Amendment, applicable to state actors through the Fourteenth Amendment, prohibits the use of excessive force during an arrest or seizure.

3. BPD officers, including Sergeant Landrum, Officer Peters, and Officer Futch, acting under color of state law, used excessive force against Plaintiff on February 4, 2022 by: (a) physically seizing, handcuffing, and restraining Plaintiff — a person they knew or should have known had just been subjected to a prolonged carotid/vascular chokehold causing respiratory distress — with force disproportionate to any legitimate law enforcement purpose; (b) forcibly arresting and transporting Plaintiff to Santa Rita Jail without medical clearance despite visible signs of strangulation injury; and (c) applying force in furtherance of an arrest that lacked probable cause, where a reasonable officer would have recognized Plaintiff as the victim rather than the aggressor.

4. An officer who witnesses a constitutional violation by another person — including a state-empowered civilian — and has a reasonable opportunity to intervene but fails to do so is liable under Section 1983. *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000).

5. The officers' conduct was objectively unreasonable under the totality of the circumstances. No reasonable officer could have concluded that standing by while a civilian applied a prolonged carotid chokehold — a technique constituting deadly force banned for sworn law enforcement under Government Code Section 7286.5 — and then arresting the victim was a reasonable use of force.

6. As a direct and proximate result of Defendants' excessive force, Plaintiff suffered physical injury, respiratory distress, emotional distress, and other damages.

## COUNT 2 — 42 U.S.C. Section 1983: Unlawful Seizure / False Arrest (Fourth Amendment)

**Against Sergeant Landrum, Officer Peters, Officer Futch, and Does 1-10**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 63.

2. The Fourth Amendment prohibits seizures of persons without probable cause.

3. BPD officers, including Sergeant Landrum, Officer Peters, and Officer Futch, acting under color of state law, seized and arrested Plaintiff on February 4, 2022 without probable cause. The officers had witnessed or had reason to know that Plaintiff was the victim of a prolonged deadly-force chokehold, yet arrested Plaintiff as the aggressor based on the account of the perpetrator, Goree, while dismissing and overriding the accounts of foreign-born witnesses who could have corroborated Plaintiff's account.

4. Officer Peters transported Plaintiff to Santa Rita Jail and falsely reported that Plaintiff had not been choked, fabricating a factual basis for the arrest that contradicted the officers' own observations.

5. The arrest lacked probable cause. A reasonable officer in possession of the facts known to the arresting officers — including the ongoing deadly-force chokehold they witnessed — would not have concluded that probable cause existed to arrest Plaintiff rather than Goree.

6. The Alameda County District Attorney's December 6, 2022 declination of prosecution confirmed the absence of merit in the charges.

7. As a direct and proximate result of the unlawful seizure and false arrest, Plaintiff suffered deprivation of liberty, physical injury, emotional distress, reputational harm, and other damages.

## COUNT 3 — 42 U.S.C. Section 1983: Malicious Prosecution (Fourth Amendment)
## Against Officer Futch, Officer Peters, Sergeant Landrum, and Does 1-10

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 70.

2. The Fourth Amendment, as incorporated by the Fourteenth Amendment, protects against malicious prosecution — the initiation or continuation of criminal proceedings without probable cause and with malice. *Thompson v. Clark*, 596 U.S. 36 (2022); *McDonough v. Smith,* 139 S. Ct. 2149 (2019).

3. Defendants initiated and caused the continuation of criminal proceedings against Plaintiff by: (a) arresting Plaintiff without probable cause based on the false account of the perpetrator, Goree; (b) fabricating police reports — including Officer Peters's false statement that Plaintiff had not been choked and the false listing of Goree as the "VICTIM"; (c) deactivating body-worn cameras to prevent creation of exculpatory evidence; (d) dismissing and excluding exculpatory witness accounts from the official record; and (e) forwarding the fabricated case to the District Attorney for prosecution.

4. The criminal proceedings terminated in Plaintiff's favor on December 6, 2022, when the Alameda County District Attorney declined to prosecute.

5. Defendants lacked probable cause to initiate or continue the criminal proceedings. The officers witnessed or had reason to know that Plaintiff was the victim of a prolonged deadly-force chokehold, not the aggressor.

6. Defendants acted with malice — the fabrication of evidence, deactivation of cameras, and exclusion of exculpatory witness testimony demonstrate that the prosecution was motivated by a desire to protect Goree and the YMCA-DBA-City enforcement apparatus, not by a good-faith belief in Plaintiff's guilt.

7. Under *Thompson v. Clark*, 596 U.S. 36, 49 (2022), the favorable termination element requires only that the prosecution ended without a conviction — the DA's declination satisfies this requirement.

8. As a direct and proximate result, Plaintiff suffered deprivation of liberty, emotional distress, reputational harm, legal expenses, and other damages.

## COUNT 4 — 42 U.S.C. Section 1983: Failure to Intervene (Fourth/Fourteenth Amendment)

**Against Sergeant Landrum, Officer Peters, Officer Futch, and Does 1-10**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 78.

2. An officer who witnesses a constitutional violation in progress and has a reasonable opportunity to intervene but fails to do so is directly liable under Section 1983. *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000).

The duty to intervene applies with full force here because Goree was not an ordinary private citizen — he was a state-empowered actor exercising delegated government authority. Under *West v. Atkins*, 487 U.S. 42, 49-50 (1988), a private individual acts under color of state law when performing a function traditionally within the exclusive prerogative of the state pursuant to a delegation of authority from the state. Goree carried a BPD radio, was trained by BPD officers, directed enforcement operations in coordination with BPD, and exercised police-type detention and arrest powers delegated by the City. The officers' duty to intervene in Goree's use of deadly force was therefore identical to their duty to intervene in another officer's use of force.

1. BPD officers, including Sergeant Landrum, Officer Peters, and Officer Futch, arrived at the scene while Goree's deadly-force chokehold was still being applied to Plaintiff. The officers observed Plaintiff being physically restrained by three civilians and subjected to a carotid/vascular chokehold — a technique constituting deadly force under California Penal Code Section 835a and specifically banned for trained, sworn law enforcement under Government Code Section 7286.5.

2. The officers had a reasonable opportunity to intervene. They were physically present, armed, and in a position of authority. They could have ordered Goree to release Plaintiff, physically separated Goree from Plaintiff, or taken any number of actions to stop the ongoing application of deadly force.

3. Instead of intervening, the officers: (a) allowed the chokehold to continue; (b) treated the perpetrator (Goree) as the "victim"; (c) handcuffed and arrested the actual victim (Plaintiff); (d) cancelled an ambulance that had been called for Plaintiff; and (e) deactivated their body-worn cameras.

4. Each officer had an independent duty to intervene to prevent the violation of Plaintiff's constitutional rights. The failure of each officer to intervene constitutes a separate and independently actionable violation under Section 1983.

5. As a direct and proximate result of Defendants' failure to intervene, Plaintiff suffered the continued application of deadly force, physical injury, respiratory distress, emotional distress, and other damages.

## COUNT 5 — 42 U.S.C. Section 1983: State-Created Danger (Fourteenth Amendment)

**Against Chief Greenwood, Chief Louis, Mayor Arreguin, City Manager Buddenhagen, and Does 11-20**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 85.

2. The Fourteenth Amendment's Due Process Clause protects individuals from state-created dangers. A state actor may be liable when the state affirmatively places a person in a position of danger — danger the person would not otherwise have faced — through action that shocks the conscience. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061-62 (9th Cir. 2006).

3. Defendants Greenwood, Louis, Arreguin, and Buddenhagen, through their affirmative acts and policies, created and maintained the civilian enforcement system that placed Plaintiff in danger. Specifically: (a) Chief Greenwood trained, equipped, and sanctioned Goree and other DBA personnel to exercise enforcement authority, knowing of Goree's history of violent confrontations; (b) Chief Louis continued and ratified the enforcement system established by Greenwood without implementing reforms, oversight, or accountability; (c) Mayor Arreguin approved and publicly supported the DBA enforcement program despite the 2015 assault scandal and the Peace and Justice Commission's recommendation to disband it; and (d) City Manager Buddenhagen provided legal cover for the program and advised on liability shielding.

4. The danger was foreseeable and known. The City was aware of repeated violent incidents involving Goree and the enforcement apparatus, including the 2014 neck-grab, the 2015 ambassador assault, the 2020 Hault assault, and the April 2021 Montoya chokehold. Despite this knowledge, Defendants continued to maintain and support the system.

5. Defendants' conduct shocks the conscience. With actual knowledge of a pattern of violence, Defendants continued to empower unsworn civilians to exercise enforcement authority without training, oversight, or accountability, creating a predictable and foreseeable risk of serious bodily harm to individuals like Plaintiff.

6. As a direct and proximate result of the state-created danger, Plaintiff suffered the February 4, 2022 assault and its consequences, including physical injury, respiratory distress, PTSD, and other damages.

## COUNT 6 — 42 U.S.C. Section 1983: Substantive Due Process (Fourteenth Amendment)

**Against All Individual Defendants and Does 1-20**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 91.

2. The Fourteenth Amendment's Due Process Clause protects individuals against arbitrary and conscience-shocking government conduct.

3. Defendants' conduct violated Plaintiff's substantive due process rights through post-arrest and post-prosecution conduct that is not redressable under any specific constitutional provision: (a) fabricating evidence by filing false police reports — including Officer Peters's false statement that Plaintiff had not been choked and the false listing of Goree as the 'VICTIM' — and submitting these fabricated reports to the Alameda County District Attorney to support criminal prosecution of the victim; (b) deactivating body-worn cameras to destroy or prevent creation of evidence that would have exonerated Plaintiff; (c) causing criminal charges to be maintained against Plaintiff from February 4, 2022 through December 6, 2022 based on the fabricated record; (d) concealing internal affairs investigation findings regarding the officers' misconduct; and (e) engaging in a systematic campaign of records suppression from 2022 through 2024 designed to prevent Plaintiff from discovering and vindicating his constitutional rights.

These post-arrest acts of evidence fabrication, evidence destruction, and institutional concealment are independent constitutional violations not subsumed by the Fourth Amendment's protections against unreasonable seizure and excessive force. *See Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (recognizing a freestanding Fourteenth Amendment right not to be subjected to criminal charges based on deliberately fabricated evidence).

1. The prosecution of Plaintiff based on fabricated evidence continued from February 4, 2022 through December 6, 2022, when the District Attorney declined to prosecute. During that period, Plaintiff was subject to pending criminal charges that restricted his liberty and caused ongoing harm.

2. Under *Manuel v. City of Joliet*, 580 U.S. 357 (2017), and *McDonough v. Smith*, 139 S. Ct. 2149 (2019), claims for wrongful pretrial legal process and fabrication of evidence do not accrue until favorable termination of the criminal proceedings. The favorable termination occurred on December 6, 2022.

3. As a direct and proximate result of Defendants' substantive due process violations, Plaintiff suffered deprivation of liberty, physical injury, emotional distress, reputational harm, and other damages.

## COUNT 7 — 42 U.S.C. Section 1983: Procedural Due Process (Fourteenth Amendment)

**Against All Individual Defendants, City of Berkeley, and Does 1-20**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 97.

2. The Fourteenth Amendment's Due Process Clause requires that the government provide adequate procedural protections before depriving an individual of life, liberty, or property.

3. Defendants deprived Plaintiff of constitutionally protected interests without adequate process through conduct distinct from the arrest itself: (a) filing false police reports that deprived Plaintiff of a fair evaluation of the criminal charges against him by the District Attorney; (b) deactivating body-worn cameras to destroy or prevent creation of evidence that would have supported Plaintiff's defense in the criminal proceedings; (c) dismissing and excluding the accounts of foreign-born witnesses from the official investigative record, depriving Plaintiff of exculpatory evidence; (d) denying Plaintiff access to police reports, body-worn camera footage, and internal affairs findings for over two years following the incident; (e) obstructing Plaintiff's public records requests through denials, false responses, and partial productions from 2022 through 2024; and (f) producing zero Goree-City communications in response to a lawful third-party subpoena — an affirmative act of concealment that deprived Plaintiff of evidence necessary to vindicate his rights.

4. Defendants' denial of access to records and evidence continued through 2023 and 2024, constituting ongoing procedural due process violations that separately accrued with each denial.

5. As a direct and proximate result of Defendants' procedural due process violations, Plaintiff suffered deprivation of liberty, inability to vindicate his rights, emotional distress, and other damages.

**COUNT 8 — 42 U.S.C. Section 1983: Deliberate Indifference to Serious Medical Needs (Fourteenth Amendment)**

**Against Officer Peters, Sergeant Landrum, and Does 1-10**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 102.

2. The Fourteenth Amendment prohibits deliberate indifference to serious medical needs. *Gordon v. County of Orange*, 6 F.4th 961, 971 (9th Cir. 2021); *Estate of Amaro v. City of Oakland*, 653 F.3d 808 (9th Cir. 2011). A pretrial detainee's medical needs claim is evaluated under an objective standard: whether the defendants' conduct was objectively unreasonable in light of the risk to the detainee. *Gordon*, 6 F.4th at 971.

3. Plaintiff had objectively serious medical needs following the prolonged carotid/vascular chokehold. A vascular neck restraint can cause loss of consciousness within seconds and death within minutes if not released. Plaintiff exhibited signs of respiratory distress and had been subjected to deadly force.

4. Defendants were aware of Plaintiff's serious medical needs. Sergeant Landrum acknowledged on his body-worn camera that Plaintiff had been choked, stating: "Alright well that guy has been choked out." Landrum also stated during his briefing to the fire department that "someone had him in a headlock in order to control him, so he had a difficult time breathing."

5. Despite this knowledge, Defendants: (a) cancelled an ambulance that had been called for Plaintiff, depriving him of emergency medical evaluation; (b) Officer Peters falsely reported that Plaintiff had not been choked, preventing medical personnel from assessing Plaintiff for strangulation injuries; (c) transported Plaintiff to Santa Rita Jail without ensuring adequate medical evaluation for a vascular neck restraint — a known life-threatening injury requiring medical assessment; and (d) failed to inform booking personnel at Santa Rita Jail that Plaintiff had been subjected to a prolonged chokehold.

6. Officer Peters's false statement that Plaintiff had not been choked was not merely a report-writing failure — it was a deliberate act that deprived Plaintiff of medical attention. Medical personnel at Santa Rita Jail, relying on the police report, had no reason to evaluate Plaintiff for strangulation-related injuries (delayed cerebral edema, carotid artery dissection, laryngeal fracture, or other vascular neck restraint complications).

7. Defendants' conduct was objectively unreasonable. No reasonable officer, knowing that a detainee had been subjected to a prolonged vascular neck restraint, would cancel an ambulance, falsify the medical history, and transport the detainee to jail without medical clearance.

8. As a direct and proximate result, Plaintiff suffered untreated medical complications, exacerbation of respiratory distress, and other damages.

## COUNT 9 — 42 U.S.C. Section 1983: Equal Protection (Fourteenth Amendment)
### Against Sergeant Landrum, Officer Peters, Officer Futch, and Does 1-10

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 110.

2. The Fourteenth Amendment's Equal Protection Clause prohibits intentional discrimination on the basis of national origin and disability.

3. BPD officers, including Sergeant Landrum, Officer Peters, and Officer Futch, violated Plaintiff's equal protection rights by: (a) crediting the account of the American-born perpetrator (Goree) over the foreign-born victim (Plaintiff) on the basis of national origin; (b) dismissing and overriding the accounts of foreign-born witnesses present at the scene on the basis of their national origin; (c) arresting the foreign-born victim rather than the American-born perpetrator; and (d) failing to provide disability-related accommodations to Plaintiff during the arrest, detention, and subsequent interactions.

4. The officers' discriminatory conduct was intentional and purposeful, not the result of a neutral application of law enforcement procedures.

5. As a direct and proximate result of Defendants' equal protection violations, Plaintiff suffered discriminatory treatment, deprivation of liberty, and other damages.

**COUNT 10 — 42 U.S.C. Section 1983: First Amendment Retaliation**

**Against All Defendants**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 115.

2. The First Amendment prohibits government officials from retaliating against individuals for exercising their rights to free speech, petition, and access to the courts. To establish a First Amendment retaliation claim under Section 1983, a plaintiff must show: (1) he engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).

3. Plaintiff engaged in constitutionally protected activity, including: (a) filing a government tort claim against the City of Berkeley regarding the February 4, 2022 assault; (b) filing a civil lawsuit, *Cammas v. YMCA of the East Bay*, Alameda County Superior Court Case No. 22CV019990; (c) submitting public records requests to BPD and the City seeking documents related to the February 4, 2022 incident and BPD's relationship with the YMCA and DBA; (d) filing complaints with the Office of the Director of Police Accountability ("ODPA"); (e) serving third-party subpoenas on the City; (f) submitting public records act requests to the City of Berkeley and its departments; and (g) speaking publicly about the assault and the City's enforcement system.

4. Defendants took adverse actions against Plaintiff that would chill a person of ordinary firmness from continuing to exercise First Amendment rights, including: (a) BPD's July 2022 recommendation to YMCA supervisors to pursue eviction-focused responses against Plaintiff — targeting Plaintiff's housing as retaliation for his legal claims; (b) post-incident intimidation visits to Plaintiff's door at the YMCA, involving banging and threats; (c) systematic obstruction and denial of Plaintiff's public records requests; (d) the City's production of zero Goree-City communications in response to a lawful subpoena — an affirmative act of concealment designed to prevent Plaintiff from prosecuting his claims; (e) BPD's refusal to investigate Plaintiff's complaints of criminal assault by Goree; (f) the continued withholding of body-worn camera footage, IAB findings, and investigative files.

5. Plaintiff's protected activity was a substantial or motivating factor in Defendants' adverse actions. The temporal proximity between Plaintiff's protected activities and the adverse actions — combined with the escalating pattern of obstruction as Plaintiff pursued more aggressive discovery — establishes a causal connection.

The retaliatory pattern is demonstrated by the temporal proximity and escalation of adverse actions following Plaintiff's protected activity. Plaintiff filed his government tort claim within six months of the February 4, 2022 assault. BPD responded in July 2022 by recommending eviction-focused responses. Plaintiff retained attorney Slater in January 2023, who demanded investigation and filed PRA requests. BPD responded by refusing to investigate, denying records, and affirming probable cause against the victim. Plaintiff served subpoenas and filed ODPA complaints. The City responded by producing zero documents in response to the first subpoena and continuing to withhold records through 2024. Each escalation of protected activity was met with a corresponding escalation of obstruction.

1. As a direct and proximate result of Defendants' First Amendment retaliation, Plaintiff suffered chilling of his protected speech and petition rights, emotional distress, obstruction of his legal claims, loss of housing stability, and other damages.

**COUNT 11 — 42 U.S.C. Section 1983: Monell Municipal Liability**

**Against City of Berkeley**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 121.

2. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality is liable under Section 1983 when an official policy or custom causes a constitutional violation.

3. The City of Berkeley maintained the following official policies, customs, and practices that were the moving force behind the constitutional violations suffered by Plaintiff:

(a) **Delegation of enforcement powers without oversight:** The City created and maintained a system in which untrained, unsworn civilians affiliated with the DBA and YMCA were delegated police-type powers — including BPD radios, training, and sanction to conduct citizen's arrests — without implementing use-of-force policies, accountability mechanisms, or oversight procedures applicable to those civilians.

(b) **No independent review of citizen's arrests by enforcement partners:** The City maintained a policy, custom, or practice of accepting citizen's arrests made by DBA and YMCA enforcement personnel at face value, without conducting independent investigations of the underlying facts. On February 4, 2022, BPD officers accepted Goree's account and arrested Plaintiff without independently investigating the incident they had personally witnessed.

(c) **No body-worn camera accountability:** The City maintained a policy, custom, or practice of failing to enforce body-worn camera policies, permitting officers to deactivate cameras during critical incidents without consequence. On February 4, 2022, officers deactivated their body-worn cameras during or after their response to the assault, and the City took no disciplinary action.

(d) **No witness-intake procedures for foreign-born individuals:** The City maintained a policy, custom, or practice of failing to ensure that foreign-born witnesses' accounts were credited and accurately documented in the investigative record. On February 4, 2022, officers dismissed the accounts of foreign-born witnesses, actively reframed their testimony to match the YMCA staff's version, and excluded their accounts from the official investigative record.

(e) **Pattern of deferring to YMCA/DBA staff:** The City maintained a policy, custom, or practice of deferring to YMCA and DBA enforcement personnel rather than conducting independent police investigations, reflecting the institutional relationship between BPD and the civilian enforcement apparatus it had created.

(f) **Ratification of unconstitutional conduct:** City policymakers, including Chief Greenwood, Chief Louis, Mayor Arreguin, and City Manager Buddenhagen, ratified the unconstitutional conduct of BPD officers by failing to discipline the officers involved in the February 4, 2022 incident, concealing internal affairs findings, obstructing Plaintiff's records requests, and continuing to maintain the enforcement system without reform.

1. These policies, customs, and practices were not isolated failures but systemic features of the City's approach to downtown enforcement. The 2015 ambassador assault scandal — involving the same enforcement apparatus, the same supervisor (Goree), and the same pattern (false citizen's arrest followed by arrest of the victim) — demonstrates that the City had actual knowledge of the constitutional risks created by its enforcement system and chose to maintain it without reform.

2. The City's policies, customs, and practices were the moving force behind the constitutional violations suffered by Plaintiff.

3. As a direct and proximate result of the City's policies, customs, and practices, Plaintiff suffered the injuries described herein.

## COUNT 12 — ADA Title II: Disability Discrimination (42 U.S.C. Section 12132)

**Against City of Berkeley**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 127.

2. Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. Section 12132.

3. Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff has documented disabilities including respiratory distress, post-traumatic stress disorder, and trauma-related impairments that substantially limit one or more major life activities.

4. The City of Berkeley is a public entity within the meaning of the ADA.

5. The City, through BPD, discriminated against Plaintiff on the basis of disability by: (a) failing to provide accommodations for Plaintiff's disabilities during the arrest, detention, and booking process on February 4, 2022; (b) failing to modify its policies, practices, and procedures to accommodate Plaintiff's disabilities in its law enforcement interactions with him; (c) failing to accommodate Plaintiff's disabilities in the administrative and records processes following the February 4, 2022 incident; and (d) subjecting Plaintiff to law enforcement action that disproportionately harmed him due to his disabilities.

6. The City's failure to accommodate Plaintiff's disabilities constituted deliberate indifference. The City had actual knowledge of Plaintiff's disabilities: BPD officers observed Plaintiff's respiratory distress at the scene on February 4, 2022; Sergeant Landrum's body-worn camera recorded his acknowledgment that Plaintiff had been choked and was having difficulty breathing; Plaintiff's government tort claim, filed within six months of the incident, documented his injuries and disabilities; and Plaintiff's subsequent communications with BPD and the City — including through attorney Michael Slater in 2023 — repeatedly referenced his ongoing medical conditions and disability status. Despite this actual knowledge, the City failed to modify its policies, practices, or procedures to accommodate Plaintiff's disabilities in any subsequent interaction.

7. As a direct and proximate result of the City's ADA violations, Plaintiff suffered physical and emotional harm, denial of services, and other damages.

## COUNT 13 — Fair Housing Act: Disability Discrimination (42 U.S.C. Section 3604(f))

**Against City of Berkeley**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 134.

2. The Fair Housing Act prohibits discrimination in housing-related services and activities on the basis of disability. 42 U.S.C. Section 3604(f).

3. Plaintiff is an individual with a disability within the meaning of the FHA.

4. The City's enforcement actions constituted discrimination in housing-related services on the basis of disability. Specifically: (a) in July 2022, BPD recommended to YMCA supervisors that they pursue eviction-focused responses against Plaintiff — a disabled individual — directly targeting his housing tenure as a consequence of the February 4, 2022 incident; (b) BPD officers conducted retaliatory visits to Plaintiff's door at the YMCA facility, banging and threatening him in his home; (c) the cross-entity coordination between BPD and YMCA resulted in adverse housing actions — including the eviction recommendation — directed at a disabled resident who had been the victim, not the perpetrator, of a violent assault; and (d) BPD's obstruction of Plaintiff's records requests impeded his ability to defend against the eviction proceedings and document the housing discrimination. The City's law enforcement arm functioned as the enforcement mechanism for YMCA's housing decisions, creating a direct nexus between the City's discriminatory conduct and Plaintiff's housing. *See Shelley v. Kraemer*, 334 U.S. 1 (1948) (state action doctrine applies when government enforcement mechanisms implement private discriminatory conduct).

5. As a direct and proximate result of the City's FHA violations, Plaintiff suffered loss of housing stability, emotional distress, and other damages.

## COUNT 14 — Fair Housing Act: Interference and Retaliation (42 U.S.C. Section 3617)

**Against City of Berkeley and Does 1-10**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 139.

2. The Fair Housing Act makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of rights protected under the FHA. 42 U.S.C. Section 3617.

3. Plaintiff exercised rights protected under the FHA, including the right to occupy his dwelling free from disability discrimination and the right to complain about discriminatory treatment.

4. Defendants interfered with Plaintiff's exercise of FHA-protected rights through the following conduct: (a) BPD's July 2022 recommendation to YMCA supervisors to pursue eviction-focused responses against Plaintiff; (b) BPD officers' post-incident visits to Plaintiff's door involving banging and intimidation; (c) the cross-entity coordination between BPD and YMCA in targeting Plaintiff's housing; and (d) BPD's obstruction of Plaintiff's records requests, which impeded his ability to document and pursue claims of housing discrimination.

5. As a direct and proximate result of Defendants' FHA interference and retaliation, Plaintiff suffered loss of housing stability, emotional distress, and other damages.

## COUNT 15 — Rehabilitation Act Section 504: Disability Discrimination (29 U.S.C. Section 794)

**Against City of Berkeley**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 144.

2. Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. Section 794.

3. The City of Berkeley receives federal financial assistance for its programs and activities, including: Community Oriented Policing Services (COPS) grants from the U.S. Department of Justice; Edward Byrne Memorial Justice Assistance Grant (JAG) Program funding; U.S. Department of Housing and Urban Development (HUD) Community Development Block Grant (CDBG) funding; HUD HOME Investment Partnerships Program funding; and pass-through federal housing assistance including Shelter Plus Care (42 U.S.C. Section 11403), Housing Assistance Payments contracts, and Mainstream Voucher administration — the same federal housing programs through which the City funded and oversaw the YMCA residential facility where Plaintiff resided.

4. Plaintiff is an otherwise qualified individual with a disability within the meaning of Section 504.

5. The City discriminated against Plaintiff on the basis of disability in the administration of its federally assisted programs by: (a) failing to accommodate Plaintiff's disabilities in law enforcement interactions; (b) targeting Plaintiff for adverse law enforcement action in connection with his housing at a federally subsidized facility; and (c) failing to ensure that its enforcement partners (YMCA, DBA) complied with disability-discrimination requirements in their exercise of City-delegated enforcement powers.

6. As a direct and proximate result of the City's Rehabilitation Act violations, Plaintiff suffered damages.

## COUNT 16 — 42 U.S.C. Section 1985: Conspiracy to Interfere with Civil Rights
### Against All Individual Defendants and Does 1-50

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 150.

2. Under 42 U.S.C. Section 1985(3), it is unlawful for two or more persons to conspire to deprive any person of the equal protection of the laws or of equal privileges and immunities under the laws.

3. Defendants conspired among themselves and with YMCA and DBA personnel to deprive Plaintiff of his constitutional rights. The conspiracy consisted of: (a) an agreement, express or implied, among BPD officers, City officials, and YMCA/DBA enforcement personnel to maintain a system in which civilians exercised police-type authority without oversight; (b) a coordinated effort to cover up the February 4, 2022 assault by deactivating body-worn cameras, filing false reports, arresting the victim, and refusing to take witness reports; (c) a coordinated campaign of post-incident retaliation including BPD's recommendation to pursue eviction, intimidation visits, and records suppression; and (d) an ongoing agreement to obstruct Plaintiff's access to evidence and records to prevent him from vindicating his rights.

4. The conspiracy was motivated by class-based invidiously discriminatory animus toward Plaintiff based on his national origin and ethnicity. The discriminatory motive is demonstrated by the following pattern: (a) BPD officers at the scene systematically credited the account of the American-born perpetrator (Goree) while dismissing, overriding, and excluding the accounts of foreign-born witnesses — including Veronica Estudillo and two French visiting students whose names were not even recorded — reflecting a pattern of devaluing foreign-born individuals' testimony; (b) Officer Futch actively reframed a foreign-born witness's account to match the American-born perpetrator's version, telling the witness that Plaintiff 'went after Lance' despite the witness's description of Plaintiff being choked — an act of deliberate narrative manipulation directed at a foreign-born individual; (c) BPD's own Downtown Bike Taskforce — operating in the same downtown Berkeley enforcement area — maintained arrest quotas and exhibited racial bias, as revealed in the 'Textgate' scandal (reported by the LA Times in November 2022 and Berkeley Copwatch in January 2024), in which text messages and records demonstrating racial bias and anti-homeless sentiment were destroyed; (d) the enforcement system itself disproportionately targeted vulnerable populations in the downtown Berkeley area — including unsheltered individuals, foreign-born residents, and persons with disabilities — as evidenced by the 2014 neck-grab of a Romanian individual, the 2015 assault on unsheltered individuals, and the 2020 assault on tenant Steven Hault accompanied by a racial slur; and (e) the post-incident cover-up was specifically directed at protecting an American-born enforcement insider (Goree) at the expense of a foreign-born victim (Plaintiff), including the refusal to allow a Hispanic woman (Estudillo) to press charges against the American-born employee (Rose Acosta) who had assaulted her.

5. Overt acts were committed in furtherance of the conspiracy, including the acts described in the factual allegations above.

6. As a direct and proximate result of the conspiracy, Plaintiff was injured in his person and property.

**COUNT 17 — Bane Act (California Civil Code Section 52.1)**

**Against Sergeant Landrum, Officer Peters, Officer Futch, and City of Berkeley (Vicariously Under Gov. Code Section 815.2)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 156.

2. California Civil Code Section 52.1 (the "Bane Act") provides a cause of action against any person who interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment of constitutional or statutory rights.

3. Defendants Sergeant Landrum, Officer Peters, and Officer Futch, acting under color of state law, interfered with Plaintiff's constitutional rights — including his Fourth Amendment rights to be free from excessive force and unreasonable seizure, and his Fourteenth Amendment rights to due process and equal protection — through threats, intimidation, and coercion, including: (a) failing to intervene to stop the deadly-force chokehold; (b) arresting Plaintiff without probable cause; (c) filing false reports; (d) deactivating body-worn cameras; (e) dismissing and overriding the accounts of foreign-born witnesses; and (f) engaging in post-incident intimidation at Plaintiff's residence.

4. The individual Defendant officers' conduct constituted threats, intimidation, and coercion independent of the underlying constitutional violations. The deactivation of cameras, fabrication of reports, Sergeant Landrum's threat that Plaintiff would "get evicted because of what happened" (made while Plaintiff was in custody), and the post-incident intimidation visits to Plaintiff's residence are independently coercive acts beyond the constitutional violations themselves.

5. The City of Berkeley is vicariously liable for the Bane Act violations committed by its employees — Sergeant Landrum, Officer Peters, and Officer Futch — under Government Code Section 815.2, which imposes liability on a public entity for injury proximately caused by an act or omission of an employee within the scope of employment.

6. As a direct and proximate result of Defendants' Bane Act violations, Plaintiff suffered physical injury, emotional distress, and other damages. Plaintiff is entitled to treble damages under Civil Code Section 52.1(b).

## COUNT 18 — False Imprisonment (California Law)

**Against Sergeant Landrum, Officer Peters, Officer Futch, and City of Berkeley (Vicariously Under Gov. Code Section 815.2)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 162.
2. On February 4, 2022, Defendants Sergeant Landrum, Officer Peters, and Officer Futch intentionally confined and restrained Plaintiff against his will by arresting and detaining him without probable cause and transporting him to Santa Rita Jail.
3. Plaintiff was confined from the time of his arrest on February 4, 2022 until his release from custody. The confinement was not privileged because it was based on fabricated evidence, false reports, and the absence of probable cause.
4. The City of Berkeley is vicariously liable for the false imprisonment committed by its employees under Government Code Section 815.2.
5. As a direct and proximate result of the false imprisonment, Plaintiff suffered deprivation of liberty, physical injury, emotional distress, humiliation, and other damages.

## COUNT 19 — Intentional Infliction of Emotional Distress (California Law)

**Against Sergeant Landrum, Officer Peters, Officer Futch, and City of Berkeley (Vicariously Under Gov. Code Section 815.2)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 167.

2. Defendants Sergeant Landrum, Officer Peters, and Officer Futch engaged in extreme and outrageous conduct by: (a) standing by while a civilian applied a prolonged deadly-force chokehold to Plaintiff without intervening; (b) arresting Plaintiff — the victim of the chokehold — as the aggressor; (c) deactivating body-worn cameras to conceal evidence; (d) filing false reports stating Plaintiff had not been choked; (e) dismissing and overriding the accounts of foreign-born witnesses who attempted to report that Plaintiff was the victim; (f) transporting Plaintiff to jail based on fabricated evidence; and (g) engaging in post-incident intimidation by coming to Plaintiff's door, banging, and threatening him.

3. This conduct was extreme and outrageous — it exceeded all bounds of decency tolerated in a civilized society. No reasonable person would expect sworn law enforcement officers to witness a prolonged chokehold, arrest the victim, fabricate reports, and then intimidate the victim at his home.

4. Defendants' conduct was intentional or undertaken with reckless disregard of the probability of causing Plaintiff emotional distress.

5. Plaintiff suffered severe emotional distress as a direct and proximate result of Defendants' conduct, including post-traumatic stress disorder, chronic anxiety, sleep disturbance, and trauma-related impairments documented by treating physicians at Kaiser Permanente and Sunset Mental Health Services.

6. The City of Berkeley is vicariously liable for the IIED committed by its employees under Government Code Section 815.2.

7. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff suffered severe emotional distress and other damages.


**COUNT 20 — Negligence (California Law)**

**Against Sergeant Landrum, Officer Peters, Officer Futch, and City of Berkeley (Vicariously Under Gov. Code Section 815.2)**

1. Plaintiff realleges and incorporates by reference paragraphs 1 through 174.

2. Government Code Section 815 eliminates common-law tort liability for public entities in California. However, Government Code Section 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from Government Code Section 815, have given rise to a cause of action against the employee.

3. Sergeant Landrum, Officer Peters, and Officer Futch, each acting within the scope of their employment with BPD, owed Plaintiff a duty of reasonable care in the performance of their law enforcement duties, including the duty to: (a) intervene to stop an ongoing use of deadly force against a restrained individual; (b) conduct an independent investigation rather than deferring to Goree's account; (c) accurately report the facts of the incident; (d) maintain body-worn camera operation during a critical incident; (e) credit and accurately document the accounts of all witnesses present, regardless of national origin; and (f) refrain from arresting an individual without probable cause.

4. Sergeant Landrum breached his duties by failing to intervene in the ongoing chokehold, by treating Plaintiff as the "suspect" and Goree as the "victim," by authorizing Plaintiff's arrest without probable cause, by approving Plaintiff's transport to Santa Rita Jail, and by threatening Plaintiff's housing while Plaintiff was in custody. Officer Peters breached his duties by transporting Plaintiff to jail, by falsely reporting that Plaintiff had not been choked, and by participating in the arrest without probable cause. Officer Futch breached his duties by failing to conduct an independent investigation, by dismissing and overriding the accounts of foreign-born witnesses, by deactivating or failing to maintain his body-worn camera, and by participating in the arrest of Plaintiff without probable cause.

5. The City of Berkeley is vicariously liable under Government Code Section 815.2 for the negligent acts and omissions of Sergeant Landrum, Officer Peters, and Officer Futch, each committed within the scope of their employment.

6. As a direct and proximate result of Defendants' negligence, for which the City is vicariously liable, Plaintiff suffered physical injury, emotional distress, deprivation of liberty, and other damages.

## VI. TOLLING AND TIMELINESS

1. This action was filed on November 28, 2025. The February 4, 2022 assault occurred approximately three years and nine months before filing. Plaintiff's claims are timely under multiple independent and alternative theories, set forth below. The extraordinary delay between the assault and filing is directly attributable to Defendants' own conduct: filing criminal charges against the victim based on fabricated evidence, actively concealing the evidentiary record through body-worn camera deactivation and false police reports, lying to Plaintiff's counsel in response to public records requests and subpoenas, obstructing every avenue of investigation, and suppressing the institutional records that made this lawsuit possible — a campaign of concealment that prevented Plaintiff from discovering the full scope of the constitutional violations until late 2024.

## A. Discovery of Claims: The City's Concealment and the Second Subpoena

1. This case is not simply about a chokehold. It is about a **municipal enforcement system** — the City's creation, funding, training, and empowerment of a civilian apparatus that predictably produced violence. Plaintiff could not have known about or pled the Monell claims (Count 11), state-created danger claims (Count 5), conspiracy claims (Count 16), or the institutional concealment that underlies every claim in this complaint without first discovering the City-DBA-YMCA institutional relationship. That discovery did not occur — and could not have occurred — until the second subpoena production in late 2024. The City's own conduct ensured it.

2. **The City obstructed Plaintiff's attorney.** After criminal charges were dismissed on December 6, 2022, Plaintiff retained attorney Michael Slater. Between January 25 and March 10, 2023, Slater repeatedly contacted BPD Sergeant Jennifer Wilson requesting that BPD investigate Goree's use of deadly force and file a police report, submitting video evidence of the prolonged chokehold. On February 7, 2023, Wilson — without reviewing the full video evidence — affirmed probable cause to arrest Plaintiff as the aggressor. On March 10, 2023, Wilson explicitly refused to investigate, stating "the Homicide Division will not be doing any investigation into this incident." On March 14, 2023, Slater sent a final demand to Wilson copying the Police Accountability Board, City Attorney's Office, and District Attorney's Office. Slater also submitted public records requests to BPD and the City seeking police reports, body-worn camera footage, internal affairs investigation findings, and documents related to BPD's relationship with the DBA and YMCA. The City denied or obstructed these requests, withholding the records that would have revealed the City-DBA-YMCA enforcement nexus. The City's stonewalling of Plaintiff's attorney — the one professional capable of evaluating the institutional relationship and filing a timely complaint — directly prevented the discovery of the claims at issue.

3. **The City lied in response to the first subpoena.** In the related state court case, *Cammas v. YMCA of the East Bay*, Alameda County Superior Court Case No. 22CV019990, Plaintiff served a third-party subpoena duces tecum on the City of Berkeley seeking communications between Lance Goree and City employees from 2015 forward. The City responded by producing **zero Goree-City communications** — not a single email, not a single radio log, not a single training record, not a single enforcement coordination document. This was a lie. As the second subpoena production would later reveal, the City possessed hundreds of emails documenting daily coordination between Goree and BPD officers, Goree carrying a BPD radio, Goree directing enforcement operations, City Manager Buddenhagen calling Goree a "colleague," and Goree's entire history of violent confrontations known to the City. The City's production of nothing in response to a lawful subpoena was an affirmative act of concealment — not mere non-disclosure, but an active misrepresentation that no responsive records existed.

4. **The second subpoena revealed the truth.** On or about November 15, 2024, the City of Berkeley — through paralegal Kassandra Perez of the City Attorney's Office — certified a second production as "complete records responsive to a subpoena for communications with Lance Goree and City employees from 2015 forward." This production contained approximately 870 pages of emails and documents that the City had concealed from the first subpoena, from Plaintiff's attorney Slater, and from every public records request Plaintiff had filed. The second subpoena production revealed for the first time:

(a) That Goree carried a BPD radio while serving as DBA Operations Manager (August 6, 2012 email to Officer Polizziani);

(b) That Goree coordinated daily with BPD officers on enforcement operations against downtown Berkeley residents;

(c) That City Manager Buddenhagen referred to Goree and YMCA CEO Gallati as "colleagues" (April 3, 2020 email) and was copied on enforcement meeting invitations;

(d) That Goree applied for the position of Assistant to the City Manager (May 2021), demonstrating his integration into the City's administrative structure;

(e) That BPD officers trained DBA ambassadors, who were armed with batons, pepper spray, and handcuffs under a program Goree supervised;

(f) That Goree warned City officials in October and November 2021 — weeks before the attack — that the YMCA was unsafe, that residents were "mentally unstable," and that the YMCA was "not trained or equipped to provide assistance to these residents";

(g) That Goree requested BPD Calls for Service data about YMCA residents (November 30, 2020), exercising police-like access even after leaving the DBA;

(h) That Goree requested his own police report from BPD five days after attacking Plaintiff (February 9, 2022), demonstrating continued privileged access to BPD records; and

(i) That the City had documented knowledge of Goree's prior violent confrontations — including the 2014 neck-grab witnessed by City Interim Audit Manager Biemeret, the 2015 Bailey assault, the 2020 Hault assault, and the April 2021 Montoya chokehold — yet took no action.

1. **Plaintiff could not have filed this lawsuit without the second subpoena.** The claims in this complaint — Monell municipal liability, state-created danger, conspiracy, and the pattern of deliberate indifference — are not claims that a victim of a chokehold can plead based on the fact of the assault alone. They require knowledge of the institutional infrastructure: the BPD radios, the training, the daily coordination, the dual governance, the prior violent incidents known to the City, and the City's deliberate decision to maintain the enforcement system despite that knowledge. None of this information was publicly available. None of it was disclosed in response to Plaintiff's PRA requests. None of it was produced in response to the first subpoena. The City ensured that Plaintiff — and Plaintiff's attorney — could not discover the factual basis for these claims during the limitations period.

2. **The individual-officer claims were equally dependent on the concealed evidence.**
Defendants may contend that Plaintiff knew the basic facts of his arrest on February 4, 2022 and could have filed suit against the individual officers without the second subpoena production. This argument fails for three independent reasons. First, Officer Peters's false report that Plaintiff had not been choked — the central act of evidence fabrication underlying the deliberate indifference and malicious prosecution claims — was not discoverable without the body-worn camera recordings and police reports that BPD refused to produce. Plaintiff knew he had been choked, but he did not know that Peters had *falsified the official record* to state otherwise, or that this falsification had been submitted to the District Attorney as the factual basis for criminal prosecution. Second, the full scope of the failure-to-intervene violation — including the fact that an ambulance was called and then cancelled, that officers deactivated their body-worn cameras during the incident, and that officers dismissed foreign-born witnesses' accounts — was concealed by the very acts that constitute the violation. The officers' deactivation of body-worn cameras simultaneously constituted a constitutional violation *and* destroyed the evidence of that violation. Third, the false arrest claim required knowledge of the citizen's arrest procedure violation — the fact that BPD did not require Goree to sign a citizen's arrest form, despite following that exact procedure in the 2015 Bailey assault — which was only revealed through the second subpoena production's disclosure of the 2015 incident records. Plaintiff's knowledge that he had been arrested did not give him the factual basis to plead *why* the arrest was unlawful under California's warrantless arrest procedures. The concealment was not incidental to the violations — it was integral to them.

## B. Applicable Limitations Periods

1. Section 1983 claims arising in California are subject to a two-year statute of limitations borrowed from California Code of Civil Procedure Section 335.1. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) (Section 1983 borrows the forum state's personal-injury limitations period). State-law personal injury claims are likewise subject to the two-year

period under CCP Section 335.1. FHA claims are subject to a two-year limitations period. 42 U.S.C. Section 3613(a)(1)(A).

## C. Section 945.3 Tolling (All Claims Against Peace Officers and City)

1. Government Code Section 945.3 provides that no person charged with a criminal offense may bring a civil action against a peace officer or public entity arising out of the same acts or omissions "while the charges are pending before a court of competent jurisdiction." Criminal charges arising from the February 4, 2022 arrest were pending against Plaintiff from February 4, 2022 through December 6, 2022, when the Alameda County District Attorney declined to prosecute — a period of approximately ten months.

2. The Ninth Circuit has confirmed that Section 945.3 tolling applies to Section 1983 claims. *Harding v. Galceran*, 889 F.2d 906, 908 (9th Cir. 1989). With ten months of tolling, the effective accrual date for claims arising from the February 4, 2022 incident shifts to December 6, 2022. The two-year limitations period, with tolling, runs through approximately December 6, 2024.

## D. Wrongful Legal Process and Evidence Fabrication (Counts 6-7): Favorable Termination Accrual

1. Plaintiff's substantive due process claims (Count 6) and procedural due process claims (Count 7) are grounded in Defendants' fabrication of evidence — including Officer Peters's false report that Plaintiff had not been choked, the false listing of Goree as the "victim," and the body-worn camera deactivation to prevent creation of an accurate record — and the wrongful legal process that flowed from that fabrication.

2. Under *McDonough v. Smith*, 139 S. Ct. 2149, 2160-62 (2019), Section 1983 claims for fabrication of evidence do not accrue until favorable termination of the criminal proceedings. The Court held that "the statute of limitations for a fabricated-evidence claim under Section 1983 begins to run only once the criminal proceedings against the defendant (i.e., the Section 1983 plaintiff) have ended in his favor." *See also Manuel v. City of Joliet*, 580 U.S. 357 (2017) (Fourth Amendment claims may challenge pretrial detention based on fabricated evidence beyond the start of legal process).

3. The Alameda County District Attorney declined to prosecute Plaintiff on December 6, 2022 — a favorable termination. The two-year statute of limitations therefore runs from December 6, 2022, and expires on December 6, 2024. **However**, Plaintiff's claims for fabrication of evidence and wrongful legal process are additionally subject to equitable tolling and fraudulent concealment tolling as set forth in Section A above and below, which independently extend the limitations period.

## E. Equitable Tolling and Fraudulent Concealment (All Claims)

1. California's equitable tolling doctrine applies where the defendant's own conduct prevents the plaintiff from discovering the factual basis for a claim. *Lukovsky v. City and County of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008) (equitable tolling may apply to Section 1983 claims where plaintiff was prevented from timely asserting claims through no fault of their own). Under California law, equitable tolling requires: (1) the defendant's conduct preventing the plaintiff from filing suit; (2) the plaintiff's reasonable reliance; and (3) the plaintiff's good faith and reasonable diligence. *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 383.

2. Separately, California's fraudulent concealment doctrine tolls the statute of limitations where the defendant has taken affirmative steps to conceal the wrongful conduct. *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931 ("[T]he defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it."). The doctrine of fraudulent concealment requires: (1) affirmative acts of concealment by the defendant; (2) the plaintiff's inability to discover the cause of action despite reasonable diligence; and (3) the plaintiff's diligent pursuit of the claim once facts are discovered. *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).

3. In addition to the comprehensive concealment narrative set forth in Section A above — including the City's lies in response to the first subpoena, obstruction of attorney Slater's investigation, and denial of PRA requests — Defendants engaged in the following specific acts of concealment:

(a) **Body-worn camera deactivation.** BPD officers deactivated their body-worn cameras during or shortly after arriving at the scene of the February 4, 2022 incident, destroying or preventing the creation of the primary evidentiary record of the assault and BPD's response.

(b) **Fabrication of police reports.** Officer Peters falsely reported that Plaintiff had not been choked — a fabrication directly contradicting the physical evidence and the officers' own observations. BPD listed Goree as the "VICTIM" in BPD Case No. 2022-00005533, inverting the identities of victim and perpetrator in the official record.

(c) **Criminal prosecution as concealment tool.** Defendants caused criminal charges to be filed against Plaintiff based on the fabricated reports. The pending criminal charges (February 4, 2022 through December 6, 2022) not only tolled the statute of limitations under Section 945.3 but also functioned as an active instrument of concealment — Plaintiff, while facing criminal charges, was unable to pursue civil discovery, public records, or investigation of the underlying facts without risk of self-incrimination.

(d) **Concealment of internal affairs findings.** BPD concealed the findings of internal affairs investigations related to the February 4, 2022 incident, including findings regarding the officers' failure to intervene, the deactivation of body-worn cameras, the refusal to credit foreign-born witnesses' accounts, and Officer Peters's false report. These findings, if disclosed, would have revealed the full scope of the constitutional violations.

1. Plaintiff exercised reasonable diligence in pursuing his claims and sought administrative relief before filing suit. After the criminal charges were dismissed on December 6, 2022, Plaintiff retained attorney Michael Slater, who pursued every available administrative channel: demanding that BPD investigate Goree's use of deadly force; submitting video evidence of the chokehold; filing public records requests for police reports, body-worn camera footage, and internal affairs findings; escalating to the Police Accountability Board, the City Attorney's Office, and the District Attorney's Office; and serving subpoenas on the City. Plaintiff also physically appeared at BPD headquarters to demand documents. Each of these efforts was obstructed, denied, or met with false or incomplete responses. Plaintiff's pursuit of reasonable administrative remedies before filing suit independently supports equitable tolling. *McDonald v. Antelope Valley Community College District* (2008) 45 Cal.4th 88, 100 (equitable tolling applies where a plaintiff reasonably pursues administrative relief before resorting to litigation). Plaintiff filed this action on November 28, 2025, within a reasonable period after the second subpoena production in late 2024 first revealed the full scope of the City's enforcement system and concealment.

2. The statute of limitations on all of Plaintiff's claims was tolled during the period of Defendants' active concealment — from February 4, 2022 (when officers fabricated reports and deactivated cameras) through late 2024 (when the second subpoena production first revealed the institutional relationships and coordinated cover-up). Alternatively, equitable tolling applies from the date of the criminal charge dismissal (December 6, 2022) through the date Plaintiff, exercising reasonable diligence, discovered or should have discovered the facts underlying his claims — which was no earlier than the second subpoena production.

## F. False Arrest (Count 2): Wallace v. Kato Accrual Plus Tolling

1. Under *Wallace v. Kato*, 549 U.S. 384, 388-89 (2007), a Section 1983 false-arrest claim accrues at the time the claimant becomes detained pursuant to legal process — i.e., at arraignment or release from custody, whichever comes first. Plaintiff was released from custody after his arrest on or about February 4, 2022.

2. With Section 945.3 tolling of approximately ten months, the effective accrual date shifts to December 6, 2022. The false arrest claim is additionally subject to the equitable tolling and fraudulent concealment analysis set forth in Sections A and E above.

## G. Excessive Force and Failure to Intervene (Counts 1 and 4)

1. The excessive force claims (Count 1) and failure-to-intervene claims (Count 4) arising from the February 4, 2022 incident accrued on that date. With Section 945.3 tolling, the effective accrual date is December 6, 2022. These claims are additionally subject to the equitable tolling and fraudulent concealment analysis set forth above — particularly the officers' deactivation of body-worn cameras and fabrication of reports, which prevented Plaintiff from discovering the full scope of the failure-to-intervene violation.

**H. Malicious Prosecution (Count 3): Favorable Termination Accrual**

1. Plaintiff's malicious prosecution claim (Count 3) accrued upon favorable termination of the criminal proceedings. Under *Thompson v. Clark*, 596 U.S. 36, 49 (2022), the favorable termination element requires only that the prosecution ended without a conviction. Under *McDonough v. Smith*, 139 S. Ct. 2149, 2160-62 (2019), the statute of limitations for claims challenging the initiation of criminal proceedings begins to run only once the proceedings have ended in the plaintiff's favor. The Alameda County District Attorney's declination of prosecution on December 6, 2022 constitutes favorable termination. The two-year statute of limitations therefore runs from December 6, 2022, and was tolled by the equitable tolling and fraudulent concealment analysis set forth in Sections A and E above.

**I. Deliberate Indifference to Medical Needs (Count 8)**

1. The deliberate indifference claim (Count 8) arises from Defendants' conduct on February 4, 2022, in cancelling the ambulance, falsifying Plaintiff's medical history, and transporting Plaintiff to Santa Rita Jail without medical clearance. This claim accrued on February 4, 2022. With Section 945.3 tolling of approximately ten months, the effective accrual date shifts to December 6, 2022. The claim is additionally subject to the equitable tolling and fraudulent concealment analysis set forth in Sections A and E above — particularly Officer Peters's false report that Plaintiff had not been choked, which concealed the deliberate indifference by creating a false record suggesting no medical intervention was needed.

**J. First Amendment Retaliation (Count 10)**

1. The First Amendment retaliation claim (Count 10) encompasses discrete retaliatory acts occurring from 2022 through 2024, including BPD's July 2022 recommendation to pursue eviction-focused responses, post-incident intimidation visits, systematic obstruction and denial of public records requests, the City's production of zero Goree-City

communications in response to a lawful subpoena, BPD's refusal to investigate Plaintiff's complaints, and the continued withholding of body-worn camera footage, IAB findings, and investigative files. Under the continuing violation doctrine, where discrete retaliatory acts are part of an ongoing pattern, the claim is timely if any discrete act falls within the limitations period. *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001). Multiple discrete retaliatory acts — including the City's lies in response to the first subpoena, BPD's June 2024 refusal to accept a police report, and the continued withholding of records through late 2024 — fall well within the two-year limitations period preceding the November 28, 2025 filing.

## K. State-Created Danger and Equal Protection (Counts 5 and 9)

1. The state-created danger claims (Count 5) arise from the City's creation and maintenance of the enforcement system — an ongoing course of conduct that continued through and after the February 4, 2022 assault. The full scope of the state-created danger — including the extent of BPD training, radio access, and operational coordination with DBA and YMCA enforcement personnel — was not discoverable until the second subpoena production in late 2024, as set forth in Section A above. These claims are timely under the fraudulent concealment and equitable tolling analysis above.

2. The equal protection claims (Count 9) accrued on February 4, 2022. With Section 945.3 tolling and the equitable tolling and fraudulent concealment analysis set forth above, these claims are timely.

## L. Monell Claims (Count 11): Coextensive with Underlying Violations

1. Municipal liability under *Monell* is coextensive with the timeliness of the underlying constitutional violations. Because the underlying Section 1983 claims (Counts 1-10) are timely, the Monell claim (Count 11) is likewise timely. Moreover, the Monell claim is independently subject to the discovery and fraudulent concealment analysis in Section A above — the City's policies, customs, and practices that constitute the Monell claim were

the very facts that the City concealed through its obstruction of PRA requests, its lies in response to the first subpoena, and its stonewalling of attorney Slater's investigation. Plaintiff could not have pled the Monell claim without the second subpoena production.

## M. ADA, FHA, and Rehabilitation Act Claims (Counts 12-15)

1. ADA Title II claims are subject to the forum state's two-year personal-injury limitations period. With Section 945.3 tolling and the equitable tolling and fraudulent concealment analysis set forth above, these claims are timely.

2. FHA claims are subject to a two-year limitations period running from the "occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. Section 3613(a)(1)(A). BPD's July 2022 recommendation to YMCA supervisors to pursue eviction-focused responses against Plaintiff, post-incident intimidation visits to Plaintiff's door through 2022 and 2023, and discriminatory records obstruction through 2024 constitute a continuing course of discriminatory housing practices. Specifically, between January 25 and March 10, 2023, Plaintiff's attorney Michael Slater repeatedly requested that BPD investigate Goree's use of deadly force and file a police report, providing video evidence of the chokehold; on March 10, 2023, Sergeant Jennifer Wilson explicitly refused, stating "the Homicide Division will not be doing any investigation into this incident"; Slater also submitted public records requests to BPD and the City, which were denied or obstructed; on June 25, 2024, Plaintiff attempted to file a police report through Lieutenant Lindenau, and BPD again refused; BPD's Internal Affairs Bureau formally confirmed the refusal on July 3, 2024; and the City continued rolling partial production of records through December 17, 2024, while withholding the most critical records (body-worn camera footage, full investigative files, internal affairs findings). Each of these acts constituted a discrete discriminatory act falling within the two-year period preceding the November 28, 2025 filing. Under the continuing violation doctrine recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982), where a plaintiff challenges not just a single discriminatory act but an ongoing unlawful practice, the complaint is timely if the last asserted occurrence falls within the limitations period.

3. Rehabilitation Act claims are subject to the same analysis as ADA claims and are timely for the same reasons.

## N. Section 1985 (Count 16)

1. Section 1985 claims are subject to the forum state's two-year personal-injury limitations period. With Section 945.3 tolling and the equitable tolling and fraudulent concealment analysis set forth above — particularly the concealment of the cross-entity conspiracy

between BPD, DBA, and YMCA until the second subpoena production in late 2024 — the claim is timely.

## O. Later Discrete Acts (2023-2024): Independently Timely

1. BPD's and the City's refusals to provide records, IAB findings, and body-worn camera footage — occurring in 2023 and 2024 — constitute separately accruing acts that are independently timely under any applicable statute of limitations. Each denial of a records request is a discrete act giving rise to an independent claim for procedural due process violations, obstruction, and retaliation. These acts fall well within the applicable two-year limitations periods. Specifically: (a) between January 25 and March 10, 2023, Plaintiff's attorney Michael Slater repeatedly contacted BPD Sergeant Jennifer Wilson requesting that BPD investigate Goree's use of deadly force and file a police report, submitting video evidence of the prolonged chokehold; on February 7, 2023, Wilson — without reviewing the full video evidence — affirmed probable cause to arrest Plaintiff as the aggressor; on March 10, 2023, Wilson explicitly refused to investigate, stating "the Homicide Division will not be doing any investigation into this incident"; on March 14, 2023, Slater sent a final demand to Wilson copying the Police Accountability Board, City Attorney's Office, and District Attorney's Office; (b) Slater submitted public records requests to BPD and the City seeking police reports, body-worn camera footage, internal affairs investigation findings, and records related to BPD's relationship with the DBA and YMCA; the City denied or obstructed these requests, withholding the records that would have revealed the enforcement nexus; (c) on July 12, 2023 — having received no responsive records — Plaintiff physically went to BPD headquarters at 2100 MLK Jr. Way and demanded the documents in person; BPD provided only bare-bones case report summaries while withholding the full investigative file, BWC footage, witness statements, and IAB findings; (d) on November 28, 2023, Chief Louis sent Plaintiff correspondence regarding the misconduct investigation findings, but the substantive findings and underlying records were not disclosed; (e) on June 25, 2024, Plaintiff attempted to file a police report through

Lieutenant Lindenau, and BPD again refused; on July 3, 2024, Sergeant Jumaane Jones of BPD's Internal Affairs Bureau formally confirmed the refusal by email; (f) the City served a first subpoena response producing zero Goree-City communications, then continued rolling partial production through 2024, while withholding body-worn camera footage and full investigative records; and (g) the second subpoena production in late 2024 — certified as "complete" — revealed approximately 870 pages of communications the City had concealed from every prior request. Each of these acts constitutes independently actionable conduct.

## P. State-Law Claims (Counts 17-20): Government Claims Act Compliance, Tolling, and Equitable Doctrines

1. Plaintiff's state-law claims against the City of Berkeley and its employees are subject to the California Government Claims Act, Government Code Sections 810 et seq. Plaintiff satisfies all applicable requirements as follows.

2. **Timely Presentation of Claim.** Plaintiff presented a government tort claim to the City of Berkeley on or about July 2022 — within six months of the February 4, 2022 assault — in compliance with Government Code Section 910. The claim provided written notice of the date, circumstances, and general nature of Plaintiff's injuries arising from the February 4, 2022 incident at the Downtown Berkeley YMCA, and identified the City and its employees as responsible parties.

3. **City's Failure to Act and Deemed Rejection.** On or about August 26, 2022, the City responded that it was "investigating" Plaintiff's claim but never issued a formal written rejection or denial. Under Government Code Section 912.4, if a public entity fails to act on a claim within forty-five days after the claim is presented, the claim is deemed rejected on the last day of the forty-five-day period. The City's failure to act within forty-five days constituted a deemed rejection of Plaintiff's claim.

4. **Failure to Provide Section 913 Warning.** Government Code Section 913 requires that when a public entity gives written notice of rejection of a claim, the notice must include a warning that the claimant has only six months from the date of the notice to file a court action on the claim, and that failure to file within that period will result in the claim being barred. The City never provided Plaintiff with the Section 913 warning notice — neither at the time of the deemed rejection nor at any subsequent time.

5. **Estoppel.** The City is estopped from asserting the Government Claims Act's suit-filing deadlines as a defense. Where a public entity fails to provide the Section 913 warning notice required by Government Code Section 913, the entity is estopped from invoking the six-month suit-filing deadline as a bar to the claimant's action. *Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1779-80 (discussing estoppel framework where public entity fails to comply with Section 913 notice requirements); *see also Phillips v. Desert Hospital District* (1989) 49 Cal.3d 699, 709 (equitable estoppel may be applied against a public entity where its agents engaged in conduct amounting to a representation that claims-filing requirements were satisfied or inapplicable). The City's failure to provide any written rejection — let alone one containing the mandatory warning — estops it from asserting that Plaintiff's state-law suit is untimely under the Government Claims Act. *See also Bayless v. Limber* (1986) 177 Cal.App.3d 1316, 1327-28 (failure to give section 913 notice creates estoppel regardless of whether claimant was represented by counsel); *Coviello v. City of Oakland* (N.D. Cal. 2012) 2012 WL 5395328, at *4 (applying estoppel where city failed to provide section 913 warning). The estoppel is not limited to the six-month suit-filing period — it estops the City from asserting any claims-presentation defense that depends on the notice the City was required but failed to provide.

6. **Section 945.3 Tolling.** Government Code Section 945.3 provides that no person charged with a criminal offense may bring a civil action against a peace officer or public entity arising out of the same acts or omissions "while the charges are pending before a court of competent jurisdiction." Criminal charges arising from the February 4, 2022 arrest were pending against Plaintiff from February 4, 2022 through December 6, 2022, when the Alameda County District Attorney declined to prosecute. The statute of limitations on Plaintiff's state-law claims was tolled during the entire period the charges were pending — a period of approximately ten months. The Ninth Circuit has confirmed that Section 945.3 tolling applies to Section 1983 claims as well. *Harding v. Galceran*, 889 F.2d 906, 908 (9th Cir. 1989). With this tolling, the effective accrual date is December 6, 2022, and the two-year limitations period under CCP Section 335.1 runs through December 6, 2024.

7. Plaintiff has satisfied all prerequisites to maintaining state-law claims against the City of Berkeley and its employees.

8. Plaintiff's delay in filing suit was reasonable under the circumstances. After the deemed rejection, Plaintiff was facing pending criminal charges (until December 6, 2022), which both tolled the statute of limitations under Section 945.3 and practically prevented Plaintiff from pursuing civil litigation. After the criminal charges were dismissed, Plaintiff retained attorney Slater, who pursued administrative remedies and records requests through 2023. The City's systematic obstruction of those efforts — culminating in the production of zero documents in response to a lawful subpoena — prevented Plaintiff from assembling the factual basis for this lawsuit until the second subpoena production in late 2024. Plaintiff filed this action on November 28, 2025 — approximately one year after discovering the full scope of the City's misconduct through the second subpoena production. This timeline demonstrates reasonable diligence, not undue delay.

9. Additionally, the Bane Act (Count 17), false imprisonment (Count 18), IIED (Count 19), and negligence (Count 20) claims are subject to the fraudulent concealment tolling analysis set forth in Sections A and E above. Defendants' systematic concealment of the evidentiary record — including the fabrication of police reports, deactivation of body-worn cameras, obstruction of attorney Slater's investigation, lies in response to the first subpoena, and ongoing denial of records requests — tolled the limitations period on the state-law claims during the period of active concealment. Under *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931, the limitations period was tolled until Plaintiff, exercising reasonable diligence, discovered or should have discovered the concealed facts — which occurred no earlier than the second subpoena production in late 2024.

10. The IIED claim (Count 19) additionally arises from a continuing course of extreme and outrageous conduct — including post-incident intimidation visits to Plaintiff's door through 2022, threats, and systematic records obstruction through 2024 — with discrete acts falling within the two-year limitations period preceding the November 28, 2025 filing.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A. Compensatory damages according to proof, including damages for physical injury, respiratory distress, post-traumatic stress disorder, emotional distress, deprivation of liberty, loss of housing stability, reputational harm, malicious prosecution, deliberate indifference to medical needs, and other economic and non-economic losses;

B. Punitive damages against the individual Defendants — Sergeant Landrum, Officer Peters, Officer Futch, Chief Greenwood, Chief Louis, Mayor Arreguin, and City Manager Buddenhagen — under 42 U.S.C. Section 1983 for conduct that was malicious, oppressive, or in reckless disregard of Plaintiff's constitutional rights, and under California Civil Code Section 3294 for malice, oppression, and fraud;

C. Treble damages under the Bane Act, California Civil Code Section 52.1(b);

D. Statutory damages and attorney-fee shifting where authorized by statute, including under 42 U.S.C. Section 1988, 42 U.S.C. Section 3613(c), 42 U.S.C. Section 12205, and 29 U.S.C. Section 794a;

E. Declaratory relief that Defendants' conduct violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments, 42 U.S.C. Section 1983, 42 U.S.C. Section 1985, the Americans with Disabilities Act, the Fair Housing Act, the Rehabilitation Act, the Bane Act, and California law;

F. Injunctive relief requiring the City of Berkeley to: (i) dismantle or reform the civilian enforcement apparatus to ensure constitutional compliance; (ii) implement body-worn camera accountability policies with meaningful enforcement; (iii) establish independent review procedures for citizen's arrests made by enforcement partners; (iv) implement witness-intake procedures that ensure foreign-born individuals can provide statements; (v) release all records related to Plaintiff's case; and (vi) cease all retaliatory conduct against Plaintiff for exercising his First Amendment rights to speech, petition, and access to the courts;

G. Costs of suit and prejudgment and post-judgment interest as allowed by law;

H. Leave to amend if needed to conform to proof;

I. Such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

1. Plaintiff demands trial by jury on all issues so triable.

DATED: March 10, 2026

/s/ Arnaud Cammas **ARNAUD CAMMAS** 201 13th St #32231 Oakland, CA 94612 Plaintiff, Pro Se