**ARNAUD CAMMAS**
Plaintiff, In Pro Per
201 13th St #32231
Oakland, CA 94612
xqtp8374@gmail.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
SAN FRANCISCO DIVISION

**ARNAUD CAMMAS,**
Plaintiff,

v.

**YMCA OF THE EAST BAY;**
**FRANCIS GALLATI;**
**LANCE GAYLORD GOREE;**
**KELLEY MALTAIS;**
**ROSE ACOSTA;**
**ANTONIO ACOSTA; AND**
**DOES 1-50,**

Defendants.

**Case No. 3:25-cv-10295-RFL**

**SECOND AMENDED COMPLAINT**

## I. INTRODUCTION

1. This Second Amended Complaint is filed pursuant to the leave granted at Dkt. 55. It addresses the continuing violations doctrine at Section VI.E, equitable tolling at Sections VI.B and VI.C, and the sufficiency of the claim under 42 U.S.C. Section 1981 at Count 4.
2. This case arises from a violent assault, a fraudulent housing scheme, and a retaliatory campaign carried out by the YMCA of the East Bay and its personnel against Hispanic residents of the Downtown Berkeley YMCA residential facility located at 2001 Allston Way, Berkeley, California, including Plaintiff.
3. Plaintiff is Hispanic. Defendants assaulted, ignored, or moved to evict Hispanic residents of the facility while extending financial assistance to, and taking no enforcement action whatever against, non-Hispanic residents who engaged in documented violence and threats. Plaintiff sues for his own injuries. The treatment of other residents is pleaded as evidence of Defendants' pattern, knowledge, and intent.
4. On February 4, 2022, Defendant Lance Gaylord Goree, the YMCA's Executive Director, a former Downtown Berkeley Association ("DBA") Operations Manager with a documented history of violent confrontations, and a de facto deputized agent of the Berkeley Police Department who at all relevant times operated for and on behalf of the City of Berkeley, stalked and threatened Plaintiff Arnaud Cammas throughout the YMCA facility for no less than seventeen minutes, cornering him, berating him, and making threats. Goree then physically attacked Plaintiff, punching him in the face, throwing him to the ground, and applying a prolonged carotid/vascular neck restraint for approximately fifteen minutes while YMCA employees Rose Acosta and Antonio Acosta physically assisted in restraining Plaintiff. YMCA later admitted under oath that all three employees were acting within the course and scope of their YMCA employment during the assault. Berkeley Police Department officers arrived while the chokehold was still ongoing, arrested Plaintiff as the aggressor, and listed Goree as the "victim." The Alameda County District Attorney declined to prosecute Plaintiff on December 6, 2022.

5. The assault occurred in the context of a broader housing fraud. While internally converting its facility from marketed student housing into a high-risk residence for vulnerable populations, populations Goree himself admitted the YMCA was "not trained or equipped" to serve, YMCA continued marketing the property to prospective tenants, including foreign students and other foreign-born individuals, as "CITY DORMS - YMCA" with 24-hour security and daily cleaning. Berkeley Fire Department records independently confirm the conversion, twice classifying the property under federal codes reserved for custodial institutions. None of these conditions were disclosed to Plaintiff.
6. After Plaintiff pursued legal claims for the assault, Defendants retaliated with workplace violence petitions, the second filed approximately five days after Plaintiff's counsel sent notice of intent to sue, cease notices, three-day notices, and two unlawful-detainer actions. YMCA executive Kelley Maltais personally directed staff to pursue eviction and remain "on alert." When Plaintiff sought documents about Goree's history through court-ordered discovery, Maltais signed verified responses under penalty of perjury on May 8, 2023 falsely stating that documents in key categories, including communications about Goree's performance, records of uses of force by Goree, Rose Acosta, and Antonio Acosta, and written complaints about their conduct, had "never existed." A subsequent third-party subpoena to the City of Berkeley produced 838 pages of emails from Goree's YMCA email account spanning 2017 through January 2022, directly contradicting those sworn representations.
7. Plaintiff brings claims under the Fair Housing Act, Title VI, 42 U.S.C. Sections 1981 and 1982, 42 U.S.C. Section 1985, the California Fair Employment and Housing Act (Government Code Section 12955), and California state law for fraud, negligence, breach of contract, and unfair competition.

## II. JURISDICTION AND VENUE

8. This Court has federal-question jurisdiction under 28 U.S.C. Section 1331 over Plaintiff's claims arising under the Fair Housing Act (42 U.S.C. Sections 3604 and 3617), Title VI of the Civil Rights Act of 1964 (42 U.S.C. Section 2000d), 42 U.S.C. Section 1981, 42 U.S.C. Section 1982, and 42 U.S.C. Section 1985.
9. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. Section 1367, as those claims arise from the same nucleus of operative fact, including claims under the California Fair Employment and Housing Act (Government Code Section 12955) and other California statutes.
10. Venue is proper in this district under 28 U.S.C. Section 1391(b) because the events giving rise to the claims occurred in Berkeley, Alameda County, California, within the Northern District of California.

## III. PARTIES

11. Plaintiff Arnaud Cammas is a foreign-born Hispanic individual who resided at the Downtown Berkeley YMCA residential facility, Room 307, at 2001 Allston Way, Berkeley, California, beginning in approximately February 2021. Plaintiff moved into the YMCA based on marketing representations that the facility was student housing with 24-hour security and daily cleaning services.
12. Defendant YMCA of the East Bay is a California nonprofit corporation that owns and operates the residential facility at 2001 Allston Way, Berkeley, California. YMCA paid a $25,378 annual PBID assessment that directly funded the DBA enforcement apparatus. YMCA also held City of Berkeley Contract No. 31900274, valued at $310,000. YMCA receives federal financial assistance through the Shelter Plus Care program (42 U.S.C. Section 11403), Housing Assistance Payments ("HAP") contracts administered through the City of Berkeley, Mainstream Vouchers, and Housing Quality Standards ("HQS") inspections conducted by City housing officials including Jennifer Vasquez.

13. Defendant Francis Gallati was, at all relevant times, the Chief Executive Officer of the YMCA of the East Bay. Gallati simultaneously served as Vice President of the Board of Directors of the Downtown Berkeley Association, as reflected in the DBA's 2012 Annual Report, linking YMCA and the DBA enforcement apparatus at the governance level. That dual role gave Gallati actual knowledge of Goree's enforcement background and the violence associated with the DBA ambassador program. In 2021, another foreign-born Hispanic tenant, Helton Carvalho, contacted Gallati and Goree directly about hate-crime harassment and threats in the building. Neither acted. By March 2022 Mr. Carvalho had reported to police that he had contacted Gallati and Goree with no resolution. Gallati's governance of both the DBA, the organization that employed Goree and supervised the ambassador enforcement program implicated in the 2015 violent assault scandal, and the YMCA, where Goree was then placed as Executive Director over a vulnerable residential facility, makes him personally liable for the injuries alleged herein.

14. Defendant Lance Gaylord Goree was the Executive Director of the Downtown Berkeley YMCA residential facility and a de facto deputized agent of the Berkeley Police Department who at all relevant times operated for and on behalf of the City of Berkeley. Before joining the YMCA, Goree served as the DBA's Operations Manager from approximately 2012 through 2018, during which period he carried a BPD radio, emailed BPD officers daily, directed surveillance operations, and supervised the DBA ambassador enforcement program. On June 25, 2014, Goree seized a man by the neck on Center Street in downtown Berkeley and shouted that he would choke him, in front of onlookers and in the presence of the City of Berkeley's Interim Audit Manager, Claudette Biemeret, who reported it to the City Auditor and called the Berkeley Police Department. Goree answered in writing to the City Manager and the Police Chief that he was "directly involved," that Ms. Biemeret's account was "accurate, but a bit incomplete because of a snapshot in time," and that he "made sure that Romanian was not physically injured in any way, although I was angry enough to do so." On March 29, 2014, Berkeley Police documented a battery with bodily injury at the 1900 block of Center Street, Berkeley Police Department Case No. 2014-00018056, in which DBA Ambassador Jeffrey D. Bailey was an involved party. On March 20, 2015, DBA Ambassador Jeffrey Bailey, operating under Goree's supervision, beat two men; Goree signed a false citizen's arrest form; one victim was criminally charged before exculpatory video surfaced; and the judge ultimately made a factual finding of innocence. The incident generated national media coverage and a Berkeley Peace and Justice Commission recommendation to disband the ambassador program. On December 1, 2020, after a resident committed a felony battery on tenant Stephen Holt at the facility, Goree assaulted Mr. Holt himself, used a racial slur toward him, claimed to know the chief of police, and threatened him with false arrest.

15. Defendant Rose Acosta was, at all relevant times, a YMCA employee at the residential facility at 2001 Allston Way. On February 4, 2022, Rose Acosta physically assisted in restraining Plaintiff while Goree applied a prolonged carotid/vascular chokehold. YMCA admitted in its May 8, 2023 verified discovery responses that Rose Acosta was acting within the course and scope of her YMCA employment during the restraint.
16. Defendant Antonio Acosta was, at all relevant times, a YMCA employee at the residential facility at 2001 Allston Way. On February 4, 2022, Antonio Acosta physically assisted in restraining Plaintiff while Goree applied a prolonged carotid/vascular chokehold. YMCA admitted in its May 8, 2023 verified discovery responses that Antonio Acosta was acting within the course and scope of his YMCA employment during the restraint.
17. Defendant Kelley Maltais was, at all relevant times, a YMCA executive and human resources official. Maltais signed YMCA's May 8, 2023 verified discovery responses under penalty of perjury, responses that falsely stated documents in key categories had "never existed," as described below. Maltais also coordinated eviction efforts against Plaintiff, including through a November 25, 2022 email chain titled "More Cammas" directing staff regarding the status of eviction, a March 7, 2023 email stating "let's move forward" after staff reported an incident, a March 9, 2023 email asking whether a filing "got filed" and instructing staff to stay "on alert," and a March 14, 2023 exchange with Rose Acosta inquiring about "the court." Maltais also participated in filing workplace violence petitions against Plaintiff.
18. Plaintiff is unaware of the true names and capacities of Does 1 through 50 and sues them by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

## IV. FACTUAL ALLEGATIONS

A. The Facility Conversion Scheme

19. Beginning no later than 2019, YMCA internally converted its facility at 2001 Allston Way from an athletic club and hostel into a long-term single-room-occupancy residence for vulnerable populations, including individuals with violent tendencies, racial animus toward foreign-born and Hispanic residents, active criminal or violent criminal histories, mental health crises, chronic medical conditions, and substance abuse, while continuing to market the property as student housing.
20. On July 24, 2019, Goree sent an email from his YMCA email account (lgoree@ymcaeastbay.org) describing an "Ambassador Housing Program" in which DBA enforcement personnel would be placed in YMCA rooms and stating that the YMCA would "transition all of our rooms to Co-Living spaces." This program placed individuals from the same enforcement apparatus implicated in the 2015 ambassador assault scandal into the residential facility.
21. On December 18, 2020, Goree sent an email from lgoree@ymcaeastbay.org stating that the YMCA was "converting the YMCA Hotel over to Long Term residence." This email was sent approximately two months before Plaintiff moved into the facility in February 2021. Its content was not disclosed to Plaintiff or prospective tenants.
22. On October 11, 2021, Goree sent an email from lgoree@ymcaeastbay.org to City of Berkeley housing official Jennifer Vasquez stating that some YMCA residents were "mentally unstable" and that the YMCA was "not trained or equipped to provide assistance to these residents." In the same communication, Goree indicated that several residents would benefit from "Board and Care, not just board."
23. On November 26, 2021, Goree sent a further email stating that social-service clients at the YMCA needed In-Home Supportive Services ("IHSS") and additional care that YMCA staff was not trained to provide.

24. On December 20, 2021, approximately forty-five days before the assault on Plaintiff, Goree sent an email requesting a welfare check on a resident whose “condition, mental and even more physical, is declining at an accelerating rate” and whose room conditions were “unbelievable.” Goree wrote to the City: “Village of Love, not maliciously, has let these people down. Put them in situations they weren’t ready for, with no planning and very little support.”

25. Independent Berkeley Fire Department records confirmed the conversion. The federal NFIRS property classification for 2001 Allston Way evolved from “Residential board and care” (March 2018, Incident 2018-003301) to “Multifamily dwelling” (2021) to “Boarding/rooming house, residential hotels” (February 2022), and on two occasions to custodial classifications: “Health care, detention, and correction, other” (September 3, 2021, Incident 2021-008958) and “Jail, prison (not juvenile)” (October 20, 2022, Incident 2022-012632), confirming that the facility had been converted from marketed student housing into a high-risk residential facility housing populations requiring institutional-level care.

26. In January and February 2022 alone, the two months surrounding the assault on Plaintiff, the Berkeley Fire Department responded repeatedly to 2001 Allston Way, including for a dual drug overdose requiring three apparatus and two medic units, a resident referred by Adult Protective Services who was unable to walk and suffering from fecal and urinary incontinence, and an elderly patient with shortness of breath requiring emergency hospital transport.

27. That 2018 classification predates the conversion timeline Defendants have stated, and matches the description Goree himself would give three years later when he wrote that residents “would benefit from Board and Care.”

28. On October 20, 2022, at 2:38 a.m., BFD responded to an EMS call at 2001 Allston Way, Incident 2022-012632, Incident Type 321. The responding officer entered "Jail, prison (not juvenile)" in the NFIRS Property Use field. A Berkeley first responder officially classified the YMCA as a jail.
29. That entry was not isolated. On September 3, 2021, at 9:04 a.m., BFD responded to 2001 Allston Way, Incident 2021-008958, Incident Type 300, and entered "Health care, detention, and correction, other" in the same NFIRS Property Use field. On two separate occasions, more than a year apart, and by different responding officers, Berkeley Fire Department personnel classified the facility under NFIRS codes reserved for custodial and correctional institutions. Both reports are attached as Exhibit G and incorporated by reference.
30. Across the entire production of Berkeley Fire Department incident reports for 2001 Allston Way, the NFIRS Property Use field varies with the responding officer and with where the patient was met. It is populated with codes for "Multifamily dwelling," "Boarding/rooming house, residential hotels," "1 or 2 family dwelling," "Athletic/health club," "Residential board and care," and "Hotel/motel, commercial," and, where responders reached a person outside the building, with codes for street and outdoor locations. The property was never once classified as a dormitory or as student housing, which is what Defendants were marketing it as throughout. The only entries in the entire production that describe an institution are the two custodial classifications.
31. Each of the incidents described below is a Berkeley Fire Department response to 2001 Allston Way. Plaintiff has reviewed the Berkeley Fire Department's incident reports for 2001 Allston Way produced in response to Public Records Act Request No. 26-106. The narratives recorded by the responding officers, in their own words, describe the following conditions at the facility.

32. Overdose. On February 14, 2021, the responding officer wrote: “E2/M2/M5 responded to a medical for a drug overdose of 2 pts. Pts transported to local ER for eval and care.” Incident 2021-001639. Two people overdosed at the same time, requiring three apparatus and two ambulances.

33. The dispatch record for that call identifies the location as “the hotel portion” of the facility. The Berkeley Fire Department’s own dispatcher recorded that 2001 Allston Way was operating a hotel.

34. On January 10, 2022, less than four weeks before the assault on Plaintiff, the dispatch record for a medical call to 2001 Allston Way recorded the occupant as “DEFICATING AND URINATING ON” a person. Incident 2022-000431.

35. Stabbing. On December 16, 2020, responders were dispatched to 2001 Allston Way. The responding officer wrote that on arrival the patient was “complaining of pain in back from a stab wound. Patient had stab wound to the left rear shoulder. Patient was assessed and transported code 2. . . . Suspect was also assessed.” Incident 2020-012909. A person was stabbed in the back at 2001 Allston Way and the person who stabbed him was still on scene when responders arrived. That was fifteen days after the December 1, 2020 felony battery on Stephen Holt at the same address.

36. A resident threatening suicide from the building. On October 13, 2021, the responding officer wrote: “E2 and M2 disp C-3 for poss 5150 threatening to jump from bldg. Units arrived and staged. After extended period, units cancelled by BPD.” Incident 2021-010697.

37. Assault. On May 30, 2019, the responding officer recorded that a person was “assessed post assault by T2 and PPLUS. Berkeley PD present. Pt refused transport.” Incident 2019-006284. The Berkeley Police Department was present at the scene.

38. Psychiatric hold. On April 7, 2019, the responding officer recorded a person placed on a hold under Welfare and Institutions Code section 5150 and “TRANSPORTED. . . BY M5 W/ BPD ON SCENE.” Incident 2019-004065.

39. Repeat responses to the same person. On August 21, 2019, the responding officer recorded that this was an elderly person "who we've responded on 3 times in the past 12 hours," that the person "still has no acute medical needs," and that the person "did not make use of shelter bed we obtained." Incident 2019-009669. Berkeley firefighters were called to 2001 Allston Way three times in twelve hours for the same elderly person, and themselves obtained a shelter bed for him.

40. Failure to thrive. On May 25, 2022, the responding officer wrote: "Medical eval for BPD and MH for a [redacted] who is a failure to thrive. After full eval [redacted] refused all care and transport." Incident 2022-006119. The bracketed omissions are redactions made by the City of Berkeley in its production. The Berkeley Police Department responded jointly with mental health services. On December 20, 2021, responders were called for a resident with "general weakness and failure to thrive." Incident 2021-013665.

41. Eviction as a medical emergency. On January 12, 2020, responders were dispatched for a reported seizure. The officer wrote: "On arrival, subject is about to be displaced from residence and is looking for options. Pt has no acute medical needs." Incident 2020-000448. The Berkeley Fire Department was summoned to 2001 Allston Way because a resident was being put out of his home.

42. Fire. On January 11, 2019, "Engine 2 responded to the report of a fire in the boiler area at the downtown YMCA. The fire was isolated to the boiler that runs the steam room." Incident 2019-000463.

43. Residents trapped. Beyond the September 15, 2022 lock-in described below, on January 12, 2019 Engine 2 "responded to the report of a person stuck in the bathroom at the YMCA" (Incident 2019-000490); on January 10, 2020 responders were dispatched for "persons stuck in stalled elevator" (Incident 2020-000388); and on September 5, 2023 the recorded situation found was "Removal of victim(s) from stalled elevator" (Incident 2023-011929).

44. A resident barricaded inside his room. On November 29, 2020, responders were dispatched to a fire alarm at 2001 Allston Way. The officer wrote: "On arrival, BPD on scene stating patient set off smoke detector in his room by smoking. He has now barricaded himself in the apa[rtment]." Incident 2020-012290. The Berkeley Police Department was already at the building, and a resident had barricaded himself in his room.

45. Repeated malicious and disability-related activation of the fire alarm system. On October 19, 2020 the officer recorded "Malicious activation of pull station" (Incident 2020-010782); on June 26, 2021, "Malicious pull station found" (Incident 2021-006370); and on August 7, 2022 the officer recorded that a mentally disabled person had pulled the pull station (Incident 2022-009236).

46. Building conditions. On November 10, 2017 the "[s]hut off from wall mounted steam heater broke off causing steam to fill room and eventually hallway on fou[rth floor]" (Incident 2017-013803). On December 2, 2018 responders "found that a dryer on the fourth floor had malfuntioned and burned up it motor" (Incident 2018-014261).

47. These are not the incidents of a student dormitory with twenty-four-hour security and daily cleaning. They are the incidents of an unsupervised residential facility housing people in crisis, recorded contemporaneously by the City's own first responders across the period Defendants marketed the building as student housing.

48. On September 15, 2022, BFD responded after a YMCA resident was locked inside the building after closing and could not exit (Incident 2022-011058). The fire department accessed the building via Knox code to release the trapped resident, demonstrating YMCA's failure to safely manage its residential tenants and the building's inadequacy as a residential facility.

49. On December 30, 2022, BFD responded to an elderly resident who suffered a mechanical fall in the YMCA lobby (Incident 2022-016028), further documenting unsafe conditions for elderly and disabled residents at the facility YMCA marketed as safe housing.

50. On April 1, 2023, a YMCA resident cooking in their room set off the fire alarm (Incident 2023-004641). BFD classified the property as "Boarding/rooming house, residential hotels", independent confirmation that residents were living in and cooking in individual rooms and that the fire department continued to classify the facility as a boarding house well into 2023.

51. On December 20, 2021, Defendant Goree called the Berkeley Police Department about a resident, Samuel Mark Schruyer, whose name the report records as Schruyer in its person record and as Schroyer in the officer's narrative. Berkeley Police Department Incident No. 2021-00058856. The responding officer recorded that Mr. Schruyer "was awake but laying in his urine and he had not been outside of his room in a week," that "[t]he room had an infestation of flies and it smelled heavily of urine and moldy food that was laying around," and that Mr. Schruyer "lives by himself and he does not have in home care." The officer concluded that Mr. Schruyer was gravely disabled and placed him on a hold, contacted Adult Protective Services, and submitted a referral the following morning.

52. The same officer recorded: "The management is aware of the conditions Schroyer lives in and will attempt to assist him with cleaning his room up." Defendants knew the condition in which that resident was living. The Berkeley Police Department, not Defendants, contacted Adult Protective Services.

53. On July 14, 2022, tenants reported maggots on the floors and a foul odor within the facility. The Berkeley Police Department responded and recovered the body of Brett Elliott Schnaper, a resident, who had been deceased for approximately two weeks. His death was investigated by the Alameda County Coroner's Bureau, Coroner Case No. 2022-02843, on the report of the Berkeley Police Department. The coroner determined the cause of death to be atherosclerotic coronary artery disease, with diabetes mellitus as a significant contributing condition. The coroner's investigation report and autopsy report are attached as Exhibit J and incorporated by reference. Defendants did not provide Mr. Schnaper with nursing or medical care, and did not discover his death for two weeks.
54. On August 29, 2023, YMCA removed dependent elder Howard Weisbaum from the facility, on information and belief, to avoid liability for his declining condition rather than to provide him with appropriate care.
55. Despite these conditions, YMCA continued marketing the facility through Kaplan International as "CITY DORMS - YMCA" with representations of 24-hour security and daily cleaning. The property was also listed on AC Housing Choices as "safe, clean and welcoming." None of the conversion, the emergency incident history, the staffing deficiencies, or Goree's own internal admissions about the facility's unsuitability for its actual population were disclosed to Plaintiff or other prospective tenants.
56. YMCA's staffing declined from approximately twenty full-time employees to five during the relevant period, even as the facility's residential population became increasingly vulnerable and the emergency incident rate escalated.

57. YMCA's own September 16, 2025 job posting confirms the nature and inadequacy of the staffing that replaced the twenty full-time employees. The posting advertises a single "Residence Custodial & Desk Representative" position at 2001 Allston Way at $19.18 per hour, a minimum-wage role combining room and restroom cleaning, laundry, front desk operations, resident check-in and check-out, and emergency response duties. The same individual hired to scrub toilets and mop floors is required to "[p]rovide leadership and assistance to Residents/Guests during emergencies" and to "physically be able to assist Residents/Guests during emergencies," including providing "physical support to assist while navigating up or down stairs in emergency situations/evacuations." The posting requires only a high school diploma or GED. This is the "24-hour security" YMCA marketed to prospective tenants: a custodian earning $19.18 per hour, responsible for cleaning rooms, operating the front desk, and serving as the sole emergency responder for a facility housing populations experiencing drug overdoses, mental health crises, and medical emergencies, populations YMCA's own Executive Director admitted the facility was "not trained or equipped" to serve. The posting also confirms ongoing biohazard exposure, listing among physical demands exposure to "toxic or caustic chemicals," "fumes or airborne particles," and "wet and/or humid conditions."

B. The February 4, 2022 Assault

58. On February 4, 2022, Defendant Goree confronted Plaintiff inside the YMCA facility and stalked and threatened him throughout the building for no less than seventeen minutes, and for a period beginning before Plaintiff started recording. This stalking phase was partially captured on the YMCA's surveillance system, but Goree later destroyed portions of the surveillance footage, eliminating evidence of premeditation and the extended threatening behavior that preceded the physical attack.

59. Following that stalking and threatening phase, Goree struck Plaintiff in the YMCA facility cafeteria, threw Plaintiff to the ground, and applied a prolonged carotid/vascular chokehold for approximately fifteen minutes. A carotid/vascular chokehold constitutes deadly force. California Government Code Section 7286.5 prohibits law enforcement agencies from authorizing the use of a carotid restraint, and California Penal Code Section 835a permits a peace officer to use deadly force only when necessary to defend against an imminent threat of death or serious bodily injury. Defendant Goree is neither a peace officer nor trained in the technique.

60. During the chokehold, Defendants Rose Acosta and Antonio Acosta physically assisted in restraining Plaintiff. Plaintiff repeatedly lost consciousness and was voiceless for the vast majority of the restraint, able to scream for help during only approximately twenty to thirty seconds of the entire fifteen minutes.

61. Rose Acosta also attacked Plaintiff's girlfriend, Veronica Estudillo, a foreign-born Hispanic immigrant from Mexico. During the assault, Rose Acosta rushed at Estudillo on three separate occasions, saying "You want some? You want some?" and "Bitch, back up unless you want some," and struck Estudillo's hand. Estudillo witnessed the entire attack, had video footage, and uploaded twelve photographs from the incident to the BPD evidence system (evidence.com). Estudillo gave a statement to the investigating officer but was repeatedly interrupted and only an incomplete, incoherent excerpt of her statement was included in the police report.

62. Antonio Acosta physically assisted Goree in restraining Plaintiff during the fifteen-minute chokehold. Despite his direct participation in the assault, Antonio Acosta does not appear anywhere in the police report, not as a witness, not as a suspect, not as an involved party. A participant in a fifteen-minute deadly-force event was completely erased from the official record.

63. Michelle Horner, a disabled YMCA resident and direct eyewitness who is visible on the YMCA's surveillance video, described what she witnessed as "attempted murder." Officers did not take her statement. Two French visiting students were also present as eyewitnesses; their names were not recorded and their statements were not taken. The pattern was consistent: every foreign-born, Hispanic, immigrant, and disabled witness who could corroborate Plaintiff's account was systematically excluded from the record, while American-born witnesses aligned with Goree were credited.

64. Berkeley Police Department body-worn camera recorded the scene. On that recording, before officers reached Plaintiff, a voice states that Plaintiff was "almost not breathing."

65. Defendant Goree admitted the chokehold to the responding officers at the scene. On the body-worn camera recording Goree states: "I then I put him in a chokehold. And then I was trying to tell him, I'm like, look, I don't want to make you pass out. Just sit tight and relax." Goree further states that staff "radioed for my maintenance guy," who came up within "30, 45 seconds," and who then "was just holding his weight on" Plaintiff.

66. Goree made that admission on February 4, 2022, within minutes of the assault. Six weeks later, on March 1, 2022, Goree executed a declaration under penalty of perjury in support of Defendants' first workplace violence petition. That declaration does not mention a chokehold. It states only that Plaintiff "pushed me and punched me in the side of the head" and that "two other residents assisted" him.

67. Sergeant Landrum described Plaintiff's condition to the responding paramedics in these terms: Plaintiff "was involved in an altercation with someone that while they were holding him down, someone. . . had him in a headlock in order to control him, so he had a difficult time breathing. When we got there, we were able to get him a handcuff and quickly put him in a recovery position, but I'd like to have him just checked out to make sure he's okay."

68. On the same recording an officer asks whether the hold applied to Plaintiff was "[k]ind of a sleeper hold kind of thing," and receives the answer "Yeah." A sleeper hold is a carotid restraint. A responder on scene also observed a mark on Plaintiff's neck.

69. The officers arrived having already been given Defendants' account. Sergeant Landrum told Plaintiff: "we were told you were the aggressor." Plaintiff was handcuffed and Mirandized before any officer had taken his statement.

70. The Berkeley Police Department's case report for the incident, Case No. 2022-00005533, records the arrest of Plaintiff on February 4, 2022 at 14:05 with the arrest type "ON-VIEW BY CITIZEN." That designation records a private person's arrest.

71. No private person's arrest form was executed. Neither Goree nor any other person signed a document making the arrest Berkeley Police recorded. The Berkeley Police Department classified Plaintiff's arrest as one made by a citizen while no citizen made it.

72. Goree knew how the form worked. On or about March 20, 2015, in connection with the beating of two men by ambassadors under his supervision, Goree signed a false citizen's arrest form. The man charged on the strength of it was prosecuted until a bystander recording surfaced, after which the charges were dismissed and a judge made a factual finding of innocence.

73. In 2022, Goree did not sign one. Berkeley Police arrested Plaintiff, booked him, and jailed him on a private person's arrest that no private person made and no document supports, and no charge was ever filed.

74. The same report lists three persons as victims of battery with bodily injury: Goree; Defendant Rose Acosta, whose race is recorded as Hispanic; and Veronica Estudillo, Plaintiff's companion, whose race is recorded as Hispanic. Ms. Estudillo was present with Plaintiff, was herself struck by Rose Acosta during the incident, and photographed the aftermath. Defendants nonetheless caused her to be recorded as a victim of Plaintiff.

75. Berkeley Police Department body-worn camera recorded the following, by timestamp, on February 4, 2022. At 14:24 the responding medical personnel were made aware that Plaintiff had been subjected to a chokehold. At 14:25 Sergeant Landrum asked, referring to Goree, “The one that was choking him?” and Officer Peters answered, “Yeah.” At 14:35 Sergeant Landrum stated, “Alright well that guy has been choked out.”
76. At 15:07, Veronica Estudillo told Officer Futch that YMCA staff “kept choking him.” At 15:36, Ms. Estudillo asked Officer Futch to take a police report based on footage she had recorded on her own telephone.
77. Ms. Estudillo asked Officer Futch, in terms, to press charges. On the body-worn camera recording she asks, “What can I do for like, if there’s going to be an incident?” Officer Futch begins, “I’m going to talk to her right now and give her.” Ms. Estudillo then asks: “Can I press charges or something?” Officer Futch answers: “Well, I’m going to talk, let me talk to her first.”
78. Ms. Estudillo pressed the point. She told the officer, “Because I have everything on video,” that “there’s been some animosity,” that “I just think it’s unfair,” that she was “quite frustrated,” and, twice, “I didn’t do anything.” Officer Futch replied: “I gotcha. Let me talk to Rosie. Let me get her statement first, okay? I’ll be back.”
79. Officer Futch then took Defendant Rose Acosta’s statement. Rose Acosta gave an account in which Plaintiff had kicked her. She was recorded as a victim. No report was taken against Rose Acosta, and Ms. Estudillo was herself recorded in Berkeley Police Department Case No. 2022-00005533 as a victim of Plaintiff. The woman who had been struck by a YMCA employee, who asked in terms to press charges against that employee, and who was told to wait while the employee gave her statement first, was written into the record as having been victimized by her own companion.

80. Ms. Estudillo's account to the officer described the restraint in detail: that Plaintiff was on the floor with several people on top of him, that he said he could not breathe, and that Defendant Rose Acosta placed her radio on his body while he was down. She also stated that Rose Acosta had told her to record the incident, saying words to the effect that she would "get something good." Only an incomplete excerpt of her account appears in the report. Defendants and the responding officers were therefore aware on the day of the assault that a second recording existed and that its holder was offering it.

81. At approximately 17:00, at Santa Rita Jail, Plaintiff told the intake nurse: "I'm not too sure, I was choked unconscious, I remember being kicked, I remember a chair being on top of me." Officer Peters had told the same nurse minutes earlier that "there was a scuffle, he punched the landlord."

82. At 14:17 and again at 14:27, two responding officers inspected Plaintiff's passport. At 14:53 a witness at the scene, Richard Martini, told Officer Futch, "Maybe the problem was that he was foreign, of another country."

83. BPD officers arrived at the scene while Goree's chokehold was still ongoing. The officers did not treat Plaintiff as the victim. They treated Goree as the victim, arrested Plaintiff as the aggressor, and listed Goree as the "VICTIM" in BPD Case No. 2022-00005533. The officers failed to intervene to stop Goree's ongoing use of deadly force, failed to conduct an independent investigation, deliberately turned off body-worn cameras, denied Plaintiff medical care, and suppressed exculpatory evidence including Estudillo's twelve photographs and the full surveillance video.

84. Specifically, BPD Sergeant Francis Landrum called an ambulance for Plaintiff and then cancelled it. Landrum acknowledged the severity of the assault to other officers, stating: “Alright well that guy has been choked out”, yet continued to treat Plaintiff as the aggressor. BPD Officer Kevin Peters told Plaintiff and the arriving EMTs that Plaintiff was “perfectly fine” and did not need to go to the hospital. Peters later falsely reported to Santa Rita Jail intake and the jail nurse that Plaintiff had not been choked, was fully conscious, and had “punched the landlord.” A person subjected to a prolonged vascular neck restraint faces risk of delayed stroke, carotid artery dissection, brain injury, and death, and requires immediate medical evaluation. Peters’ and Landrum’s conduct denied Plaintiff critical medical care.

85. No criminal charge was ever filed against Plaintiff arising from February 4, 2022. On December 6, 2022, the Alameda County District Attorney declined to prosecute. A certified criminal records search issued by the Alameda County Superior Court on August 9, 2023, signed by Deputy Clerk Shvata Malhotra, records as to Plaintiff: “NO CHARGES FILED, INTEREST OF JUSTICE ON CEN: 2362291 ON 11/23/2022.” That record is attached as Exhibit I and incorporated by reference.

86. Plaintiff was therefore seized, handcuffed, Mirandized, booked, and jailed on a citizen’s arrest, and no prosecutor ever filed a charge. The workplace violence petitions Defendants filed against Plaintiff in March and August 2022 rested on the same conduct for which the District Attorney filed nothing.

87. In YMCA’s May 8, 2023 verified discovery responses, YMCA admitted that (a) Goree’s conduct during the February 4, 2022 restraint was within the course and scope of his YMCA employment; (b) Rose Acosta’s assistance in restraining Plaintiff was within the course and scope of her YMCA employment; and (c) Antonio Acosta’s assistance in restraining Plaintiff was within the course and scope of his YMCA employment.

C. Goree’s History of Violence

88. Goree had a documented history of violent confrontations known to YMCA prior to the February 4, 2022 assault on Plaintiff.

89. On April 9, 2012, while James Armstrong Richard II was speaking with Berkeley Mayor Tom Bates, Goree confronted Richard, ordered him to stop speaking, and pushed him using physical force. Goree then called BPD to intimidate Richard, but responding Officer Rashawn Cummings classified Goree's complaint as "unfounded." This was Goree's earliest documented act of physical aggression and false police reporting.

90. On the morning of June 25, 2014, on Center Street in downtown Berkeley, Goree, then Operations Manager of the Downtown Berkeley Association, confronted a man in an alcove on the Center Street frontage of the Center Street Garage, a public parking structure then owned and operated by the City of Berkeley, in a place open to public view on a downtown street. Claudette Biemeret, then the City of Berkeley's Interim Audit Manager, passed the scene and saw part of the encounter. At 8:15 that morning she reported it in writing to the City Auditor, Ann-Marie Hogan. She wrote that she saw "the uniformed person grabbing the homeless man by the neck" and that she was "certain he shouted at the homeless man, 'I will choke you.'" She called the Berkeley Police Department to report it. She wrote that "[m]any people on Center Street were watching and disturbed by what they witnessed."

91. Goree had no ownership of, tenancy in, or authority over the location. He was an employee of a private business association. The garage maintained its own security personnel, who wore dark blue rather than the brown Goree was wearing and who did not begin their shift until 8:00 a.m., as the City Auditor confirmed that morning by going to the garage and speaking with the guard on duty. Goree was neither the property's owner nor its security. He was an employee of a private business association who applied force to a man on municipal property in downtown Berkeley.

92. The City of Berkeley learned within hours that a Downtown Berkeley Association employee had seized a man by the neck on City property and threatened to choke him. The City Auditor, the City Manager, and the Chief of Police were all told that morning, and Goree admitted his conduct to them in writing the same day. The City took no action.

93. No police report was ever generated. Ms. Biemeret called the Berkeley Police Department from the scene and reported what she had seen. The Chief of Police, Michael Meehan, was copied on the email chain that same morning and read Goree's written admission that he was "directly involved," that Ms. Biemeret's account was "accurate," and that he "was angry enough" to injure the man. A City official reported a choking to the police, the Chief of Police was personally told, the perpetrator identified himself in writing, and the Berkeley Police Department opened nothing. The only record of the incident that exists is the email chain attached as Exhibit A.

94. Goree was not disciplined. He remained in his position directing the ambassador enforcement program that the City funded through the Downtown Berkeley Association, and was later hired by the YMCA of the East Bay and placed in charge of a residential building.

95. Goree announced that he would choke the man while he already had the man by the neck. The threat of force yet to come, delivered while force was already being applied, presented the encounter to onlookers as restraint under control rather than as the choking it was.

96. Ms. Biemeret saw only a portion of the encounter, and Goree said so himself.

97. The report reached the highest levels of the City and of the Downtown Berkeley Association within hours. Ms. Hogan forwarded it to City Manager Christine Daniel, copying Police Chief Michael Meehan, Ms. Biemeret, and Downtown Berkeley Association Chief Executive Officer John Caner. Ms. Hogan reported that additional ambassadors had arrived and that they "all appeared to be following the lead of the brown-uniformed individual," and that Ms. Biemeret saw one ambassador take the pillow out from under the man's head and throw it into a transport vehicle. Ms. Hogan established that the parking garage's own security wore dark blue rather than brown and did not begin work until 8:00 a.m. Mr. Caner identified the man in the brown shirt as "Lance Gorée, our Operation[s] Manager."

98. Goree answered in writing the same morning, at 10:40 a.m., to Mr. Caner and to the City Manager, the Police Chief, the City Auditor, and Ms. Biemeret. He wrote: "I am fully aware of the incident, because I was directly involved. I was the person in brown." He wrote that "Ms. Biemeret's account is accurate, but a bit incomplete because of a snapshot in time." He wrote that "[s]he saw the response to Romanian's aggressiveness and Romanian was not in a 'winning' situation." He wrote: "I made sure that Romanian was not physically injured in any way, although I was angry enough to do so." The email chain is attached as Exhibit A and incorporated by reference.

99. Goree's own account is an admission that more force was used than the witness saw. He did not deny grabbing the man by the neck or shouting that he would choke him. He characterized what Ms. Biemeret observed as only "a snapshot," described the remainder as "the response," and stated that the man "was not in a 'winning' situation."

100. Goree referred to the man throughout by nationality, as "Romanian." Goree wrote that this was "the name he has chosen to go by."

101. Goree's written justification in 2014 is the same account he would give of the February 4, 2022 assault on Plaintiff and of the April 2021 assault on Mauricio Montoya: that the other man was aggressive, that the other man initiated physical contact, that the other man had been warned before, and that Goree's own use of force was measured and restrained. In 2014 he wrote that the encounter "escalated when 'Romanian' . . . decided that he wanted to physically assault/challenge me," and that "Romanian was told MANY times not to put his hands on anyone, including me."

102. The Downtown Berkeley Association did not discipline Goree either. He remained its Operations Manager.

103. On March 20, 2015, Downtown Berkeley Association Ambassadors Jeffrey Bailey and Carmen Francois, operating under Goree's supervision within the DBA ambassador enforcement program, confronted Nathan Swor and James Cocklereese, in an alley behind a CVS pharmacy in downtown Berkeley. Mr. Bailey grabbed Mr. Cocklereese and struck him repeatedly. The encounter was recorded by a bystander from a balcony.

104. Mr. Bailey and Ms. Francois reported to the Berkeley Police Department that Mr. Swor and Mr. Cocklereese had threatened to kill them and had assaulted them. Goree signed a false citizen's arrest form in connection with the incident. On the strength of that report the District Attorney charged Mr. Swor with misdemeanor assault with a deadly weapon and exhibiting a deadly weapon. After the recording surfaced, the charges were dismissed and a judge made a factual finding of innocence. The Downtown Berkeley Association terminated Mr. Bailey and suspended Ms. Francois. The incident generated national media coverage and a formal Berkeley Peace and Justice Commission recommendation in April 2015 that the ambassador program be disbanded.

105. Nearly a year earlier, on March 29, 2014, the Berkeley Police Department had documented a battery with bodily injury at the 1900 block of Center Street in Berkeley, Berkeley Police Department Case No. 2014-00018056, in which the same Jeffrey D. Bailey was an involved party. Defendants and the Downtown Berkeley Association therefore had notice of Mr. Bailey's violence before the March 20, 2015 beating.

106. The 2015 incident followed the same pattern as the February 4, 2022 assault on Plaintiff: an individual supervised by Goree attacks a vulnerable person, a false report is made to police, and the victim is treated as the perpetrator.

107. On April 19, 2016, at approximately 11:00 a.m., at Kittredge Street and Shattuck Avenue in downtown Berkeley, a Downtown Berkeley Association ambassador struck a man named Jue in the face. Mr. Jue is Asian. He was 35 years old. He was lying in a cement planter circle, and told the Berkeley Police Department that he had been "day dreaming and looking at leaves" when he was struck on the right side of his face, which knocked him off the planter and split his lip on the sidewalk.

108. Mr. Jue reported that after striking him the ambassador said, "The businesses don't want you laying on the planter." The blow was struck to move a man off public street furniture on behalf of private businesses.

109. Mr. Jue walked to the North Berkeley Senior Center and called the police from there. Officer M. Juster, Badge No. 46, responded and took his statement. Officer Pierantoni, Badge No. 96, photographed the cut inside Mr. Jue's lip. The incident was recorded as a battery under Penal Code section 242, Berkeley Police Department Case No. 2016-00022939.

110. Officer Juster then contacted Goree to identify the ambassador. Goree told the officer "that there was only one Ambassador it could be." Goree did not give the officer that ambassador's name. Instead Goree relayed the ambassador's own account: that the ambassador "had told him that he tried to get someone to move along from McDonalds and that individual said he was going to contact the police and say that the Ambassador had hit him."

111. Goree thus told the investigating officer, before any name was disclosed, that the victim had announced in advance an intention to make a false accusation. The pattern is the one repeated throughout this complaint: the person struck is recast as the person lying.

112. Officer Juster gave Goree his contact information and asked Goree to call once he had confirmed the ambassador's identity. The officer closed his report: "I will continue this investigation when I have the Ambassador's name and contact information." Goree knew which ambassador it was. He never provided the name. The investigation went no further.

113. Berkeley Police Department records list Goree as an involved party in Case No. 2016-00022939, an assault and battery. Goree was again in a position to identify the person who had used force, and again no one was identified, no report advanced, and no one was disciplined.

114. On August 2, 2018, YMCA maintenance employee Antonio Acosta assaulted tenant Joel Hutner after Hutner requested a routine maintenance task, challenging Hutner to a fight: "Let's go, you and I outside, are you a man?" Mr. Hutner answered, "I do not care what you call me, I will not fight you."

115. Mr. Hutner asked Antonio Acosta for his name. Antonio Acosta refused to give it and turned his body so that his name tag could not be read. Mr. Hutner said that if he would not give his name, Mr. Hutner would photograph him. Antonio Acosta then entered the elevator and said he was going to see Goree. Mr. Hutner said, "Let's go together." Antonio Acosta answered, "Leave us alone."

116. Mr. Hutner held the elevator door and said, “Let’s go and talk to Lance together.” Antonio Acosta instead called Goree on the intercom and reported that the tenant “is bothering us.” The tenant who had been challenged to a fight, and who had asked only for the employee’s name, was reported to management as the person causing the trouble.

117. Mr. Hutner wrote to Goree the same day describing the incident. He wrote that “[t]he event was captured on video” and asked for a copy. Goree did not provide it. When Mr. Hutner reported the assault to the Berkeley Police Department, no investigation followed.

118. The sequence is the same one later directed at Plaintiff. A YMCA employee escalated a routine interaction into a physical challenge; concealed his identity when the tenant sought to document him; treated the tenant’s attempt to photograph him as the offense; inverted the roles by reporting the complaining tenant to management as the aggressor; and withheld the video that would have shown what happened. Defendants were on notice of that pattern from their own employee’s conduct in 2018, three and a half years before February 4, 2022.

119. On December 1, 2020, at approximately 7:50 p.m., YMCA resident Meldon Janiel Davis, Jr. committed a felony battery on tenant Stephen Frederick Holt at the facility. The Berkeley Police Department documented the incident as assault and battery, felony, under Penal Code section 242, Berkeley Police Department Case No. 2020-00054942. Mr. Davis was arrested by field citation the same evening. Defendant Goree was recorded as an involved party.

120. Rather than taking action against the assailant, Goree assaulted Mr. Holt himself. Goree used a racial slur toward Mr. Holt, claimed to know the chief of police, and threatened Mr. Holt with false arrest, the same tactic later deployed against Plaintiff. The victim of the battery was thus assaulted a second time, by the Executive Director of the facility, and then threatened with arrest for it. Defendants took no housing enforcement action against Mr. Davis, who resided at the facility, and took no action against Goree.

121. On January 1, 2021, Goree called BPD to request an extrajudicial eviction of a YMCA tenant. BPD declined, explaining Goree needed to go through legal means, demonstrating Goree's pattern of attempting to weaponize BPD against tenants.

122. On March 30, 2021, Goree entered the room of a YMCA tenant to handle the tenant's handguns, disregarding basic tenant safety and boundaries.

123. On April 6, 2021, YMCA employee Antonio Acosta assaulted tenant Mauricio Montoya and challenged him to fight outside the building. On April 27, 2021, Goree himself cornered Montoya, threw him to the ground, and applied a chokehold for approximately ten minutes until BPD arrived and ordered Goree to release Montoya. The Berkeley Police Department report of the incident, Case No. 21-015142, records the parties involved but does not name Goree. Goree's participation is established by contemporaneous communications about the incident, by Mr. Montoya's own account, and by other residents who witnessed it. BPD Sergeant Kleppe then intimidated Montoya rather than arresting Goree. In communications about the incident, Goree admitted that YMCA staff were "not trained in de-escalation" but "VERY well versed in NO escalation." BPD conspired with YMCA to omit key details from the report and to destroy surveillance footage. This chokehold, applied by the same person, at the same facility, using the same technique, occurred just ten months before Goree's fifteen-minute chokehold on Plaintiff.

124. YMCA CEO Gallati simultaneously served as DBA Board Vice President throughout this period, giving him direct knowledge of Goree's enforcement background and the violence associated with the ambassador program he supervised.

125. The overlap between the two organizations was not limited to Defendant Gallati. Hae Won Rhow served as Executive Director of the Downtown Berkeley YMCA at 2001 Allston Way, the branch where Plaintiff lived, and simultaneously served as a Director of the Downtown Berkeley Association from 2018 through 2021. The on-site executive of the building in which Plaintiff was assaulted sat on the board of the organization that had employed Goree and that ran the ambassador enforcement program, during the period in which Goree moved from one to the other.

D. Discriminatory Treatment of Foreign-Born and Hispanic Residents

126. Plaintiff is foreign-born and Hispanic. YMCA marketed its facility to foreign students and other foreign-born tenants through the Kaplan International partnership and affiliated language-school programs.

127. On February 4, 2022, BPD officers at the scene of the assault refused to take reports from foreign-born and Hispanic individuals present, including witnesses who could have corroborated Plaintiff's account that he was the victim.

128. Helton Carvalho, another foreign-born Hispanic tenant at the YMCA, reported a hate-crime assault in which another resident called him a "fucking Mexican," threatened to kill Mexicans, grabbed him, shook him, and ripped off his mask. Carvalho is foreign-born and Hispanic. In 2021 Carvalho personally contacted both YMCA CEO Gallati and Executive Director Goree about the hate-crime harassment and threats directed at him. Both were personally notified in 2021 and neither took any action to resolve the situation, protect Carvalho, or discipline the perpetrator. The Carvalho incident demonstrates that YMCA management had direct, personal notice of xenophobic violence targeting foreign-born Hispanic residents and chose to do nothing, while simultaneously deploying the full range of housing-enforcement mechanisms against Plaintiff, a foreign-born Hispanic whistleblower.

129. On October 11, 2021, American-born tenant Demetrius McNeil assaulted Carvalho, shouting racial slurs including “fucking Mexican” and other hate speech. Despite BPD responding to the incident, no protective action was taken and YMCA did not pursue eviction against McNeil.

130. In October 2023, Carvalho reported that yet another resident threatened to have him arrested because he was “not a citizen”, directly weaponizing the threat of police action against a foreign-born resident’s immigration status in the same building where BPD had arrested Plaintiff after a chokehold.

131. Resident Kevin Haynes repeatedly questioned Plaintiff about whether he was born in the United States and threatened to call ICE on Plaintiff because Plaintiff was foreign-born. Haynes also repeatedly threatened Maria Perez, Julissa Garcia, and Nadine Morante with racist and xenophobic abuse. YMCA took no action against Haynes.

132. Resident Gregory Bigsbee threatened Plaintiff and others with knives. Bigsbee was allowed to remain at the facility despite these threats.

133. In September 2020, Bigsbee brandished a knife against Victor Alfonso Ramirez, a foreign-born Hispanic tenant. On subsequent days, Bigsbee walked through the YMCA carrying a ten-inch knife and broke into multiple tenants’ apartments. YMCA destroyed surveillance footage of these incidents. Despite repeated BPD responses, neither YMCA nor BPD took action to remove Bigsbee or protect the foreign-born residents he targeted.

134. Chantalle Moore, an American-born resident, was a personal friend of Defendant Goree, a DBA employee serving as an enforcement ambassador, and a YMCA tenant. Moore had a long criminal history including elder abuse. She was accused of going through elderly residents' belongings at the facility and was eventually burglarized herself. Moore harassed Plaintiff and other tenants and later committed violence against a Hispanic foreign-born victim. Despite this extensive history of criminal conduct, violence, and elder abuse, Moore remained at the facility without consequence. Moore also claimed to know people in the City government of Berkeley and stated that she knew the police chief, mirroring the same connections that Defendant Goree invoked to intimidate tenants and avoid accountability. YMCA's decision to allow Moore, a violent individual with active criminal history and close ties to both Goree and the DBA enforcement apparatus, to remain in the facility while aggressively pursuing eviction of Plaintiff exemplifies the discriminatory double standard at the core of this case.

135. YMCA's pattern of differential treatment is demonstrated by comparing how it treated dangerous American-born residents with how it treated Plaintiff, a foreign-born Hispanic resident. Residents who committed objectively worse conduct than anything alleged against Plaintiff were not subjected to eviction proceedings: Haynes made xenophobic threats and threatened to call ICE on foreign-born residents; Bigsbee threatened Plaintiff and others with knives; Moore committed actual violence against a Hispanic foreign-born victim. None of these residents was subjected to workplace-violence petitions, cease notices, three-day notices, or unlawful-detainer actions. Only Plaintiff, the foreign-born Hispanic resident who reported the assault and retained counsel, was targeted with the full range of YMCA's housing-enforcement mechanisms, including two workplace violence petitions, two cease notices, two three-day notices, and two unlawful-detainer actions. YMCA selectively deployed its eviction apparatus against the foreign-born Hispanic whistleblower while permitting American-born residents who committed equal or worse conduct to remain undisturbed.

E. The Retaliation Sequence

136. After Plaintiff pursued legal claims arising from the February 4, 2022 assault, Defendants engaged in a systematic retaliatory campaign designed to force Plaintiff from the facility and punish him for exercising his legal rights.

137. On or about March 21, 2022, YMCA filed the first workplace-violence petition against Plaintiff.

138. In July 2022, BPD recommended that YMCA supervisors pursue eviction-focused responses against Plaintiff, reflecting cross-entity coordination between the police department and the YMCA in targeting Plaintiff's housing.

139. On July 19, 2022, YMCA employee Rose Acosta, in coordination with BPD, filed a false police report that listed Plaintiff as a suspect. These false reports, filed by the same employee who had physically participated in the chokehold against Plaintiff, constituted ongoing retaliation.

140. On or about August 5, 2022, YMCA served a cease notice on Plaintiff.

141. On or about August 21, 2022, Plaintiff's counsel sent YMCA a notice of intent to sue.

142. Approximately five days later, on or about August 26, 2022, YMCA filed a second workplace-violence petition against Plaintiff, Alameda County Superior Court Case No. 22CV016890. The timing, approximately five days after receiving notice of Plaintiff's intent to sue, demonstrates retaliatory motive.

143. On October 16, 2022, Rose Acosta filed another police report fraudulently listing Plaintiff as a suspect.

144. On November 3, 2022, the court denied the second workplace-violence petition for failure of proof. Case No. 22CV016890.

145. On or about November 28, 2022, YMCA served a Three-Day Notice to Cease on Plaintiff. Defendant Maltais personally coordinated the eviction efforts. On November 25, 2022, Maltais was copied on and responded to the "More Cammas" email chain in which residence manager Shavon Dorsey asked for "the status of eviction" and described security and policing issues involving Plaintiff.

146. On or about December 6, 2022, YMCA served a Three-Day Notice to Quit for nuisance on Plaintiff.

147. On or about January 11, 2023, YMCA filed the first unlawful-detainer action against Plaintiff, Alameda County Superior Court Case No. 23CV025513, assigned to the Hayward Hall of Justice, Department 511. On March 7, 2023, Maltais replied "let's move forward" after staff reported an incident report had been completed. On March 9, 2023, Maltais asked whether the filing "got filed" and instructed staff to stay "on alert." On March 14, 2023, Maltais exchanged emails with Rose Acosta inquiring about how "the court" was going.

148. On or about April 13, 2023, YMCA filed the second unlawful-detainer action against Plaintiff.

E-1. Plaintiff's Lock Change as Self-Protective Measure and Whistleblower Activity

149. Approximately two weeks before the February 4, 2022 assault, Plaintiff changed the lock on his room at 2001 Allston Way, Room 307, to protect himself and his girlfriend Veronica Estudillo from escalating race-based harassment, threats to their safety, and burglary activity at the facility. This self-protective measure was necessitated by the fact that Defendant Goree, the facility's Executive Director, held master keys to every room, and the existing locks provided no security against the dangerous conditions inside the building, including threats from other residents and unauthorized entries into Plaintiff's unit. The lock change directly precipitated the February 4, 2022 assault.

150. Under California Civil Code Section 1941.3, a landlord has an affirmative duty to install and maintain operable deadbolt locks on the main entry doors of dwelling units. The YMCA's security infrastructure was manifestly inadequate to protect Plaintiff from the race-based harassment, threats, and burglary activity occurring at the facility. Plaintiff's lock change was a reasonable exercise of his right to secure housing, a right that California law recognizes and protects. California law does not prohibit a tenant from securing his own dwelling when the landlord has failed to provide adequate security against dangerous conditions within the building.

151. In retaliation for Plaintiff's lock change, YMCA's response was immediate and violent. BPD Sergeant Landrum, during the February 4, 2022 encounter, explicitly connected the lock change to the assault, stating: "I know it's about something about changing the locks" and "Obviously you're mad about the staff doing something, right?", confirming that YMCA management was aggrieved by Plaintiff's self-protective measure and that the assault was retaliatory. Following the assault, YMCA escalated its campaign with workplace-violence petitions, cease notices, three-day notices, and two unlawful-detainer actions.

152. YMCA subsequently installed locks on the electrical breakers serving Plaintiff's unit, depriving Plaintiff of access to and control over his own electrical service. Restricting a resident's access to the electrical panel serving his dwelling unit violates California Electrical Code requirements and fire department regulations that restrict the locking of electrical panels serving residential units unless the facility maintains continuous building-management supervision. The breaker lockout constituted both retaliation for Plaintiff's lock change and an independent violation of Plaintiff's habitability rights.

153. Plaintiff also engaged in protected whistleblower activity throughout this period. Plaintiff reported the assault and dangerous facility conditions to law enforcement. Plaintiff initiated public records requests to the City of Berkeley seeking BPD incident logs for 2001 Allston Way for 2020 through 2022, copying City officials including the Police Chief and the Mayor, putting the City on notice of the dangerous conditions at the YMCA facility.

154. Fellow YMCA tenant and former resident Mauricio Montoya, also a foreign-born Hispanic individual who was separately choked by Goree in April 2021, reported Goree's violence. Both foreign-born Hispanic residents who reported Goree's violence were subjected to retaliation, while American-born residents who committed equal or worse conduct faced no consequences.

155. Plaintiff's lock change, his reports to law enforcement, his public records requests, and his retention of counsel all constitute protected activity under the Fair Housing Act (42 U.S.C. Section 3617) and the California Fair Employment and Housing Act (Government Code Section 12955(f)). YMCA's retaliatory campaign, workplace-violence petitions, cease notices, three-day notices, and two unlawful-detainer actions, was motivated by and directed at punishing Plaintiff for this protected activity.

F. YMCA's Fraudulent Concealment and False Discovery Responses

156. On May 8, 2023, Defendant Maltais signed YMCA's verified discovery responses under penalty of perjury. In those responses, YMCA stated that documents in categories including the following had "never existed":

a. Communications regarding Goree's performance; (b) Documents describing any use of force Goree employed against any person from 2003 forward, and any injury caused by Rose Acosta or Antonio Acosta (Requests for Production Nos. 17-40); (c) Written complaints about Goree's, Rose Acosta's, and Antonio Acosta's performance during their YMCA employment (Requests for Production Nos. 53-55); and (d) Video and audio

footage of the encounter, the incident, Plaintiff, and the responding officers (Requests for Production Nos. 63-66).

157. These verified representations were false. A subsequent third-party subpoena directed to the City of Berkeley produced 838 pages of emails sent from Goree's YMCA email account (lgoree@ymcaeastbay.org) spanning 2017 through January 2022. These emails, sent from YMCA's own email system, included communications with BPD officers, City housing officials, City mental health personnel, and other City employees regarding Goree's management of the facility, uses of force, resident complaints, and the facility conversion. The existence of these documents directly contradicted YMCA's sworn representation that such records had "never existed."

158. Plaintiff's Requests for Production, Set One, propounded on YMCA on March 10, 2023, contained four separate requests for video, each framed differently:

a. No. 63, "all video and audio footage of the INITIAL ENCOUNTER, including five minutes before and five minutes after";

b. No. 64, "all video and audio footage of the SUBJECT INCIDENT, including five minutes before and after";

c. No. 65, "all video and audio footage of PLAINTIFF on February 4, 2022"; and

d. No. 66, "all video and audio footage of BPD on February 4, 2022, including… video footage of BPD arriving at the YMCA building."

The requests are attached as Exhibit M and incorporated by reference.

159. Defendants verified that no such video had ever existed. The response was not to a single request capable of being misread. It was to four requests describing the same day from four different directions.

160. That verification cannot be reconciled with Defendants' own conduct. On February 4, 2022, YMCA staff told the responding Berkeley Police officers that "the whole thing is on the video." On March 1, 2022, Goree swore under penalty of perjury that "[t]his incident was captured by security cameras, the footage of which is attached hereto as Exhibit 1." Fourteen months later Defendants verified that video of the encounter had never existed.

161. Defendants also withheld documents on claims of privilege and privacy. Their privilege log identified, among others: correspondence between YMCA personnel concerning Plaintiff, withheld as attorney-client privileged; correspondence between Rose Acosta and YMCA personnel, withheld as attorney-client privileged; a "YMCA report regarding Arnaud Cammas' behavior," withheld for the privacy of third parties; Goree's separation report from the YMCA, withheld for Goree's privacy; Goree's employment application; Goree's offer of employment letter; and Goree's professional references.

162. The existence of a separation report for Goree is itself significant. Defendants represented to the Alameda County Superior Court on August 2, 2022 that the first workplace violence petition was being dismissed because Goree no longer worked for them. Defendants therefore possess a document recording the circumstances under which the employee who assaulted Plaintiff left their employment, and have withheld it on privacy grounds.

163. Goree's employment application, offer letter, and professional references are the documents that would show what Defendants knew about Goree's history when they hired him and placed him in charge of a residential building. Defendants withheld all three.

164. YMCA also represented in discovery that extensive amounts of video surveillance from the February 4, 2022 incident were missing. However, evidence shows that Goree routinely reviewed and provided surveillance footage from the YMCA facility to BPD, demonstrating that comprehensive footage existed and was within YMCA's control, and that the missing footage was destroyed rather than lost.

165. YMCA's false verified discovery responses prevented Plaintiff from discovering the facility conversion scheme, Goree's "not trained or equipped" admissions, the Ambassador Housing Program, the YMCA-City-DBA institutional nexus, and Goree's documented history of violence until the third-party subpoena production in 2024.

G. The YMCA-City-DBA Nexus

166. YMCA did not operate in isolation. It was embedded in an interconnected network with the City of Berkeley and the Downtown Berkeley Association that gave rise to and concealed the conditions that harmed Plaintiff.

167. YMCA CEO Francis Gallati simultaneously served as Vice President of the DBA Board of Directors, as documented in the DBA's 2012 Annual Report. This dual governance role bridged the two entities and gave Gallati direct knowledge of both the DBA enforcement apparatus and the YMCA residential facility.

168. Goree transitioned from the DBA, where he served as Operations Manager, carried a BPD radio, and supervised the ambassador enforcement program, to the YMCA, where he became Executive Director of the same facility. This career path placed a former enforcement manager with a documented history of violent confrontations in charge of a vulnerable residential population.

169. YMCA paid a $25,378 annual PBID assessment that directly funded the DBA enforcement apparatus.

170. The City of Berkeley held Contract No. 31900274 with YMCA, valued at $310,000.

171. YMCA received federal financial assistance through multiple programs: the Shelter Plus Care program (42 U.S.C. Section 11403), Housing Assistance Payments contracts administered through the City of Berkeley, Mainstream Vouchers, and HQS inspections conducted by City housing officials. City of Berkeley Shelter Plus Care Program Coordinator Jose Rios processed HAP contracts directly with Goree, sent Goree lease-up packets for YMCA rooms that included a City Shelter Plus Care lease and HAP contract, and stated the City would issue monthly HAP subsidy payments. Berkeley Housing Authority Acting Executive Director Rachel Gonzales-Levine informed Goree that Mainstream Voucher placements at the YMCA would require HQS inspection and a HAP contract signed by YMCA and BHA, and wrote that she had presented the idea of projectbasing Mainstream Vouchers at “the Y SRO building” to the BHA Board. City Behavioral Health Clinician Charles Green coordinated Shelter Plus Care placements and delivered lease paperwork to YMCA tenants.

172. The City of Berkeley’s Housing Assistance Payments register, produced in response to Public Records Act Request No. 26-781, records monthly HAP subsidy payments to “Berkeley-Albany Ymca” at 2001 Allston Way from January 1, 2019 through December 31, 2022. Monthly contract rents ranged from $925 to $1,129, of which the federal subsidy paid to the owner was $824 to $931 per unit per month, with the balance paid by the resident. Payments were made by direct deposit and covered multiple units simultaneously. The payments were administered through named City caseworkers under the COACH Continuum of Care program and the Supportive Housing Network program, within Continuum of Care CA-502.

173. Defendants were therefore direct recipients of federal financial assistance for the building in which Plaintiff lived, during the period of Plaintiff’s tenancy, and not merely incidental beneficiaries of it.

174. The federal Annual Performance Reports the City filed with the United States Department of Housing and Urban Development describe the population housed under those programs at 2001 Allston Way. For the COACH program period covering calendar year 2019, of fifty-two persons served, forty-five were chronically homeless, forty had mental health problems, nineteen had both alcohol and drug abuse, twenty-four had chronic health conditions, thirteen had physical disabilities, and seven had developmental disabilities.

175. For the Supportive Housing Network program period covering June 2019 through May 2020, of sixteen persons served, fifteen were chronically homeless, all sixteen had mental health disorders, half had three or more co-occurring conditions, fifteen came directly from homelessness, and none had earned income.

176. That is the population Defendants were housing at 2001 Allston Way while marketing the same building to students and foreign visitors as a dormitory with twenty-four-hour security and daily cleaning. The data is not Plaintiff's characterization and it is not Defendants' admission. It is the City of Berkeley's own reporting to the federal government. City housing official Jennifer Vasquez coordinated with Goree regarding available rooms, referrals, and program requirements.

177. A YMCA resident, Michael Robert Surryhne, died at the facility on October 17, 2022. His death was investigated by the Alameda County Coroner's Bureau, Coroner Case No. 2022-04114, on the report of Berkeley Police Officer Macapagal. The coroner's investigation report is attached as Exhibit J and incorporated by reference. Berkeley Police Department Case No. 2022-00049154.

178. Violence at the facility continued through the end of 2025. On December 8, 2025, at approximately 8:40 p.m., the Berkeley Police Department responded to an assault and battery in the 2000 block of Allston Way, Berkeley Police Department Case No. 2025-00056163, reported by Officer Jacala, ID 16080. Three individuals were recorded as victims of battery in that single incident.

179. Plaintiff suffered physical injury, emotional distress, financial losses, loss of housing stability, and loss of quiet enjoyment as a direct and proximate result of Defendants' conduct.

## V. CLAIMS FOR RELIEF

COUNT 1, Fair Housing Act Discrimination (42 U.S.C. Section 3604(b)) Against All Defendants

180. Plaintiff realleges and incorporates by reference all preceding paragraphs.

181. Plaintiff is foreign-born and Hispanic and is a member of classes protected under the Fair Housing Act.

182. Defendants provided housing services and facilities in connection with the sale or rental of a dwelling on discriminatory terms and conditions based on Plaintiff's race and national origin, in violation of 42 U.S.C. Section 3604(b).

183. Specifically, Defendants engaged in discriminatory conduct including but not limited to:

a. selectively deploying housing-enforcement mechanisms, workplace-violence petitions, cease notices, three-day notices, and two unlawful-detainer actions, against Plaintiff, a foreign-born Hispanic resident, while permitting American-born residents who committed equal or worse conduct (Haynes: xenophobic threats, ICE threats; Bigsbee: knife threats; Moore: harassment, violence against a Hispanic victim) to remain undisturbed; (b) failing to protect foreign-born and Hispanic residents from documented xenophobic harassment and violence, including the hate-crime assault on Carvalho, the ICE threats against Plaintiff by Haynes, and the racist abuse directed at Perez, Garcia, and Morante; (c) targeting Plaintiff's housing through retaliatory actions after he exercised legal rights; and (d) refusing to take action against xenophobic abusers while aggressively pursuing Plaintiff's eviction.

184. A landlord who has notice of tenant-on-tenant harassment based on a protected characteristic and fails to take reasonable steps to stop it violates the Fair Housing Act. Wetzel v. Glen St. Andrew Living Community, LLC, 901 F.3d 856, 862-63 (7th Cir. 2018). YMCA had direct notice, through reports to CEO Gallati and Executive Director Goree, of xenophobic harassment targeting foreign-born and Hispanic residents and failed to act.

185. The Fair Housing Act reaches discriminatory provision of post-acquisition housing services and facilities. Committee Concerning Community Improvement v. City of Modesto, 583 F.3d 690, 713-15 (9th Cir. 2009); 24 C.F.R. Section 100.65(b)(2), (4). Defendants' discrimination was not limited to the initial rental but extended throughout Plaintiff's tenancy.

186. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered physical injury, emotional distress, financial losses, loss of housing stability, and other damages.

COUNT 2, Fair Housing Act Retaliation and Interference (42 U.S.C. Section 3617) Against All Defendants

187. Plaintiff realleges and incorporates by reference all preceding paragraphs.

188. Plaintiff engaged in protected activity under the Fair Housing Act by complaining about the February 4, 2022 assault, reporting discriminatory and unsafe treatment, retaining counsel, sending notice of intent to sue on or about August 21, 2022, filing a state-court action on October 19, 2022, and pursuing discovery and legal remedies.

189. Defendants retaliated against and interfered with Plaintiff's exercise of rights protected under the Fair Housing Act through the following specific acts, among others:

a. On or about March 21, 2022: filed the first workplace-violence petition against Plaintiff; (b) On or about August 5, 2022: served a cease notice on Plaintiff; (c) On or about August 26, 2022, approximately five days after Plaintiff's counsel sent notice of intent to sue: filed the second workplace-violence petition against Plaintiff; (d) On or about November

28, 2022: served a Three-Day Notice to Cease; (e) On or about December 6, 2022: served a Three-Day Notice to Quit for nuisance; (f) On or about January 11, 2023: filed the first unlawful-detainer action; (g) On or about April 13, 2023: filed the second unlawful-detainer action; (h) Throughout late 2022 and 2023: Maltais directed staff to pursue eviction through the "More Cammas" email chain, "let's move forward" directives, and "on alert" instructions.

190. Each of these actions was taken in response to Plaintiff's exercise of rights protected under the Fair Housing Act and constituted coercion, intimidation, threats, or interference within the meaning of 42 U.S.C. Section 3617.

191. As a direct and proximate result, Plaintiff suffered damages including loss of housing stability, emotional distress, and financial losses.

COUNT 3, Title VI of the Civil Rights Act of 1964 (42 U.S.C. Section 2000d) Against Defendant YMCA of the East Bay

192. Plaintiff realleges and incorporates by reference all preceding paragraphs.

193. YMCA of the East Bay receives federal financial assistance within the meaning of 42 U.S.C. Section 2000d. Federal financial assistance flows through the City of Berkeley's housing programs to YMCA's residential operations through the following specific programs: (a) the Shelter Plus Care program (42 U.S.C. Section 11403), under which City Shelter Plus Care Program Coordinator Jose Rios processed HAP contracts directly with Goree and sent lease-up packets for YMCA rooms; (b) Housing Assistance Payments contracts administered through the City of Berkeley, under which the City issued monthly HAP subsidy payments to YMCA; (c) Mainstream Vouchers, as to which Berkeley Housing Authority Acting Executive Director Rachel Gonzales-Levine informed Goree that placements at YMCA would require HQS inspection and a HAP contract signed by YMCA and BHA, and wrote that she had presented the idea of project-basing Mainstream Vouchers at "the Y SRO building" to the BHA Board; and (d) HQS inspections conducted by City housing officials including Jennifer Vasquez.

194. YMCA is a recipient, not a mere beneficiary, of federal financial assistance. Federal funds flow directly to YMCA through HAP contracts, subsidy payments, and voucher allocations administered through the City. City housing official Jennifer Vasquez directly coordinated with Goree regarding resident placements, room availability, referrals, and program requirements. City Behavioral Health Clinician Charles Green coordinated Shelter Plus Care placements and delivered lease paperwork to YMCA tenants.

195. YMCA discriminated against Plaintiff on the basis of race and national origin in the administration of a program or activity receiving federal financial assistance. YMCA marketed its federally subsidized housing to foreign-born tenants through the Kaplan International partnership, ignored documented race- and national-origin harassment complaints from foreign-born Hispanic tenants even after CEO Gallati and Executive Director Goree were personally notified, and selectively targeted Plaintiff, a foreign-born Hispanic resident, with adverse housing actions while failing to take comparable action against American-born residents who committed equal or worse misconduct.

196. As a direct and proximate result, Plaintiff suffered damages.

COUNT 4, 42 U.S.C. Section 1981 Against All Defendants

**Protected classification**

197. Plaintiff is Hispanic. He is a person of Hispanic ancestry and ethnicity, and his ethnic characteristics were known to and perceived by Defendants, their employees, and other residents of the facility throughout his tenancy. Plaintiff is a member of a racial group protected by 42 U.S.C. Section 1981. Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613

1987. (Section 1981 reaches discrimination against “identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics”).

198. Defendants and other residents of the facility perceived and treated Plaintiff as Hispanic, and directed at Hispanic residents of the facility conduct identifying them by ethnicity.

Resident Demetrius McNeil assaulted Hispanic tenant Helton Carvalho while shouting "fucking Mexican" and threatening to kill Mexicans. Hispanic tenant Juan Bonilla was told to "go back to your country" and that he was "not from here." In his written report to City officials concerning the June 25, 2014 Center Street incident, Goree identified the man he had seized by the neck only by nationality, as "Romanian," six times in a single message. The animus at the facility was expressed in terms of ancestry and ethnicity.

**The contract and the post-formation conduct at issue**

199. Plaintiff held a tenancy at 2001 Allston Way pursuant to contract with Defendant YMCA of the East Bay from approximately February 2021 until July 31, 2023.

200. The termination date is established by Defendants' own admission. In their Separate Statement of Undisputed Material Facts filed April 4, 2025 in YMCA of the East Bay v. Cammas, Alameda County Superior Court No. 23CV031079, Defendants stated as Undisputed Material Fact No. 6: "Defendant continued his possession of the Premises until he vacated the Premises July 31, 2023." Defendants cited in support their own Amended Complaint for Damages at paragraph 28 and Plaintiff's Response to Request for Admission No. 24. The Separate Statement is attached as Exhibit E and incorporated by reference.

201. Plaintiff was therefore a tenant of the facility at all times through July 31, 2023, including throughout the period in which Defendants prosecuted the second unlawful detainer action commenced April 13, 2023.

202. This claim is directed solely to conduct after formation: the performance and termination of the tenancy and Plaintiff's enjoyment of its benefits, privileges, terms, and conditions. Plaintiff does not premise Count 4 on the formation of the tenancy or on any representation that induced him to enter it, and does not incorporate those allegations into this Count.

203. Accordingly this claim arises under 42 U.S.C. Section 1981(b), enacted by the Civil Rights Act of 1991, and is governed by the four-year limitations period of 28 U.S.C. Section 1658(a). Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83 (2004). Measured from the April 13, 2023 date the Court identified, that period ran through April 13, 2027. Count 4 is timely without resort to tolling.

**Defendants' enforcement machinery, as applied to Plaintiff**

204. Against Plaintiff, a Hispanic resident, Defendants deployed:

a. two workplace violence restraining order petitions, filed on or about March 21, 2022 (Case No. 22CV008690) and August 26, 2022 (Case No. 22CV016890), the second of which was denied on November 3, 2022;

b. two cease notices, served on or about August 5, 2022 and November 28, 2022;

c. two three-day notices;

d. two false police reports naming Plaintiff as a suspect, in July and October 2022, one coordinated with the Berkeley Police Department by Defendant Rose Acosta; and

e. two unlawful detainer actions, commenced in January 2023 (Case No. 23CV025513) and April 2023 (Case No. 23CV031079).

**In the alternative: the equal benefit clause**

205. In the alternative, Defendants deprived Plaintiff of "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. Section 1981(a). Section 1981(c) provides that the rights protected by the section "are protected against impairment by nongovernmental discrimination and impairment under color of State law."

206. Defendant Goree assaulted Plaintiff and Mauricio Montoya, both Hispanic. In each case the Berkeley Police Department arrived, and in each case the machinery for the security of persons operated against the Hispanic victim rather than the assailant: Plaintiff was arrested and jailed; Mr. Montoya was intimidated by Sergeant Kleppe rather than Goree being arrested. Officers declined to take statements from foreign-born witnesses present at Plaintiff's assault, and told Plaintiff's companion that Plaintiff "went after Lance."

207. To the extent state action is required for this theory, it is present. Plaintiff has alleged that the City of Berkeley created, funded, and directed the Downtown Berkeley Association enforcement program; that Defendant Goree was that program's Operations Manager before becoming Executive Director of the facility; that the City placed residents at the facility through the Ambassador Housing Program; and that the Berkeley Police Department supervised the program's personnel and acted in concert with Defendants.

**Comparators**

208. Kevin Edward Haynes, Unit 418. Mr. Haynes is not Hispanic. He was referred to the facility by Defendant Goree and held a tenancy on substantially the same terms as Plaintiff. Throughout his tenancy Haynes questioned Plaintiff and other residents about whether they were born in the United States and threatened to call immigration authorities. He subjected YMCA employees Maria Perez and Julissa Garcia and tenant Nadine Morante to sustained racist and xenophobic abuse. In October 2023 he threatened to have Hispanic tenant Helton Carvalho arrested because Carvalho was "not a citizen."

209. On May 10, 2024, YMCA employees Julissa Garcia and Nadine Morante went in person to the Berkeley Police Department jail lobby to report Haynes's conduct. Their report was captured on Berkeley Police Department body-worn camera, Axon Body 3, serial X60A6823J, timestamped May 10, 2024 at 21:03 Pacific. Officer Jan Paul De Guzman, Badge No. 57, documented their reports in BPD Case No. 2024-00021370: Haynes had spent five hours walking the hallways striking walls and cursing; he called Ms. Garcia a "bitch" and told her to "run like you bitches do"; he shouted "The gang will be out to get you" in the hallways and struck walls hard enough to dislodge items in neighboring units; and when contacted by police he stated "The US Marshall will respond" and "Only the US Marshall has authority here." A related incident the same day was documented in BPD Case No. 2024-00021351. Officer De Guzman's body-worn camera was activated throughout.




Berkeley Police Department body-worn camera, Axon Body 3, serial X60A6823J, May 10, 2024 at 21:03 Pacific. YMCA employees Julissa Garcia and Nadine Morante at the Berkeley Police Department reporting the conduct of resident Kevin Edward Haynes. Faces redacted by Plaintiff.

210. Defendants took no action in response. On August 21, 2024, three months after the Berkeley Police Department documented Mr. Haynes's conduct on body-worn camera and Defendants' own employees reported it in person, Juan E. Bonilla, a Hispanic tenant of the facility, was the victim of a felony battery at the 2000 block of Allston Way. The Berkeley Police Department recorded the incident as Case No. 2024-00038343, classified the offense as battery with serious bodily injury under California Penal Code section 243(d), and recorded the disposition as "Complaint Filed" on August 22, 2024. The reporting officer was Officer Chan, ID 16059. The police report identifies Mr. Bonilla's race as Hispanic. Criminal charges were filed against Kevin Haynes in the Superior Court of California, County of Alameda, Case No. 24-CR-009033, arising from the battery on Mr. Bonilla. The Berkeley Police Department declined to release its report on the ground that the matter was under investigation or pending criminal litigation. Plaintiff does not allege that Mr. Haynes was convicted of any offense.

211. Mr. Bonilla had complained to Defendants of harassment and threats since 2020. He complained to the front desk, to Defendant Rose Acosta, to Defendant Goree, and subsequently to Ms. Dorsey. The harassment directed at Mr. Bonilla included statements that he should "go back to your country" and that he was "not from here." Plaintiff is in possession of video recordings of abuse directed at Mr. Bonilla at the facility. Defendants took no action on any of those complaints in the four years preceding the August 21, 2024 felony battery.

212. Defendants took no action against Mr. Haynes following his arrest for a felony battery causing serious bodily injury to a Hispanic tenant of their facility. Defendants served him with no notice to cease, no three-day notice, and no notice of termination, and commenced no unlawful detainer action against him. Mr. Haynes had been referred to the facility by Defendant Goree.

213. The comparison is exact on the point Defendants made against Plaintiff. Defendants justified two workplace violence petitions against Plaintiff on the ground that he had used force against a YMCA employee. Mr. Haynes subjected three YMCA employees and a tenant to sustained abuse over a period of years, two of those employees went to the Berkeley Police Department in person to report him, and he was arrested for a felony battery on a tenant. Defendants filed no workplace violence petition on behalf of any of them.

214. Defendants filed no workplace violence petition, no cease notice, no three-day notice, and no unlawful detainer action against Mr. Haynes at any time, not after the immigration-based threats, not after the police documentation, and not after the assault on Mr. Bonilla.

215. The contrast is not one of degree. Defendants commenced two unlawful detainer actions against Plaintiff on the strength of an unwitnessed, undocumented allegation concerning a trash can. Defendants commenced nothing whatever against Mr. Haynes after police documented him threatening residents and staff on body-worn camera, and after he brutally assaulted a tenant.

216. Defendants' surveillance of Plaintiff began well before 2023 and was known to management. In or about July 2022 Rose Acosta waited outside the shower for Plaintiff and stared at him as he entered his room. Ms. Acosta entered the building adjacent to the facility and photographed Plaintiff's window and the interior of his room. Plaintiff emailed Defendant Goree to report that Ms. Acosta was surveilling him, and Goree responded by sending Plaintiff the photograph Ms. Acosta had taken.

217. On or about October 13, 2022, Rose Acosta and Antonio Acosta cornered Plaintiff at the door of his unit and shouted at him about his locks. Ms. Acosta told Plaintiff "you're going to see what happens," and forced every key she carried into his locks in a display of intimidation.

218. Demetrius McNeil, Unit 413. Mr. McNeil is not Hispanic. On October 11, 2021, Mr. McNeil assaulted Hispanic tenant Helton Carvalho. Berkeley Police Officer Melowitz, Badge No. 94, documented the incident as a hate crime and an assault, Berkeley Police Department Case No. 21-47370. Mr. McNeil called Mr. Carvalho "a fucking Mexican" and said "I'm going to kill all you Mexicans." Mr. McNeil grabbed Mr. Carvalho, shook him, and ripped his mask off. Mr. Carvalho denied McNeil's claim that he had used a slur and stated the attack was unprovoked. The report was referred to the District Attorney's Office for review. Defendants took no protective action and commenced no eviction proceeding against Mr. McNeil.

219. That was not the only documented incident between them. The Berkeley Police Department separately documented a further altercation between Mr. McNeil and Mr. Carvalho, in which Mr. Carvalho identified Mr. McNeil as the aggressor, Berkeley Police Department Incident No. 22-11751.

220. On October 24, 2022, Mr. Carvalho again reported Mr. McNeil to the Berkeley Police Department. Mr. Carvalho stated that Mr. McNeil had cut in front of him in the communal kitchen, told him "Rules don't apply to me," and threatened him, saying "You'll see what I'm going to do to you." Mr. Carvalho stated that he feared for his life given their history, and asked that Mr. McNeil be arrested. Berkeley Police Department Case No. 2022-00050486. No arrest was made.

221. Mr. Carvalho further reported that he had heard Mr. McNeil boast about the earlier hate crime, saying that he had gotten away with it.

222. Across three documented police contacts spanning more than a year, including one classified by the Berkeley Police Department as a hate crime and referred to the District Attorney, Defendants served Mr. McNeil with no cease notice, no three-day notice, and no workplace violence petition, and commenced no unlawful detainer action against him. During the same period Defendants pursued two workplace violence petitions and two unlawful detainer actions against Plaintiff over a trash can and the filming of a manager.

223. Gregory Bigsbee. Mr. Bigsbee is not Hispanic. In September 2020, Mr. Bigsbee brandished a knife at Victor Alfonso Ramirez, a Hispanic tenant. On subsequent days he walked through the facility carrying a ten-inch knife and broke into multiple tenants' units. Defendants destroyed surveillance footage of these incidents. Despite repeated police responses, Defendants took no action to remove Mr. Bigsbee or to protect the Hispanic residents he targeted.

224. Plaintiff identified additional comparators under oath in verified responses to Defendants' form interrogatories in Alameda County Superior Court Case No. 23CV031079. Defendants themselves placed those responses in the record, as Exhibit C to the Declaration of Katherine S. Catlos in support of their motion for summary judgment filed April 4, 2025. The responses are attached as Exhibit H and incorporated by reference. The responses identify the following, each by name and date, and each drawn from Berkeley Police Department responses to 2001 Allston Way.

225. The responses identify Tenant Bigbee, who is not Hispanic and is the same Gregory Bigsbee identified above. On November 29, 2020, Tenant Bigbee broke a window of his apartment and made excessive noise. On January 6, 2021, the Berkeley Police Department responded because Tenant Bigbee was suspected of throwing items from the front desk onto the floor, including a printer and a computer.

226. On that occasion Goree told the responding officers that the YMCA "had to call BPD more than ten (10) times for other disturbances perpetrated by Tenant Bigbee," and that Tenant Bigbee "was not paying his rent."

227. Goree also described to the officers the process Defendants ordinarily followed. He explained that when a tenant did not pay rent, Defendants would "first see if said tenants would voluntarily leave the Subject Premises without having to pay rents due under their leases and, if they refused, the YMCA would only then start the eviction process."

228. Defendants did not follow that process with Plaintiff. Defendants did not first ask Plaintiff to leave voluntarily. Defendants filed a workplace violence petition against Plaintiff on March 21, 2022, and a second on August 26, 2022, served two cease notices and two three-day notices, and commenced two unlawful detainer actions. Tenant Bigbee, who generated more than ten police responses and paid no rent, was never evicted.

229. The responses identify Tenant Cumbo, who is not Hispanic. On September 29, 2021, the Berkeley Police Department responded because Tenant Cumbo was suspected of having a psychotic break and was frightening other tenants. Defendants took no steps to evict Tenant Cumbo.

230. The responses identify Tenant Schroyer, who is not Hispanic. On December 20, 2021, the Berkeley Police Department responded and found Tenant Schroyer's apartment covered in urine and feces, with a fly infestation, and smelling heavily of bodily fluids and rotten food. The responding officers recorded that Defendants "[were] aware" of the condition. Defendants took no steps to evict Tenant Schroyer.

231. Chantalle Moore, Unit 407. Ms. Moore is not Hispanic. She was a personal friend of Defendant Goree, a Downtown Berkeley Association enforcement ambassador, and a YMCA tenant. She had an extensive criminal history including elder abuse, harassment of tenants, and violence against a Hispanic victim, reflected in Alameda County Superior Court case numbers 538016, 424602, 158500, and 135663. Defendants permitted Ms. Moore to remain at the facility without consequence while pursuing eviction against Plaintiff. In December 2025 Ms. Moore assaulted Ana B. Hoover, a Hispanic resident of the facility of Mexican ancestry. Defendants took no enforcement action against Ms. Moore then either.

232. Plaintiff alleges Ms. Moore's association with the Downtown Berkeley Association expressly. Mr. Haynes, Mr. McNeil, and Mr. Bigsbee held no such association. The favorable treatment Defendants extended to those residents cannot be explained by any program affiliation.

233. Each comparator held a tenancy at 2001 Allston Way during Plaintiff's tenancy, on substantially the same terms, subject to the same house rules and the same management. Each engaged in conduct materially more serious than any conduct attributed to Plaintiff. None was subjected to a workplace violence petition, a cease notice, a three-day notice, or an unlawful detainer action.

234. Plaintiff, by contrast, was subjected to all four categories of enforcement, twice each.

235. The first petition, filed March 21, 2022, rested on a declaration executed by Defendant Goree on March 1, 2022. The declaration of Michael A. Slater describing the petitions and their procedural history is attached as Exhibit F and incorporated by reference. In it Goree swore that he overheard what he "thought was 'Go fuck yourself,'" that Rose Acosta told him it was Plaintiff, that he went to the dining room to discuss "his behavior towards Ms. Acosta and whether he changed a lock on a YMCA door," and that "after 4-5 minutes of discussion" Plaintiff "pushed me and punched me in the side of the head." Goree further swore that Plaintiff kicked Rose Acosta, and sought protection for himself, Antonio Acosta, Tammy Barberio, and Maria Luisa Perez-Leon.

236. Goree's declaration omitted his own conduct during the encounter. It did not disclose that Goree demanded repeatedly, and by his own count on the recording at least five times, that Plaintiff leave the dining room and go elsewhere with him; that Plaintiff repeatedly declined and said he did not wish to speak with Goree; that Goree refused to permit Plaintiff to leave; that Goree announced "That's the fifth time I've said it. That's the last time I'm gonna say it"; that Goree told Plaintiff "You're not in your area," "This is my place. This isn't your place," and "What do you own here? What do you run here? Nothing"; or that Goree took a fighting stance and taunted Plaintiff before striking him. Goree characterized the encounter as "4-5 minutes of discussion." That is contradicted by Plaintiff's audio recording and by Defendants' own video, as set forth above. The declaration is attached as Exhibit B and incorporated by reference.

237. Goree's declaration omitted the chokehold entirely. Goree had admitted applying a chokehold to responding officers at the scene on February 4, 2022, and that admission was recorded on Berkeley Police Department body-worn camera. His sworn declaration six weeks later describes no chokehold, no headlock, and no restraint of Plaintiff's neck.

238. Goree's declaration also omitted that he told officers he did not want to make Plaintiff "pass out," and that a maintenance employee was summoned by radio and placed his weight on Plaintiff while Goree held him.

239. Goree swore that "two other residents assisted" him in subduing Plaintiff. Only one resident did so. That individual is now deceased.

240. On February 4, 2022, at the scene, YMCA staff told the responding officers that "the whole thing is on the video." Defendants' own personnel represented to the Berkeley Police Department on the day of the assault that the entire incident had been captured.

241. What Defendants actually gave the Berkeley Police Department was not the video. Goree furnished the officers with three short clips, each approximately five to six seconds long. None was an export from the surveillance system. Each was a handheld recording made with a telephone pointed at a surveillance monitor, and each is unsteady. Approximately eighteen seconds of telephone footage of a screen was the entirety of what Defendants provided to the police concerning an incident that ran approximately an hour from the start of Goree's confrontation of Plaintiff to the departure of the responding officers.

242. Defendants therefore told the Berkeley Police Department that "the whole thing is on the video" and then produced eighteen seconds of it, filmed off a monitor, while the recording system that held the original remained in Defendants' control.

243. On the same recording Goree told officers, twice, that Plaintiff's companion "was videoing the whole time," and that he had said "no, let her keep doing that." Goree was therefore aware on February 4, 2022 that the encounter was being recorded from more than one source.

244. Goree swore that "[t]his incident was captured by security cameras, the footage of which is attached hereto as Exhibit 1." Nothing was attached. The page filed as Exhibit 1 reads: "MP4 VIDEO THAT WILL BE LODGE WHEN CASE AND DEPT NUMBER IS ASSIGNED."

245. Two days later Defendants lodged the video with the court. On March 23, 2022 YMCA filed a "Notice of Lodging of thumb drive," the docket recording that the hard copy was sent to Department 105, together with a "Notice of Lodging of Exhibit 1 to Petition for Workplace Violence Restraining Orders." Alameda County Superior Court Case No. 22CV008690, Hon. Kelli Evans, Department 105.

246. Defendants therefore possessed video of the February 4, 2022 encounter, reduced it to a physical thumb drive, and lodged that drive with a court, all within seven weeks of the assault. Fourteen months later they verified under penalty of perjury that video of the encounter had never existed.

247. Five months after the lodging, in support of their second petition, Defendants again represented that Plaintiff's alleged conduct had been captured on the facility's video monitors, and this time produced nothing.

248. The video Defendants produced is not a native export from the facility's recording system. The file, produced in discovery as YMCA ET AL 000172, was created on February 6, 2022, two days after the incident, and was re-encoded and re-muxed through editing software rather than exported directly from the recorder. It carries no audio.

249. The file depicts a single camera position, identified in its burned-in overlay as "Dining Lounge." Its burned-in clock runs from 13:59:01 to 14:33:41 on February 4, 2022. It does not depict the other areas of the facility through which Goree followed, cornered, and berated Plaintiff.

250. Plaintiff began an audio recording of Goree at approximately 13:45 on February 4, 2022, without Goree's knowledge. The recording runs twenty-three minutes and five seconds and ends at approximately 14:08. Its start therefore precedes the first frame of Defendants' produced video by approximately fourteen minutes.

251. The video Defendants produced does not begin until the confrontation had been underway for roughly fourteen minutes. Whatever the facility's cameras recorded during that period has never been produced.

252. Within the produced video, Plaintiff is taken to the floor and physically restrained beginning at approximately 14:02, and the restraint continues with Goree and others over Plaintiff on the ground through at least 14:09. A uniformed Berkeley Police Department officer is present in the frame at 14:18.

253. Measured from the start of Plaintiff's audio recording to the takedown depicted in Defendants' own video, Goree's confrontation of Plaintiff lasted approximately seventeen minutes before any physical contact.

254. Roughly the final fifteen minutes of the file depict an empty room after the participants and responding officers have departed. The volume of the file is not a measure of what it shows.

255. Within the file, a segment of approximately ninety-eight seconds beginning at 14:20:53 consists of a single held frame, during which the burned-in clock is likewise frozen and no events are depicted. That is the longest such interruption in the file by more than double.

256. Defendants have never produced footage from any other camera position, and have represented that other footage of the February 4, 2022 incident is missing.

257. Goree testified under oath that he confronted Plaintiff for approximately four to five minutes before the physical altercation. That testimony is contradicted by two independent records: Plaintiff's audio recording, which begins approximately seventeen minutes before the takedown, and Defendants' own video, which shows the confrontation already in progress when the footage opens fourteen minutes into it.

258. During the confrontation Goree made threatening hand gestures at Plaintiff. When Plaintiff raised a camera to photograph those gestures, Goree immediately put his hands in his pockets. Goree was aware that his conduct was being documented and concealed his demeanor from the record while continuing the confrontation.

259. Goree's conduct changed according to whether he believed he was being observed. He concealed his hands the moment Plaintiff raised a camera. For the seventeen minutes preceding the assault, however, Goree did not know he was being recorded at all, and had reason to believe the only record of that period was the facility's own surveillance system, which he controlled and from which he routinely selected and furnished footage to the Berkeley Police Department.

260. That is the period Goree later described under oath as "4-5 minutes of discussion." It is also the period for which Defendants produced no video, the file they produced opening some fourteen minutes into the confrontation. Plaintiff's audio recording, made without Goree's knowledge, is the only surviving record of it, and it contradicts both the account Goree swore to and the footage Defendants chose to produce.

261. The missing footage is not a random portion of the recording. What Defendants withheld is precisely the material that would have disproved the account Goree gave under oath and identified who began the encounter. Defendants' file opens fourteen minutes into the confrontation, at the point where Plaintiff is already cornered. The fourteen minutes they did not produce are the minutes in which, on Plaintiff's audio, Goree demanded six times that Plaintiff go elsewhere with him, refused to let him leave, announced "That's the fifth time I've said it. That's the last time I'm gonna say it," told Plaintiff "You do not want to threaten me," took a fighting stance and taunted him.

262. Footage of that period would have established two facts fatal to Defendants' position: that the confrontation lasted far longer than the "4-5 minutes of discussion" Goree swore to, and that during it Goree was the aggressor. Footage beginning where Defendants' file begins establishes neither. Plaintiff alleges that the footage of the first fourteen minutes was destroyed, and that it was destroyed because of what it showed.

263. A second and separate gap exists in the footage Defendants produced. In a video produced in discovery as YMCA ET AL 000170, the footage of the moment Goree struck Plaintiff in the face is absent. Plaintiff's then-counsel identified that gap contemporaneously and raised it with Defendants' counsel in writing on at least four occasions during 2023, describing "the missing video footage of the precise moment Goree punched Plaintiff in the face in the video produced as 'YMCA ET AL 000170.'" That correspondence is attached as Exhibit L and incorporated by reference.

264. Defendants were therefore placed on written notice of the loss in 2023. Plaintiff's counsel wrote that "the YMCA failed to preserve video footage of precisely the moment the foregoing occurred," and that "failure to preserve evidence amounts to spoliation." Counsel advised that Plaintiff intended to move for issue sanctions establishing the blow as true for purposes of the litigation and precluding Defendants from introducing evidence to the contrary.

265. Defendants' response to that correspondence is the point. Defendants' counsel characterized Plaintiff's account of the blow as "impossible to prove." It is impossible to prove because the footage of it is gone, and that footage was in Defendants' custody and control. Defendants asserted the absence of the very evidence they failed to preserve as a reason the allegation could not be established.

266. In both proceedings Defendant YMCA of the East Bay obtained a temporary restraining order against Plaintiff without notice to him and without any hearing. In the first, the petition was filed March 21, 2022 and the temporary restraining order issued two days later, on March 23, 2022; Plaintiff was not personally served until May 24, 2022. In the second, the petition and the temporary restraining order were both filed on August 26, 2022; Plaintiff was not personally served until September 6, 2022. On each occasion an order restraining Plaintiff was in force before he had been served with the papers seeking it.

267. Each order rested on Defendant Goree's declaration and nothing else. That is the declaration that omitted the chokehold, that described the encounter as "4-5 minutes of discussion," and that swore video was "attached hereto as Exhibit 1" when the page attached said only that video would be lodged later.

268. Every time Plaintiff was actually heard, Defendants failed. The first petition was dismissed on August 2, 2022 without any finding against Plaintiff, on Defendants' own application, because Goree no longer worked for Defendants. The reporter's transcript of that hearing is attached as Exhibit D and incorporated by reference. The second petition was denied on November 3, 2022 for failure of proof.

269. Defendants thus secured the coercive effect they sought at the outset, twice, on an ex parte record of their own making, and lost both petitions once Plaintiff could answer them.

**What Plaintiff was actually accused of**

270. The conduct Defendants attributed to Plaintiff in support of their second workplace violence petition consisted of the following, in its entirety: that on "one occasion," on a date Defendants did not specify, Plaintiff "kicked or threw a trashcan down the hall outside of [Shavon Dorsey's] office"; that Plaintiff waited in the hallway with his phone out ready to record Ms. Dorsey; and that Plaintiff had "filmed [her] several more times since July 27, 2022."

271. Plaintiff denied then, and denies now, ever kicking or throwing a trash can outside Ms. Dorsey's office or anywhere else at the facility.

272. In support of the second petition, on the declaration of residence manager Shavon Dorsey, Defendants represented that Plaintiff's conduct had been captured on the facility's video monitors. No such footage was ever produced. Defendants had been advised in writing on August 21, 2022, by Plaintiff's counsel, of their obligation to preserve relevant evidence.

273. The petition was denied on November 3, 2022. The first petition had been dismissed on August 2, 2022 for reasons unrelated to Plaintiff's conduct. Neither petition produced any finding against Plaintiff.

274. On August 5, 2022, Defendants served Plaintiff with a "Notice to Cease, Nuisance" letter threatening eviction, predicated on the same alleged conduct.

275. On the basis of an unwitnessed and undocumented allegation concerning a trash can, and Plaintiff's act of recording a manager in a common hallway, Defendants pursued against Plaintiff: two workplace violence restraining order petitions; two cease notices; two three-day notices; two false police reports naming Plaintiff as a suspect; and two unlawful detainer actions.

276. During the same period, and at the same facility, Defendants took no enforcement action of any kind against:

a. Kevin Edward Haynes, who spent five hours striking walls and cursing in the hallways, called a YMCA employee a "bitch" and told her to "run like you bitches do," shouted "The gang will be out to get you," and in August 2024 physically assaulted tenant Juan Bonilla;

b. Gregory Bigsbee, who brandished a knife at a Hispanic tenant, walked through the facility carrying a ten-inch knife, and broke into multiple tenants' units;

c. Demetrius McNeil, who assaulted Hispanic tenant Helton Carvalho while shouting "fucking Mexican" and threatening to kill Mexicans; and

d. Chantalle Moore, whose criminal history included elder abuse, harassment of tenants, and violence against a Hispanic victim.

277. The difference between Plaintiff and each of these residents was not the gravity of the conduct attributed to them. On any measure, the conduct attributed to them was materially more serious. The difference was that Plaintiff is Hispanic and they are not.

**Denial of the benefits and privileges of the tenancy**

278. Defendant YMCA of the East Bay administered financial assistance to tenants at 2001 Allston Way. Assistance at the property included Rapid Re-Housing subsidies, referrals to the Emergency Rental Assistance Program, and negotiated rent reductions.

279. In or about November 2021, Plaintiff applied to the Alameda County Housing Secure Emergency Rental Assistance Program for assistance with the rent arrears Defendants had been citing against him. Plaintiff received the County's notice regarding the program on October 13, 2021, and the County confirmed receipt of his application.

280. On February 24, 2022, Maria Elena Ramos of the program's administering partner (renthelp@firstpreshayward.com) wrote to Plaintiff that she would be working on his application and listed the documents required to complete it. Among the required documents were items obtainable only from the landlord: a W-9 and proof of ownership of the property.

281. On March 2, 2022 at 9:31 a.m., Plaintiff submitted his application and provided the program with Defendant Goree's full contact information: "Lance Goree, Executive Director Residence & Facilities, Downtown Berkeley YMCA of the East Bay, 2001 Allston Way, Berkeley, CA 94704," together with his telephone number and his email address at lgoree@ymcaeastbay.org.

282. That same day the program transmitted the form the landlord was required to sign, the "(Federal) Landlord Attestation ACHS 3.0." At 1:01 p.m. Plaintiff sent the program a detailed payment ledger. The program then advised Plaintiff that it would "wait for the information the landlord will sent."

283. Defendants did not provide the attestation, the W-9, or the proof of ownership, and the application could not be completed. Plaintiff had no contact with Defendant Goree after the February 4, 2022 assault. The program communicated with Defendants directly, using the contact information Plaintiff supplied on March 2, 2022.

284. The assistance Plaintiff sought would have been paid to Defendants. On January 24, 2022, Defendant Goree and Defendant Rose Acosta had written to Plaintiff asserting rent arrears of $8,416.66 as of January 31, 2022 and invoking Berkeley Municipal Code section 13.76.130, "Good Cause Required For Eviction." That letter is attached as Exhibit C and incorporated by reference. Defendants were therefore aware of the arrears, had threatened eviction on the basis of them, and declined to execute a form that would have caused a government program to pay those arrears to Defendants.

285. Nineteen days after the program requested the landlord's documents, Defendant YMCA of the East Bay filed its first workplace violence restraining order petition against Plaintiff. Defendants thereafter served two cease notices, two three-day notices, and commenced two unlawful detainer actions, each predicated in part on the arrears that the rental assistance program stood ready to pay.

286. Plaintiff had earlier requested financial assistance at the time he applied for tenancy in or about February 2021 and was told the assistance was not available to him. Plaintiff does not assert that refusal as an independent basis for relief and does not premise any claim on the formation of the tenancy. It is alleged solely as background evidence of Defendants' discriminatory intent. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (time-barred acts may be used as background evidence in support of a timely claim).

287. During the same period, Defendants provided financial assistance and other material support to non-Hispanic residents of the same facility, including Gregory Bigsbee, Kevin Edward Haynes, and Chantalle Moore, each of whom engaged in documented threatening or violent conduct at the property, and none of whom was subjected to any enforcement measure. Plaintiff alleges this on information and belief, based on statements made to Plaintiff by Mr. Bigsbee, Mr. Haynes, and Ms. Moore themselves, who told Plaintiff that they were not employed and that Defendants were providing them with financial assistance that enabled them to remain at the facility.

288. Defendant Moore was a personal friend of Defendant Goree. Defendant Goree referred Mr. Haynes to the facility. Plaintiff alleges that Defendants extended material benefits to these non-Hispanic residents while denying the same benefits to Plaintiff, a Hispanic resident, and while directing the full range of housing-enforcement measures at Plaintiff alone.

**Facts tending to exclude the innocent explanations**

289. Retaliation for litigation cannot explain the enforcement campaign, because the campaign predates the litigation. Defendants filed the first workplace violence petition against Plaintiff on or about March 21, 2022. Plaintiff commenced the state court action on October 19, 2022, seven months later. Plaintiff's counsel served notice of intent to sue on or about August 21, 2022, five months after the first petition. When Defendants initiated enforcement, Plaintiff had asserted no legal claim, had no counsel of record, and had served no notice.

290. Defendants began assembling the enforcement file within days. On February 9, 2022, five days after the assault and while Plaintiff was still under medical evaluation for strangulation, Goree emailed the Berkeley Police Department Records Bureau from his YMCA account asking, as to Police Report 2022-05533, "what is the fastest way to get the above report?"

291. Uniform neglect cannot explain what happened to Plaintiff, because Defendants did not fail to act. Each time Defendants were told that a Hispanic resident was being harassed or assaulted, they acted, and each time they acted in favor of the non-Hispanic resident and against the Hispanic one.

292. Mr. Bonilla complained to the front desk, to Defendant Rose Acosta, to Defendant Goree, and to Ms. Dorsey, beginning in 2020 and continuing for four years. Mr. Haynes remained. In August 2024 Mr. Haynes committed a felony battery on Mr. Bonilla causing serious bodily injury.

293. Mr. Carvalho was the victim of an incident the Berkeley Police Department classified as a hate crime and referred to the District Attorney, and of two further documented incidents with the same resident. Mr. McNeil remained, and was never served with a cease notice, a three-day notice, or a workplace violence petition.

294. Mr. Montoya complained of conditions to Defendant Rose Acosta and to his social worker. Three weeks later Defendant Goree cornered him, threw him to the ground, and applied a chokehold until police ordered him released.

295. Plaintiff reported the conduct directed at him. Defendants responded by filing two workplace violence petitions against Plaintiff, serving two cease notices and two three-day notices, and commencing two unlawful detainer actions.

296. Defendants were capable of accommodating a resident, and did so. On June 28, 2019, Goree wrote to Peter Radu of the City of Berkeley about a resident, identified in Defendants' own correspondence as Mr. Kirk, who had lived at the YMCA Hotel since 1995 and whose room had repeatedly become infested with bed bugs. Goree wrote: "We have moved him from 3 different rooms within the past 4 years." He wrote that "corporately the YMCA would like to start the eviction process," and then: "I am trying to avoid that." He proposed instead "[m]oving him out for a week or two while insuring that he is bed bug free," and asked the City for resources to help the resident remain housed.

297. On December 20, 2021, Goree wrote to Berkeley Police Officer Matthew Valle, copying City staff, about another resident whose "condition, mental and even more physical, is declining at an accelerating rate." Goree wrote, "We need a welfare check on him ASAP," said he had already left a message for mobile crisis, and asked what other agency he could contact.

298. Defendant Goree therefore knew how to relocate a resident rather than evict him, knew how to resist his own corporate office when it wanted an eviction, and knew how to summon City services for a resident in distress. They did none of these things for Mr. Bonilla, who complained for four years; for Mr. Carvalho, the victim of a documented hate crime; for Mr. Montoya; or for Plaintiff.

299. That is not neglect. Defendants possessed a full apparatus of housing enforcement, understood how to use it, and used it. Across the entire period alleged, Defendants directed that apparatus at one resident, and that resident is Hispanic. The residents against whom Hispanic tenants complained kept their tenancies without a single enforcement measure between them.

300. A tenant of the facility described the same pattern to the City of Berkeley Rent Stabilization Board on May 15, 2024, writing that the conversion of the building "continues to generate Hate Crimes on Hispanic Americans" and that Director Dorsey "adamantly enables the bullies in discriminatory fashion."

301. The lock change cannot explain the assault. Defendant Goree confined Plaintiff to a corner of the cafeteria to confront him about a change Plaintiff had allegedly made to the lock on his apartment door. Plaintiff stated dozens of times that he did not wish to discuss the matter, that Goree was making him and his companion feel unsafe, and that he wanted to leave. Goree would not permit him to leave. For more than fifteen minutes Goree berated Plaintiff and made thinly veiled threats of violence, and then threatened the safety of Plaintiff and his companion directly.

302. When Plaintiff attempted to push past Goree to leave the cafeteria, Goree took a fighting stance, advanced on Plaintiff, and taunted him: “You want some? You want some? Hu? You want that? … You really want it? You really want it?” Plaintiff retreated to the corner. Goree closed the distance and struck Plaintiff in the face with a closed fist, nearly rendering him unconscious. Goree then threw Plaintiff to the floor and applied a carotid and airway chokehold for approximately fifteen minutes.

303. Goree’s own statements during the restraint establish that he was not addressing a lock. When Plaintiff said “I can’t breathe,” Goree replied: “I know. That’s the point!” Goree told Plaintiff: “You are not getting out of this. And if you do get out of this, I will pummel you until you can’t move.” When Plaintiff said “I need air,” Goree replied: “No. Don’t tell me what you need. It’s too late, Mr. Cammas. It’s too late.” When Plaintiff asked why other employees were placing furniture on his feet, Goree replied: “I’d be more worried about this guy around my neck.” When Plaintiff said “I need help,” Goree replied: “Yes you do.”

304. A person addressing a tenant’s lock does not confine the tenant for fifteen minutes, refuse to let him leave, take a fighting stance, taunt him, strike him in the face, and choke him for fifteen minutes. The lock was the occasion for the confrontation. It does not explain it.

305. Throughout the confrontation Defendant Goree repeatedly demanded that Plaintiff leave the cafeteria and go elsewhere with him. He put the demand at least six times in the opening minutes: “You guys wanna talk about this here or do you wanna go talk about it someplace else?”; “Do you wanna talk about this here or do you want to talk about it somewhere else?”; “I need you to answer that question.”; “I tried to be nice and just tell you we can go talk about this someplace else, but we’re going to talk about it.”; and finally, “Do you wanna discuss this right here, right now, or would you like to discuss it somewhere else? Okay. That’s the fifth time I’ve said it. That’s the last time I’m gonna say it.”

306. Plaintiff declined each time and said he did not wish to speak with Goree at all. Goree would not permit Plaintiff to leave. Shortly after Goree announced it was "the last time" he would ask, Goree took a fighting stance, taunted Plaintiff, "You want some? You want some? Hu? You want that? . . . You really want it?", struck Plaintiff in the face with a closed fist, took him to the floor, and applied a chokehold for approximately fifteen minutes.

307. Defendants have alleged that the subject of the encounter was a change to the lock on Plaintiff's door. A landlord with a question about a door lock does not demand six times that the tenant accompany him away from the room they are in, refuse to let the tenant leave, announce that it is the last time he will ask, and then assault him.

308. Defendant Goree's own words during the confrontation establish that what was at issue was not a lock but Plaintiff's standing as a tenant. An audio recording of the February 4, 2022 confrontation, transcribed, records Goree stating to Plaintiff:

"You're not in your area."

"Mr. Cammas. . . you do not understand. You do not understand. You don't run this. You don't run this. Okay? I don't think you understand this. I don't know why you think you're running this here, but you don't run this."

"This is my place. This isn't your place. That's the thing. That's the mistake you are making."

"What do you own here? What do you run here? Nothing."

309. When Plaintiff said that all he wanted was for Defendants to leave him alone, Goree answered that this was not "a leave you alone situation." Goree thereby stated in terms that he would not disengage, and that Plaintiff's request to be left alone would not be honored.

310. Goree also told Plaintiff during the same encounter that Plaintiff was "bothering" and "pestering" them. Those are the same terms Antonio Acosta used to management about tenant Joel Hutner in 2018, when Mr. Hutner had asked only for the employee's name. In both instances the tenant who sought to be left alone or to identify staff was recast as the person causing trouble.

311. Goree also told Plaintiff during the encounter, "You do not want to threaten me." Plaintiff had made no threat. Goree's statement was of a piece with the rest of the encounter: Goree cast Plaintiff, who had asked to be left alone and had declined to talk, as the person presenting a danger. Goree made that characterization before any physical contact occurred, and he repeated it afterward in his sworn declaration and in Defendants' two workplace violence petitions.

312. Goree further raised Plaintiff's rent during the confrontation, asking Plaintiff why he did not pay his rent and disputing which months had been paid. The subject of the encounter was Plaintiff's tenancy and his standing as a tenant, not a lock.

313. Plaintiff was at that time a tenant of the facility under contract with Defendant YMCA of the East Bay, lawfully present in the common area of the building in which he lived. Goree's statements, that the premises were "my place" and not Plaintiff's, that Plaintiff was "not in [his] area," and that Plaintiff owned and ran "nothing", were a direct denial of the benefits, privileges, terms, and conditions of Plaintiff's tenancy, which 42 U.S.C. Section 1981(b) protects.

314. Weeks later, in or about March 2022, the same individual denied Plaintiff's request for financial assistance, while Defendants extended such assistance to non-Hispanic residents of the same building.

315. The assault was witnessed by other residents of the facility. Michelle Horner, a resident who uses a wheelchair, is visible in the recording of the incident. She later told Plaintiff that while the restraint was ongoing she was praying that Defendant Goree would not kill him. A second resident, also visible in the recording, told Plaintiff that he did not understand what was happening, that he feared Goree was going to kill Plaintiff, and that he thought it strange that Plaintiff received no medical attention.

316. Defendants' management had actual, personal notice of ethnic violence at the facility and elected not to act. In 2021 Helton Carvalho personally notified both Defendant Gallati, the Chief Executive Officer, and Defendant Goree, the Executive Director, of ongoing hate-crime harassment and threats directed at him as a Hispanic resident. Neither took any action to protect Carvalho or to discipline the perpetrator. During the same period Defendants deployed the full range of housing-enforcement mechanisms against Plaintiff.

317. The animus alleged here is specific and documented. Residents at the facility directed ethnic epithets at Hispanic tenants, including "fucking Mexican" and threats to kill Mexicans; residents threatened Hispanic tenants with immigration enforcement; and Defendants' management, having received personal notice of that conduct, protected the residents who engaged in it while deploying the full range of housing-enforcement mechanisms against the Hispanic tenant who reported it.

318. Plaintiff sues for his own injuries only. Plaintiff does not assert any claim on behalf of Mauricio Montoya, Helton Carvalho, Juan Bonilla, or any other resident, and does not seek damages for any injury other than his own. The treatment of those residents is pleaded as evidence of Defendants' pattern and practice, of Defendants' knowledge and intent, and of the reason Plaintiff was treated as he was. Fed. R. Evid. 404(b).

319. The pattern. Defendants' conduct toward Hispanic residents of the facility, set beside their conduct toward the non-Hispanic residents identified above, permits no explanation other than race.

320. Hispanic residents who complained were assaulted, ignored, or driven out:

a. Mauricio Montoya, a Hispanic tenant. On April 6, 2021, YMCA employee Antonio Acosta assaulted Mr. Montoya and challenged him to fight outside the building. Mr. Montoya complained of the conditions to Defendant Rose Acosta and to his social worker. On April 27, 2021, Defendant Goree cornered Mr. Montoya, threw him to the ground, and applied a chokehold for approximately ten minutes, until Berkeley Police arrived and ordered Goree to release him. Berkeley Police Department Case No. 21-015142. Sergeant Kleppe then intimidated Mr. Montoya rather than arresting Goree. Defendants took no action against Goree, who remained Executive Director.

b. Plaintiff, a Hispanic tenant. Nine months later, on February 4, 2022, Defendant Goree confined Plaintiff, demanded six times that he go elsewhere, refused to let him leave, struck him, and applied a chokehold for approximately fifteen minutes. Berkeley Police arrested Plaintiff rather than Goree.

c. Helton Carvalho, a Hispanic tenant. Assaulted by a resident who shouted “fucking Mexican” and threatened to kill Mexicans. Mr. Carvalho notified Defendants Gallati and Goree personally. Neither acted.

d. Juan E. Bonilla, a Hispanic tenant, whose ethnicity is recorded as Hispanic in Berkeley Police Department records. He complained of harassment and threats from at least 2020, to the front desk, to Defendant Rose Acosta, to Defendant Goree, and to Ms. Dorsey. He was told to “go back to your country” and that he was “not from here.” Defendants took no action for four years. On August 21, 2024 he was the victim of a felony battery causing serious bodily injury. BPD Case No. 2024-00038343.

321. The pattern was established before Plaintiff was assaulted. Eight years earlier, on Center Street, Defendant Goree seized a man by the neck, shouted that he would choke him in front of onlookers, admitted it in writing the same morning to the City Manager and the Chief of Police, and identified the man throughout only by his nationality, as set out above.

322. Against that, non-Hispanic residents who committed materially worse conduct were protected and materially supported. Mr. Haynes, Mr. Bigsbee, and Ms. Moore received financial assistance from Defendants. None of them, nor Mr. McNeil, was ever served with a cease notice, a three-day notice, or a workplace violence petition, or made the subject of an unlawful detainer action, not after knife incidents, not after ethnic threats documented by police on body-worn camera, and not after a felony battery causing serious bodily injury to a Hispanic tenant.

323. Every resident Defendants assaulted, ignored, or moved to evict was Hispanic or foreign-born. Every resident Defendants sheltered and subsidized was not. That is the difference between them.

324. Plaintiff's Hispanic ancestry and ethnicity were a but-for cause of Defendants' conduct. Comcast Corp. v. National Association of African American-Owned Media, 589 U.S. 327, 341 (2020). Had Plaintiff been a non-Hispanic resident engaged in the same or materially similar conduct, Defendants would not have subjected him to the workplace violence petitions, cease notices, three-day notices, and unlawful detainer actions described above, would not have withheld from him the protection they extended to non-Hispanic residents, and would not have terminated his tenancy.

COUNT 5, 42 U.S.C. Section 1982 Against All Defendants

325. Plaintiff realleges and incorporates by reference all preceding paragraphs.

326. Plaintiff's Hispanic ancestry and ethnicity are protected under 42 U.S.C. Section 1982 as interpreted by the Supreme Court in Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987).

327. Defendants interfered with Plaintiff's right to lease and hold residential property on the same terms as are enjoyed by white citizens and citizens of other ancestries, by: (a) subjecting Plaintiff to conditions of tenancy materially worse than those experienced by American-born residents, including violent assault by the facility's Executive Director, xenophobic harassment with no management intervention, and targeted housing-enforcement actions; and (b) deploying the full range of YMCA's housing-enforcement powers against Plaintiff while permitting dangerous American-born residents to remain undisturbed.

328. As a direct and proximate result, Plaintiff suffered damages.

COUNT 6, Negligent Operation, Supervision, and Retention Against Defendants YMCA of the East Bay and Gallati

329. Plaintiff realleges and incorporates by reference all preceding paragraphs.

330. Defendants YMCA and Gallati owed Plaintiff, as a residential tenant at 2001 Allston Way, a duty to operate the facility with reasonable care, to hire and retain competent personnel, to adequately supervise employees, and to maintain conditions safe for residential occupancy.

331. Defendants knew or should have known that Goree posed an unreasonable risk of harm to residents. Prior to the February 4, 2022 assault on Plaintiff, Goree had a documented history of violent confrontations at and around the YMCA facility, including: (a) the 2012 physical confrontation with James Armstrong Richard II; (b) the June 25, 2014 neck seizure and threat to choke on Center Street, witnessed by City Interim Audit Manager Claudette Biemeret and admitted by Goree in writing to the City Manager and the Police Chief; (c) the March 29, 2014 battery documented at BPD Case No. 2014-00018056; (d) the 2015 false citizen's arrest and brutal beating of a man by DBA Ambassador Jeffrey Bailey operating under Goree's supervision; (e) Goree's December 2020 assault on tenant Stephen Holt at the facility, in which Goree also used a racial slur and threatened Mr. Holt with false arrest; and (f) the April 2021 chokehold on tenant Mauricio Montoya for approximately ten minutes (BPD Case No. 21-015142), in which Goree himself admitted YMCA staff were "not trained in de-escalation."

332. Defendants negligently operated the facility by: (a) converting the facility from marketed student housing to a de facto long-term SRO for vulnerable populations including mentally unstable individuals, hospice-level patients, and dependent adults, populations Goree admitted YMCA was "not trained or equipped" to serve; (b) reducing staffing from approximately twenty full-time employees to five while the resident population's emergency needs intensified; (c) failing to implement any de-escalation training despite Goree's own admission that staff were "not trained in de-escalation"; (d) retaining Goree as Executive Director despite his documented history of violent confrontations spanning at least ten years; (e) retaining Antonio Acosta despite his August 2018 assault on tenant Joel Hutner and April 2021 assault on tenant Mauricio Montoya; and (f) failing to maintain adequate security despite marketing the facility as having "24-hour security," when the actual security was a single $19.18-per-hour custodian.

333. Defendant Gallati, as YMCA CEO who simultaneously served as Vice President of the DBA Board of Directors, had direct knowledge of Goree's enforcement background and the violence associated with the DBA ambassador program Goree supervised. That dual role gave Gallati actual knowledge of facts making Goree's retention as Executive Director of a residential facility unreasonably dangerous.

334. The assault on Plaintiff was a foreseeable consequence of Defendants' negligent operation, supervision, and retention. Goree had applied a chokehold to another tenant at the same facility just ten months earlier. The facility housed vulnerable populations with escalating emergency needs and inadequate staffing. An assault by Goree on a resident was not merely foreseeable, it was, by February 2022, virtually inevitable.

335. As a direct and proximate result of Defendants' negligence, Plaintiff suffered physical injuries, emotional distress, loss of housing stability, and related damages.

COUNT 7, Intentional Misrepresentation (Fraud), Pleaded With Rule 9(b) Specificity Against Defendants YMCA of the East Bay and Goree

336. Plaintiff realleges and incorporates by reference all preceding paragraphs.

337. WHO: Defendant Goree, acting as YMCA Executive Director and communicating from his YMCA email account (lgoree@ymcaeastbay.org); Defendant YMCA of the East Bay, through its marketing materials and management representations; and YMCA CEO Francis Gallati, through the Kaplan International partnership and AC Housing Choices listings.

338. WHAT: Defendants made the following material representations of fact to Plaintiff and prospective tenants: (a) "CITY DORMS - YMCA" marketing through Kaplan International, representing the facility as student housing; (b) representations of a "safe, clean and welcoming" environment in AC Housing Choices listings; (c) representations of 24-hour security services; (d) representations of daily cleaning services; and (e) representations that the facility was suitable for ordinary residential use. At the same time, Defendants concealed from Plaintiff the conversion of the facility to long-term SRO housing, the nature of the actual resident population, Goree's history of violence, the staffing deficiencies, and the chronic emergency conditions.

339. WHEN: The marketing representations were ongoing from at least 2019 through Plaintiff's move-in in approximately February 2021 and throughout his tenancy. Internally, Goree's July 24, 2019 email described the Ambassador Housing Program and the plan to "transition all of our rooms to Co-Living spaces." Goree's December 18, 2020 email, approximately two months before Plaintiff moved in, stated YMCA was "converting the YMCA Hotel over to Long Term residence." Goree's October 11, 2021 email, approximately four months before the assault, admitted the YMCA was "not trained or equipped to provide assistance to these residents."

340. WHERE: The representations were made through Kaplan International online listings, the AC Housing Choices website, on-site leasing communications at 2001 Allston Way, and ongoing tenancy-related communications. The internal contradicting communications were sent from Goree's YMCA email account (lgoree@ymcaeastbay.org) to City of Berkeley officials including Danette Perry, Jennifer Vasquez, Jay Kelekian, and Michele Byrnes.

341. HOW FALSE: The facility was internally being converted from marketed student housing into a high-risk hospice and halfway house for vulnerable populations with mental health crises, drug overdoses, and chronic emergency incidents while being marketed externally as student dormitories with security and cleaning services. BFD's independent reclassification to "Boarding/rooming house" confirmed the conversion. In In January and February 2022 the fire department responded repeatedly to the address. Staffing was reduced from twenty to five employees. Goree himself admitted the facility was "not trained or equipped" for its actual population. YMCA's own September 2025 job posting confirms the fraud: the "24-hour security" marketed to tenants was a $19.18-per-hour custodian whose primary duties were cleaning rooms, scrubbing restrooms, and doing laundry, the same individual doubling as the sole front desk operator and emergency responder for a facility housing populations experiencing overdoses, mental health crises, and medical emergencies. The marketed character and the actual conditions were fundamentally irreconcilable.

342. KNOWLEDGE AND INTENT: Defendants knew the representations were false when they were made. Goree wrote on July 24, 2019 that the YMCA would "transition all of our rooms to Co-Living spaces," on December 18, 2020 that the YMCA was "converting the YMCA Hotel over to Long Term residence," and on October 11, 2021 that the YMCA was "not trained or equipped to provide assistance to these residents." Those statements were made to City officials while the facility was simultaneously marketed to Plaintiff and other prospective tenants as student housing with twenty-four-hour security and daily cleaning. Defendants made the representations with the intent that prospective tenants, including Plaintiff, rely on them in deciding to rent, and continue to rent, rooms at the facility.

343. RELIANCE: Plaintiff moved into Room 307 at 2001 Allston Way in approximately February 2021 in reliance on the marketed character of the facility as safe student housing with security and cleaning services. Plaintiff would not have moved in, or would not have done so on the same terms, had the true conditions been disclosed.

344. DAMAGES: As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiff suffered: rent paid under false pretenses throughout his tenancy; exposure to dangerous conditions that Defendants concealed, including the resident population's chronic emergency needs, biohazard contamination in common areas, and Goree's propensity for violence; the February 4, 2022 physical assault by an executive with a known and concealed history of violence; and severe emotional distress.

COUNT 8, Fraudulent Concealment Against All Defendants

345. Plaintiff realleges and incorporates by reference all preceding paragraphs.

346. Defendants had exclusive knowledge of material facts regarding the facility at 2001 Allston Way, including: (a) the internal conversion scheme documented in Goree's December 2020, July 2019, and October 2021 emails; (b) the emergency incident history at the facility; (c) Goree's documented history of violent confrontations, including the June 25, 2014 Center Street neck seizure, the March 2014 Center Street battery, the 2015 ambassador assault, and the December 2020 assault on tenant Holt; (d) the staffing reduction from twenty to five employees; (e) Goree's own admission that YMCA was "not trained or equipped" to serve its resident population; and (f) chronic dangerous conditions including drug overdoses, APS referrals, and biohazard contamination.

347. Defendants had a duty to disclose these facts to Plaintiff. The duty arose from: (a) the landlord-tenant relationship between YMCA and Plaintiff; (b) the partial representations made through marketing materials that were misleading without full disclosure of the concealed conditions; and (c) Defendants' superior and exclusive knowledge of facts not reasonably accessible to Plaintiff.

348. Defendants actively concealed these material facts by: (a) Maltais's May 8, 2023 verification under penalty of perjury that documents in key categories had "never existed," directly contradicted by 838 pages of emails subsequently produced through a third-party subpoena to the City of Berkeley; (b) YMCA's representation that significant amounts of video surveillance from the February 4, 2022 incident were missing, despite evidence that Goree routinely reviewed and provided surveillance footage to BPD, demonstrating the footage was destroyed rather than lost; (c) Goree's destruction of portions of the YMCA surveillance footage showing the stalking and threatening phase that preceded the physical assault, eliminating evidence of premeditation and the extended threatening behavior; and (d) continuing to market the facility as "CITY DORMS YMCA" with 24-hour security and daily cleaning while internally converting it to long-term SRO housing for populations YMCA could not safely manage.

349. Plaintiff was unaware of the concealed facts and could not reasonably discover them before relying on Defendants' representations. The conversion scheme, the emergency incident history, Goree's violence history, and the staffing deficiencies were in Defendants' exclusive control. Plaintiff first learned of many of these facts only through the 838-page subpoena production from the City of Berkeley in 2024.

350. Plaintiff relied on the absence of disclosure and was damaged as described herein.

COUNT 9, Negligent Misrepresentation Against All Defendants

351. Plaintiff realleges and incorporates by reference all preceding paragraphs.

352. In the course of leasing and managing Plaintiff's tenancy, Defendants supplied information to Plaintiff about the safety, staffing, and condition of the facility at 2001 Allston Way, including the "CITY DORMS - YMCA" marketing, the "safe, clean and welcoming" representations, the 24-hour security claims, and the daily cleaning claims, without reasonable grounds for believing those representations were true as communicated. Goree's own internal emails from 2019, 2020, and 2021 demonstrate that YMCA's management knew the facility was being converted, was understaffed, and was not equipped to serve its actual population, while the marketing continued unchanged.

353. Defendants intended Plaintiff to rely on those representations in entering and maintaining his tenancy at the facility.

354. Plaintiff reasonably relied on Defendants' representations in moving into Room 307 in approximately February 2021 and in continuing his tenancy and paying rent.

355. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff suffered damages including rent paid under misleading conditions, exposure to dangerous conditions, physical assault, and emotional distress.

COUNT 10, Breach of Contract / Breach of Implied Covenant of Good Faith and Fair Dealing / Breach of Implied Warranty of Habitability Against Defendant YMCA of the East Bay

356. Plaintiff realleges and incorporates by reference all preceding paragraphs.

357. Plaintiff and YMCA entered into a residential rental agreement for Room 307 at 2001 Allston Way, under which Plaintiff paid rent and YMCA was obligated to provide habitable residential premises, maintain the property in compliance with applicable building and housing codes, and deal in good faith with Plaintiff as a tenant.

358. YMCA breached its contractual and implied obligations by: (a) providing premises that did not conform to the represented character of the facility, student housing with 24-hour security and daily cleaning, when the facility had in fact been converted to a long-term SRO for vulnerable populations that YMCA's own Executive Director admitted it was "not trained or equipped" to serve, and the "24-hour security" was in fact a $19.18-per-hour custodian whose primary duties were cleaning rooms and doing laundry, as confirmed by YMCA's own September 2025 job posting; (b) failing to maintain minimum habitability standards, as evidenced by the BFD reclassification of the property to "Boarding/rooming house," the emergency incident history at the facility, biohazard conditions (including blood, feces, and urine in common areas), and chronic emergency incidents; (c) subjecting Plaintiff to an assault by the facility's Executive Director while within the course and scope of employment; and (d) breaching the implied covenant of good faith and fair dealing by retaliating against Plaintiff for exercising legal rights rather than addressing the conditions that gave rise to Plaintiff's complaints.

359. As a direct and proximate result of YMCA's breaches, Plaintiff suffered economic and non-economic damages including rent paid for premises that did not conform to their represented or legally required condition, physical injury, emotional distress, and loss of quiet enjoyment.

COUNT 11, Unfair Competition (California Business and Professions Code Section 17200) Against Defendant YMCA of the East Bay

360. Plaintiff realleges and incorporates by reference all preceding paragraphs.

361. YMCA engaged in unlawful, unfair, and fraudulent business practices within the meaning of California Business and Professions Code Section 17200 et seq.

362. YMCA's conduct was unlawful in that it violated the Fair Housing Act (42 U.S.C. Sections 3604(b) and 3617), Title VI of the Civil Rights Act of 1964 (42 U.S.C. Section 2000d), 42 U.S.C. Sections 1981 and 1982, and California Civil Code Sections 1941 and 1942.5.

363. YMCA's conduct was unfair in that it marketed the facility as "CITY DORMS - YMCA" with 24-hour security and daily cleaning to foreign-born students and other prospective tenants while internally converting the facility to a long-term SRO for populations YMCA's own Executive Director admitted it was "not trained or equipped" to serve, and then selectively deployed the full range of housing-enforcement mechanisms against Plaintiff, a foreign-born Hispanic whistleblower, while permitting American-born residents who committed equal or worse conduct to remain undisturbed.

364. YMCA's conduct was fraudulent in that it was likely to deceive members of the public, including prospective tenants, about the nature, safety, staffing, and character of the residential facility at 2001 Allston Way. The Kaplan International "CITY DORMS YMCA" marketing, the AC Housing Choices "safe, clean and welcoming" listing, and the 24-hour security representations were materially misleading.

365. As a direct and proximate result of YMCA's unfair business practices, Plaintiff suffered injury in fact and lost money or property, specifically, rent paid under deceptive and unsafe conditions. Plaintiff has standing under Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 323 (2011).

366. Plaintiff seeks restitution of rent wrongfully obtained by YMCA under deceptive conditions, and such other equitable relief as the Court deems appropriate.

COUNT 12, Conspiracy to Interfere with Civil Rights (42 U.S.C. Section 1985(3)) Against All Defendants

367. Plaintiff realleges and incorporates by reference all preceding paragraphs.

368. Two or more persons, including Defendants YMCA of the East Bay, Goree, Maltais, Rose Acosta, and Antonio Acosta, acting in coordination with the Downtown Berkeley Association and the Berkeley Police Department, conspired to deprive Plaintiff, a foreign-born Hispanic individual, of the equal protection of the laws and of equal privileges and immunities under the laws, within the meaning of 42 U.S.C. Section 1985(3).

369. The conspiracy was motivated by racial and class-based invidiously discriminatory animus toward Plaintiff based on his race, national origin, and ancestry as a foreign-born Hispanic individual.

370. The following overt acts were committed in furtherance of the conspiracy:

a. On February 5, 2022, one day after the assault, Goree sent an email to BPD officers regarding "Assault Charges against Mr. Cammas," seeking to ensure that the victim of his assault would be charged as the perpetrator, reflecting cross-entity coordination between YMCA and BPD; (b) On February 9, 2022, Goree emailed BPD Police Records requesting a copy of the police report (Case No. 2022-00005533), continuing coordination with BPD in the days following the assault; (c) On February 18, 2022, Goree sent a follow-up email to BPD officers again regarding "Assault Charges against Mr. Cammas," continuing the coordinated effort to prosecute Plaintiff for being assaulted; (d) During his tenure as DBA Operations Manager, Goree carried a BPD radio, enabling real-time coordination between the DBA enforcement apparatus and law enforcement; (e) The DBA provided monthly updates to BPD, establishing a regular coordination channel between the entities; (f) YMCA paid a $25,378 annual PBID assessment that directly funded the DBA enforcement apparatus, creating a financial nexus connecting YMCA, the DBA, and BPD; (g) YMCA CEO Francis Gallati simultaneously served as Vice President of the DBA Board of Directors, bridging YMCA and the DBA enforcement apparatus at the governance level; (h) In July 2022, BPD recommended that YMCA supervisors pursue eviction-focused responses against Plaintiff, reflecting cross-entity coordination between the police department and YMCA in targeting Plaintiff's housing; (i) The false citizen's arrest pattern: On March 20, 2015, DBA Ambassador Jeffrey Bailey, operating under Goree's supervision, brutally beat two men; Goree signed a false citizen's arrest form; one victim was criminally charged before exculpatory video surfaced. The February 4, 2022 assault on Plaintiff followed an identical playbook: a Goree-supervised individual attacks a vulnerable person, a false report is filed, and the victim is treated as the perpetrator. This

repeated pattern evidences an ongoing conspiracy to use citizen's arrest procedures to victimize vulnerable individuals and then blame them.

371. A claim under 42 U.S.C. section 1985(3) accrues from the last overt act committed in furtherance of the conspiracy. Overt acts in furtherance of the conspiracy alleged here continued after Plaintiff vacated the facility on July 31, 2023, including Defendants' amendment of the action against Plaintiff on October 13, 2023 to seek money from him, their motion resulting in summary adjudication on June 25, 2025, and their entry of an amended judgment against him on August 4, 2025.

372. As a direct and proximate result of the conspiracy and overt acts in furtherance thereof, Plaintiff was injured in his person and property, deprived of having and exercising rights and privileges of a citizen of the United States, and suffered physical injury, emotional distress, loss of housing stability, financial losses, and deprivation of his civil rights.

Count 13, Conversion, was voluntarily dismissed without prejudice and is not realleged. (Dkt. 47.)

COUNT 14, FEHA Housing Retaliation (California Government Code Section 12955(f)) Against All Defendants

373. Plaintiff realleges and incorporates by reference all preceding paragraphs.

374. California Government Code Section 12955(f) makes it unlawful for any person to "discriminate against, or harass, any person because the person has opposed practices unlawful under [FEHA], informed law enforcement agencies of practices believed unlawful under [FEHA], or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]."

375. Plaintiff engaged in activity protected under Government Code Section 12955(f) by:

a. Reporting the February 4, 2022 assault to law enforcement, which was an act of opposing discriminatory housing practices, namely, the selective use of physical violence against a foreign-born Hispanic tenant by YMCA management while permitting American-born residents who committed equal or worse conduct to remain undisturbed; (b) Retaining

counsel and providing notice of intent to sue, thereby opposing YMCA's discriminatory housing practices; (c) Initiating public records requests to the City of Berkeley, copying City officials including the Police Chief and Mayor, regarding the pattern of incidents at 2001 Allston Way; (d) Changing his room lock approximately two weeks before the assault to secure his dwelling against escalating race-based harassment, threats, and burglary activity, an act of self-protection that directly precipitated YMCA's retaliatory assault; (e) Filing the state-court action (Alameda County Superior Court Case No. 22CV019990) against YMCA; (f) Filing the present federal action.

376. Defendants' retaliatory campaign, including the workplace-violence petitions, cease notices, three-day notices, two unlawful-detainer actions, false police reports by Rose Acosta, the installation of locks on electrical breakers, and the coordinated BPD recommendation to pursue eviction, was motivated by Plaintiff's protected activity. The retaliatory motive is demonstrated by:

a. Temporal proximity: The second workplace-violence petition was filed approximately five days after Plaintiff's counsel sent notice of intent to sue; (b) Escalating severity: The retaliatory actions escalated from petitions to cease notices to three-day notices to unlawful-detainer actions, each following an instance of Plaintiff's protected activity; (c) Differential treatment: No American-born resident who committed equal or worse conduct, including knife threats, xenophobic harassment, ICE threats, and physical violence, was subjected to any of these enforcement mechanisms; (d) Management coordination: Defendant Maltais personally directed the retaliation through the "More Cammas" email chain, the "let's move forward" directive, and the "got filed" and "on alert" instructions; (e) Cross-entity coordination: BPD recommended eviction-focused responses to YMCA supervisors, and Rose Acosta filed false police reports in coordination with BPD, reflecting institutional coordination in the retaliatory campaign.

377. Under FEHA, Plaintiff's protected status as a foreign-born Hispanic individual need only be "a motivating factor" in Defendants' adverse actions, no mixed-motive defense is available. The evidence of selective enforcement against foreign-born Hispanic residents, combined with the temporal proximity between protected activity and adverse actions, establishes that Plaintiff's national origin and race were motivating factors.

378. As a direct and proximate result of Defendants' FEHA retaliation, Plaintiff suffered damages including loss of housing stability, severe emotional distress, financial losses, the chilling of his exercise of civil rights, and deprivation of the quiet enjoyment of his dwelling.

## VI. TIMELINESS AND TOLLING ALLEGATIONS

### A. Accrual

379. Plaintiff filed his original complaint on November 28, 2025.

380. The Court identified April 13, 2023 as the date by which Plaintiff knew or had reason to know he had been injured. (Dkt. 55 at 5-7.) Plaintiff does not concede that every claim pleaded here accrued on that date, and preserves the contention that a claim resting on differential treatment does not accrue until the plaintiff knows or has reason to know how the same defendants treated others. Plaintiff obtained the comparator facts only when Defendants filed their own verified interrogatory responses in the state action.

381. The allegations that follow establish that the claims are timely measured from April 13, 2023 in any event. Plaintiff therefore does not ask the Court to revisit accrual, and pleads timeliness on the Court's own date without waiving the point.

382. Not every claim pleaded here is governed by a two-year period, and several are timely on the Court's own date without resort to any tolling:

a. Count 4 arises under 42 U.S.C. Section 1981(b) and is governed by the four-year period of 28 U.S.C. Section 1658(a). Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83 (2004). Measured from April 13, 2023, that period runs through April 13, 2027.

b. Count 11 arises under Business and Professions Code Section 17200 and is governed by the four-year period of Section 17208, which applies whatever the nature of the underlying violation. That period runs through April 13, 2027.

c. Counts 7, 8, and 9 sound in fraud and are governed by the three-year period of Code of Civil Procedure Section 338(d), which does not begin to run until the plaintiff discovers, or should have discovered, the facts constituting the fraud. Debro v. Los Angeles Raiders, 92 Cal. App. 4th 940, 950 (2001). Plaintiff obtained those facts from the City of Berkeley's 838-page production in 2024.

d. Count 12 arises under 42 U.S.C. Section 1985(3), which accrues from the last overt act committed in furtherance of the conspiracy. The last such act occurred on August 4, 2025, and the claim is timely measured from that date.

383. As to Counts 1, 2, 3, 5, 6, 12, and 14, a two-year period measured from April 13, 2023 alone and without tolling would have expired April 13, 2025. As set forth below, that period was tolled on each of several independent grounds, and those claims are timely. Count 12 is therefore timely twice over: from the last overt act in furtherance of the conspiracy, and on each of the tolling grounds that follow.

## B. Equitable Tolling

B.1, Pursuit of an Alternative Remedy

384. California's tolling rules govern the limitations periods borrowed for Plaintiff's federal civil rights claims. TwoRivers v. Lewis, 174 F.3d 987, 992 (9th Cir. 1999).

385. Under California law, where a plaintiff possesses several legal remedies and, reasonably and in good faith, pursues one, the limitations period on the others is suspended during the pendency of the first proceeding and resumes when that proceeding concludes. Elkins v. Derby, 12 Cal. 3d 410, 414 (1974); Addison

v. State of California, 21 Cal. 3d 313, 319 (1978); McDonald v. Antelope Valley Cmty. Coll. Dist., 45 Cal. 4th 88, 100 (2008). The doctrine operates to stop the clock, not merely to excuse a delay.

386. It is immaterial that Plaintiff was not required to bring the state action first. Equitable tolling extends to the voluntary pursuit of an alternate remedy. Campbell v. Graham-Armstrong, 9 Cal. 3d 482, 490 (1973); Elkins, 12 Cal. 3d at 414.

387. Plaintiff pursued such an alternative remedy continuously and without interruption from October 19, 2022 to the present.

388. The state personal injury action. On October 19, 2022, Plaintiff, then represented by counsel, commenced Cammas v. YMCA of the East Bay, Lance Goree, Rose Acosta, and Antonio Acosta, Alameda County Superior Court No. 22CV019990, asserting battery, intentional infliction of emotional distress, false imprisonment, and negligence arising from the February 4, 2022 assault and the conditions at the facility. That action named four of the Defendants named here and arose from the same operative facts.

389. That action was pending when the claims asserted here accrued on any view of the date. Measured from April 13, 2023, the date the Court identified, on that date the state action had been pending for nearly six months and would remain pending for nearly two years more. The limitations period on the present claims was therefore suspended from the moment of accrual.

390. Judgment of dismissal was entered in that action on January 30, 2025, and an amended judgment of dismissal on April 11, 2025. Plaintiff moved to set aside and vacate the judgment under Code of Civil Procedure section 663 on February 3, 2025. That motion was denied on August 13, 2025.

391. Plaintiff appealed. Appeal No. A172620 was taken from the judgment in 22CV019990 and remains pending before the California Court of Appeal, First Appellate District, where it has been fully briefed and is pending oral argument. The judgment is therefore not final.

392. The state contract action. On April 13, 2023, Defendants commenced YMCA of the East Bay v. Cammas, Alameda County Superior Court No. 23CV031079. Plaintiff defended that action, in which the same course of conduct was at issue. By order of June 25, 2025 the court denied summary judgment but granted summary adjudication, and an amended judgment was entered August 4, 2025. Plaintiff filed a notice of appeal on August 24, 2025. The Court of Appeal entered a stay order on December 26, 2025. Appeal No. A174186 remains pending, and Plaintiff filed his opening brief on July 17, 2026.

393. Measuring from the earliest date on which the alternative remedy can be said to have concluded, January 30, 2025, the two-year limitations period resumed and had nearly its full duration remaining when Plaintiff commenced this action on November 28, 2025. On any of the later candidate dates (April 11, 2025; August 13, 2025; or the pendency of the appeals) the action is timely by a greater margin.

394. The interval between January 30, 2025 and the filing of this action is accounted for, and it was not a period of inaction. Plaintiff moved to vacate the judgment under Code of Civil Procedure section 663 on February 3, 2025, four days after entry, and prosecuted that motion until it was denied on August 13, 2025. He filed a notice of appeal, and that appeal is pending. Throughout the same months he remained under the specialty psychiatric care described in Section VI.C below, and his treating providers had stated in writing that his incapacity was expected to continue through November 12, 2025. He commenced this action sixteen days after that date. There was no period in which Plaintiff was both able to proceed and did nothing.

B.2, The Saint Francis Elements Are Satisfied in Any Event

395. California equitable tolling requires timely notice to the defendant, lack of prejudice to the defendant, and reasonable and good faith conduct by the plaintiff. Saint Francis Mem'l Hosp. v. State Dep't of Pub. Health, 9 Cal. 5th 710, 724 (2020).

396. Timely notice. Defendants YMCA of the East Bay, Goree, Rose Acosta, and Antonio Acosta were served with the October 19, 2022 state complaint, which pleaded the February 4, 2022 assault, the conditions at the facility, and Defendants' conduct toward Plaintiff. Defendants have had notice of the factual basis of every claim asserted here since 2022 and have litigated those facts continuously since. Defendants Gallati and Maltais, as the Chief Executive Officer and a human resources executive of Defendant YMCA of the East Bay, had notice through the entity.

397. Lack of prejudice. The claims here arise from the same transactions, depend on the same witnesses, and rest on the same documentary record as the proceedings Defendants have litigated since 2022. Defendants propounded and responded to discovery on these facts, served verified discovery responses concerning them, and are represented by the same counsel. Defendants identify no evidence lost, no witness now unavailable, and no defense impaired by the timing of this filing.

398. Reasonable and good faith conduct. Plaintiff pursued one coherent course of litigation. He filed the state action promptly, within eight months of the assault, through counsel. When judgment was entered against him he moved to vacate under section 663 rather than abandon the claim, and when that motion was denied he appealed. He did not litigate the same claims simultaneously in two forums; he commenced this action only after the state judgments were entered. Both appeals remain pending and Plaintiff has abandoned no remedy he sought.

399. Plaintiff further alleges that the state dismissals were erroneous and are the subject of the pending appeals identified above. A judgment under appeal is not final, and Plaintiff's continued prosecution of those appeals is itself evidence of the diligence the third element requires.

400. In Appeal No. A172620, taken from the dismissal of the personal injury action, Plaintiff contends: (a) that the dismissal was discretionary under Code of Civil Procedure section 583.420(a)(2)(A) and was entered barely past the two-year threshold, at a posture where the policy favoring trial on the merits is strongest and the court's discretion is narrowly confined; (b) that the trial court's finding that Plaintiff made "no competent showing of excusable delay" is contradicted by the record, which contains uncontroverted medical evidence that Plaintiff was incapable of participating in the litigation; (c) that the order's statement that Plaintiff "failed to appear for deposition on September 23, 2024" is contradicted by the declaration cited for it and is disavowed in Respondents' own appellate brief, which admits that Plaintiff "never sat for deposition"; (d) that the trial court vacated the impending trial date and then dismissed the action for failure to reach trial; and (e) that the court made no finding of prejudice and Respondents identified none.

401. In Appeal No. A174186, taken from the judgment in the action Defendants commenced against Plaintiff, Plaintiff contends: (a) that summary adjudication of Plaintiff's retaliatory-eviction cross-complaint was error because the trial court held the claim barred by Plaintiff's rent default, a limitation appearing only in Civil Code section 1942.5(a), when the claim arises under section 1942.5(d) and the common law, neither of which requires the tenant to be current on rent; (b) that the moving party did not carry its initial burden, its separate statement establishing only nonpayment and offering no evidence negating retaliatory motive; (c) that the contract award was unsupported by any rent ledger or business record; and (d) that the amended judgment grants summary judgment "in its entirety" although the court denied summary judgment and denied adjudication of one cause of action.

402. The medical incapacity evidence described in Section VI.C was before the state court and is described in Plaintiff's appellate briefing as uncontroverted.

B.3, Defendants' Own Conduct Prevented Plaintiff From Asserting These Claims

403. Equitable tolling applies where a plaintiff "is prevented from asserting a claim by wrongful conduct on the part of the defendant." Stoll v. Runyon, 165 F.3d 1238, 1242 (9th Cir. 1999). Under California law a defendant whose concealment prevented the plaintiff from discovering the facts may be estopped from pleading the statute of limitations. Bernson v. Browning-Ferris Industries, 7 Cal. 4th 926, 936 (1994). Plaintiff pleads that ground independently of any claim that he was unaware his injuries had occurred.

404. Plaintiff does not contend he was unaware that he had been assaulted or that Defendants were seeking to evict him. He knew both, and he sued on both in state court on October 19, 2022.

405. What Plaintiff could not know from his own experience was whether what happened to him was an isolated event or a practice. A claim under 42 U.S.C. section 1981 does not rest on the plaintiff's own experience alone. It requires proof of how the same defendants treated others, of what they knew about the employee who assaulted him, and of what they did about it. That evidence existed only in Defendants' files.

406. On May 8, 2023, seven months after Plaintiff sued, Defendant Maltais signed verified responses under penalty of perjury representing that Defendants possessed no records of any use of force by Goree, Rose Acosta, or Antonio Acosta at any time from 2003 forward; no written complaints about any of their performance; no records of any adverse employment action against any of them; no communications with Goree concerning Plaintiff, the incident, or the lawsuit; and no video of the encounter. As to each, the verified response was that such documents "have never existed."

407. Each of those representations was false. Goree had seized a man by the neck on Center Street in 2014 and admitted it in writing to the City Manager and the Chief of Police. He had declined to identify an ambassador who struck a man in 2016, ending that investigation. He had choked Mauricio Montoya in April 2021 until police ordered him to stop. He had admitted choking Plaintiff to the responding officers on February 4, 2022. Defendants held his separation report, his employment application, and his professional references, and withheld all three. Video of the encounter existed, had been described to police on the day, and had been lodged with the Superior Court on a thumb drive by Defendants themselves on March 23, 2022.

408. Plaintiff had no means of learning any of this except from Defendants. He asked for it through the discovery process the law provides, and Defendants answered under oath that it did not exist. He obtained it only in 2024, and only because a third party, the City of Berkeley, produced 838 pages from Goree's own YMCA email account in response to a subpoena Defendants did not control.

409. A defendant may not swear that evidence does not exist, withhold it for a year, and then argue that the plaintiff should have pleaded a claim that evidence alone could support. The verified responses Defendant Maltais signed are the reason the pattern was not pleaded earlier, and a party may not take advantage of its own wrong. Cal. Civ. Code section 3517.

410. Defendant Maltais's verification, and YMCA's reliance on it, estop Defendants from asserting the statute of limitations. Equitable estoppel applies where the party to be estopped knows the facts, acts so that the other party has a right to believe the conduct was intended to be acted upon, the other party is ignorant of the true state of facts, and relies on the conduct to his injury. Lantzy v. Centex Homes, 31 Cal. 4th 363, 383-84 (2003). Estoppel operates independently of equitable tolling and addresses the circumstances in which a defendant may not invoke the limitations bar at all.

411. Each element is present. Defendants knew what their files contained; they had produced Goree's declaration attaching video, and Goree had reported his own conduct in writing on three prior occasions. They served verified responses signed under penalty of perjury, which are made to be relied upon and which the discovery statutes require a party to rely upon. Plaintiff was ignorant of the true state of the facts, having no access to Defendants' records. He relied on those responses, and the state action he was then prosecuting was dismissed for failure to prosecute.

412. The obstruction had a second consequence. Plaintiff's state action was dismissed for failure to prosecute. It was dismissed during the period of Plaintiff's documented medical incapacity, and after Defendants had represented that the evidence necessary to prosecute it did not exist.

## C. Medical Incapacity

### Objective medical documentation of the injury

413. The injury Plaintiff sustained on February 4, 2022 was documented by multiple independent physicians as a strangulation injury. On March 8, 2022, Plaintiff was evaluated at the Kaiser Oakland Emergency Department for worsening throat fullness, voice change, painful swallowing, and positional stridor, with tenderness of the larynx and trachea. The treating physician ordered CT angiography of the neck for "subacute neck trauma (choke hold)," diagnosed neck injury under ICD-10 code S19.9XXA, and discharged Plaintiff with formal "Strangulation Injury: Care Instructions."

414. On May 27, 2022, Plaintiff underwent CT imaging of the neck. The stated indication was "history of strangulation, persistent pain around left hyoid bone, concerning for missed fracture."

415. On July 12, 2022, Plaintiff underwent MRI of the brain. The stated indication was "strangulated 2/4/2022 for 15 min. Brief LOC. Distracting conductivity difficulties, occipital headaches, dizziness." The study found periventricular white matter T2 hyperintensity foci. The duration recorded in that imaging order, fifteen minutes, is the duration alleged throughout this complaint, and it was recorded by a treating physician five months after the assault and more than three years before this action was filed.

416. On July 27 and 28, 2022, Plaintiff underwent MR angiography of the head and neck. The stated indication was "rule out dissection of carotid arteries, strangulation."

417. On November 27, 2022, Plaintiff was hospitalized at the UCSF Parnassus Emergency Department. Venous blood gas measurement recorded an oxygen saturation of 74 percent and a partial pressure of oxygen of 39 millimeters of mercury.

418. On September 22, 2022, post-concussion syndrome was formally diagnosed. Memory loss and chronic daily headaches had been diagnosed on July 18, 2022.

419. As a direct result of the February 4, 2022 assault, Plaintiff suffered post-traumatic stress disorder, post-concussion syndrome, chronic respiratory distress, dysphonia, and executive-function impairment. Plaintiff's post-traumatic stress disorder was formally diagnosed on December 6, 2022 and has been carried continuously since as an active clinical problem.

420. Plaintiff did not merely receive diagnoses. He was enrolled in and treated through the San Francisco Department of Public Health's specialty mental health system, including its Adult and Older Adult Mental Health program and its Sunset Mental Health Center, and was assigned case management services. Enrollment in specialty mental health care with assigned case management reflects impairment of the functions required to manage one's own affairs.

421. On September 9, 2024, Plaintiff's treating clinicians at Sunset Mental Health Services, wrote that Plaintiff was receiving mental health services and was "not in a mental condition that would allow him to participate fairly in legal process," and that the condition might require months before he reached stabilization.

422. On November 12, 2024, the same providers wrote that Plaintiff had been a patient since August 6, 2024, that he "would be incapable of adequately representing himself or his interests in a legal setting or fulfilling necessary court-related duties," and that the condition was expected to affect him for the next six to twelve months.

423. Six to twelve months from November 12, 2024 extends through November 12, 2025. Plaintiff commenced this action on November 28, 2025, sixteen days after the outer limit of the incapacity his treating providers projected.

**Physician-ordered disability from 2022 through 2024**

424. The Court found that the sole allegations about the length of Plaintiff's disabilities described about five months. That is not the record. Plaintiff's treating physicians placed him off work or on restricted activity, in writing, on the following occasions:

a. April 5, 2022. Dr. O.L., Kaiser Oakland, off work April 5 through April 18, 2022.

b. July 21, 2022. Dr. O.L., modified activity July 21 through October 21, 2022, with the notation that if the restrictions were not accommodated Plaintiff was "temporarily and totally disabled."

c. February 22 through May 23, 2023. Dr. P.L., Kaiser, off work, with a stated onset date of July 1, 2022.

d. September 1 through October 6, 2023. Dr. A.R., Ph.D., Kaiser, off work for continued psychiatric disability.

e. October 6 through November 6, 2023. Dr. A.R., Ph.D., off work.

f. March 29 through July 5, 2024. Dr. A.D., Psy.D., Kaiser, off work.

g. June 28, 2024. Dr. J.M., Ph.D., Kaiser, off work July 8 through August 9, 2024.

425. On October 31, 2022, Dr. R.P. recorded that Plaintiff's post-traumatic stress disorder produced difficulty concentrating, difficulty managing emotions, sleep disruption, and executive dysfunction, described the symptoms as "residual, uncontrolled," and requested accommodation under the Americans with Disabilities Act and the Fair Employment and Housing Act.

**Psychiatric emergencies and involuntary hospitalization**

426. On November 21 and 22, 2023, Plaintiff was held overnight at the Kaiser San Francisco Emergency Department in psychiatric crisis.

427. On July 15, 2024, Plaintiff was taken from an intensive outpatient treatment program to the Kaiser Emergency Department in acute psychiatric crisis.

428. From July 17 through July 25, 2024, Plaintiff was involuntarily hospitalized for eight days at UCSF Langley Porter Psychiatric Hospital on a hold under Welfare and Institutions Code section 5150, as a danger to himself. He was assessed at moderate imminent risk. The admitting diagnoses included post-traumatic stress disorder together with conditions Plaintiff does not label here, and the attending physician attributed a likely contribution to Plaintiff's post-traumatic stress disorder.

429. Plaintiff was therefore under physician-ordered disability, psychiatric emergency care, or involuntary psychiatric commitment across 2022, 2023, and 2024, and not for a period of about five months. His entry into the San Francisco Department of Public Health specialty mental health system on August 5, 2024 followed an eight-day involuntary commitment two weeks earlier.

**The Ninth Circuit standard for mental-impairment tolling**

430. Where a plaintiff seeks equitable tolling on the ground of mental impairment, the Ninth Circuit applies a two-part test. First, the plaintiff must show the impairment was an extraordinary circumstance beyond his control, in that it was so severe that either he "was unable rationally or factually to personally understand the need to timely file," or his "mental state rendered him unable personally to prepare" the pleading "and effectuate its filing." Second, he must show diligence in pursuing the claims to the extent he could understand them, and that the impairment made timely filing impossible under the totality of the circumstances, including reasonably available access to assistance. Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010).

431. Total incapacity is not required. The Ninth Circuit has "not insisted that it be literally impossible" to file on time, and grants tolling where filing would have been technically possible but the plaintiff "would have likely been unable to do so." Bills, 628 F.3d at 1100 n.3; see Forbess v. Franke, 749 F.3d 837, 840 (9th Cir. 2014) (rejecting "an overly-rigid interpretation of the but-for test"; the second Bills prong "does not require a literal impossibility").

**How the incapacity prevented Plaintiff from pursuing his claims**

432. The Court held that the prior pleading did not allege how Plaintiff's conditions prevented him from obtaining information bearing on his claims. They did so in the following specific ways. Plaintiff sustained an anoxic brain injury, and memory loss and post-concussion syndrome were formally diagnosed within eight months of the assault. His treating psychiatrist recorded executive dysfunction and difficulty concentrating as uncontrolled symptoms. On admission to a residential crisis program his treating clinician recorded impairment of activities of daily living, including difficulty preparing meals, keeping appointments, and maintaining his household, and recorded that Plaintiff "has trouble thinking."

433. Plaintiff satisfies both alternatives of the first Bills prong. During the periods of psychiatric emergency and involuntary commitment he was unable rationally to understand the need to file. Across the longer period of documented executive dysfunction, memory loss, and post-concussion syndrome he was unable personally to prepare a federal complaint and effectuate its filing.

434. Plaintiff was diligent to the extent he could understand his claims. He commenced a state court action on October 19, 2022 and pursued it. He served a notice of intent to sue through counsel on August 21, 2022. He made public records requests to the City of Berkeley. He appealed the state judgments. He filed this action within sixteen days of the outer limit of the incapacity his treating providers projected.

435. Representation by counsel does not defeat tolling. "Equitable tolling is permitted even when a plaintiff has a lawyer if the interests of justice so require and there is no prejudice to the defendant." Stoll v. Runyon, 165 F.3d 1238, 1242 (9th Cir. 1999). In Stoll the Ninth Circuit held that tolling applied notwithstanding representation, because the plaintiff's incapacity and "the effect it had upon her relationship with her lawyer" was itself an extraordinary circumstance beyond her control. Id. Plaintiff's state action was dismissed for failure to prosecute during the period of his documented incapacity, and that dismissal is the subject of Appeal No. A172620, in which Plaintiff contends the record contains uncontroverted medical evidence that he was incapable of participating in the litigation.

436. During the eight days of his involuntary commitment Plaintiff was confined to a locked psychiatric facility. During the periods his physicians placed him off work he was, by their written assessment, unable to perform the functions of employment. Assembling records, tracking deadlines, keeping appointments, and corresponding with courts and counsel are the same executive functions his providers recorded as impaired.

**Continuous treatment throughout 2025**

437. Plaintiff's treatment did not end in January or February 2025. Plaintiff received psychiatric and mental health treatment continuously throughout 2025, including on the following dates: January 6; January 28; February 3; February 12; March 3; March 18; April 29; May 5; July 9; July 14; October 7; October 21; November 4; November 6; November 25; November 26; December 3; December 9; and December 17, 2025.

438. Plaintiff's treating providers during this period included clinicians in the San Francisco Department of Public Health's Psychiatry and Adult and Older Adult Mental Health programs, together with assigned case management and adult behavioral health staff.

439. Plaintiff was under treatment for serious mental illness throughout this period, diagnosed and re-assessed by treating clinicians on multiple occasions between January and May 2025. Plaintiff does not set out his diagnostic labels anywhere in this pleading. He will provide them, and the underlying records, to the Court and to Defendants under seal on request or by noticed motion pursuant to Civil Local Rule 79-5 of this Court.

440. On July 16-17, 2025, Plaintiff was evaluated at the UCSF Parnassus Emergency Department. The treating emergency physician's discharge instructions directed Plaintiff to "set up an appointment with Sunset Mental Health to follow up with how you are doing," and instructed him to return if his condition worsened.

441. Four of those dates, November 4, 6, 25 and 26, fall in the weeks immediately surrounding the commencement of this action. There is accordingly no interval between the end of Plaintiff's documented incapacity and the filing of this action. Plaintiff was under continuous specialty psychiatric care, with active psychotic-feature diagnoses, throughout the entire period.

**The effect on the limitations period**

442. This Section is pleaded independently of Sections VI.B and VI.E. The computation that follows assumes, for this ground only, that no other tolling applied. It does not limit the grounds pleaded elsewhere, under which the limitations period was suspended from the date of accrual.

443. Measured from April 13, 2023, and disregarding every other ground, a two-year period would have expired April 13, 2025.

444. Plaintiff's incapacity began on or about August 5, 2024, when he entered the San Francisco Department of Public Health specialty mental health system. On that assumption four hundred and eighty days would have run by that date, leaving two hundred fifty.

445. The period was tolled from August 5, 2024 through November 12, 2025, the outer limit of the incapacity Plaintiff's treating providers projected, a period of four hundred sixty-four days.

446. On resumption, two hundred fifty days remained, running to approximately July 20, 2026. Plaintiff commenced this action on November 28, 2025, well within that period.

447. Plaintiff does not contend that his incapacity was total for the entire period following accrual, and the tolling sought in this Section is limited to the period during which the incapacity is documented. Plaintiff does not thereby concede that the limitations period ran at any time, and expressly relies on the independent grounds pleaded in Section VI.B.

**Functional impairment**

448. Plaintiff was admitted to residential crisis programs twice within one month: to the Progress Avenues Crisis Program from August 16 through September 4, 2024, and to the La Posada Crisis Program from September 10 through September 14, 2024, the latter on referral from urgent care.

449. Plaintiff's incapacity was caused by Defendants' own conduct. Equitable tolling applies where "extraordinary circumstances beyond the plaintiff's control made it impossible to file a claim on time," Stoll, 165 F.3d at 1242, and in Stoll the Ninth Circuit reversed a limitations dismissal where the plaintiff's psychiatric disability had itself been caused by the defendant's wrongful conduct. That is this case. The post-traumatic stress disorder, post-concussion syndrome, and related conditions that disabled Plaintiff from prosecuting this action are the direct sequelae of the February 4, 2022 assault. Defendants injured Plaintiff into the condition on which they now rely to argue his claims are untimely.

450. "Principles of equity mandate that when mental incompetence precludes a person from asserting his rights during the proper time period, he should not be precluded from later seeking redress for his injuries." Stoll, 165 F.3d at 1242 (citation omitted).

C.1, Statutory Tolling Under Code of Civil Procedure Section 352(a)

451. In the alternative, and without limiting the foregoing, Code of Civil Procedure section 352(a) provides that if a person entitled to bring an action is, at the time the cause of action accrued, lacking the legal capacity to make decisions, the time of that disability is not part of the time limited for commencing the action. The statute is directed to functional capacity: whether the person was able to understand his rights and to manage his own affairs.

452. On the April 13, 2023 accrual date Plaintiff was under a written off-work order issued by Dr. P.L. of Kaiser, running from February 22 through May 23, 2023 and stating an onset date of July 1, 2022. He carried active diagnoses of post-concussion syndrome, chronic post-traumatic stress disorder, memory loss, and chronic daily headaches, all first recorded in 2022. His treating psychiatrist had recorded in writing that his symptoms included difficulty concentrating and executive dysfunction and that they were "residual, uncontrolled."

453. The state court action then pending was prosecuted by counsel, not by Plaintiff. That action was dismissed for failure to prosecute, and the dismissal occurred during the period of Plaintiff's documented impairment.

454. If section 352(a) applies, the limitations period did not begin to run at accrual and Plaintiff's claims are timely on that ground alone. Plaintiff pleads this ground in the alternative to the equitable grounds set forth above and does not rely on it to the exclusion of them.

## D. Relation Back

455. Plaintiff commenced this action on November 28, 2025. This Second Amended Complaint arises out of the same conduct, transactions, and occurrences set out in the original complaint and in the First Amended Complaint: the February 4, 2022 assault, Defendants' enforcement campaign against Plaintiff, and the conditions and operation of the facility at 2001 Allston Way. It relates back to the date of the original pleading. Fed. R. Civ. P. 15(c)(1)(B).

456. The additional factual allegations pleaded here describe the same course of conduct already alleged and were developed from documents produced by third parties and from Defendants' own records and communications. No new party is added and no new transaction is alleged.

## E. The Continuing Violations Doctrine

457. The Fair Housing Act's limitations period runs from "the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. Section 3613(a)(1)(A). The statute therefore contemplates practices that terminate rather than merely occur, and fixes the period by reference to the termination of the practice.

458. Where a plaintiff "challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the statutory period, running from] the last asserted occurrence of that practice." Garcia v. Brockway, 526 F.3d 456, 461-62 (9th Cir. 2008) (en banc) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 380-81 (1982)).

E.1, The practice Defendants directed at Plaintiff continued into the limitations period

459. Plaintiff remained a tenant of the facility until July 31, 2023. Defendants' conduct toward Plaintiff between April 13, 2023 and July 31, 2023 was therefore directed at a current tenant, during the pendency of the unlawful detainer action Defendants had commenced against him.

460. Throughout that period, and on a near-daily basis, Shavon Dorsey and Defendant Rose Acosta followed, watched, and intimidated Plaintiff within the facility. Their conduct was persistent and was directed at Plaintiff personally.

461. During this period Ms. Dorsey made references to Plaintiff's immigration status.

462. Ms. Dorsey was the declarant on whose account Defendants' second workplace violence petition rested. She declared that Plaintiff had kicked a trash can outside her office and had filmed her. Plaintiff alleges that Ms. Dorsey, who directed the enforcement measures taken against him, harbored and expressed animus toward Plaintiff on the basis of his ethnicity and perceived foreign status.

463. The immigration-based targeting of Plaintiff by Ms. Dorsey was consistent with the practice at the facility. Resident Haynes threatened Hispanic tenant Helton Carvalho with arrest because he was "not a citizen," and told Hispanic tenant Juan Bonilla to "go back to your country." Defendants took no action against Mr. Haynes for that conduct. When Defendants' own manager engaged in the same conduct toward Plaintiff, Defendants pursued Plaintiff to eviction.

464. Post-April 2023 acts in furtherance of the same practice further include:

a. October 2023, Haynes threatened to have Hispanic tenant Carvalho arrested because he was "not a citizen," and Defendants took no action;

b. May 10, 2024, Defendants' own employees reported Haynes's ethnic harassment to the Berkeley Police Department, documented in BPD Case Nos. 2024-00021370 and 2024-00021351 and on body-worn camera, and Defendants took no action;

c. August 2024, Haynes assaulted Hispanic tenant Juan Bonilla, and Defendants still commenced no enforcement proceeding against him.

d. December 2025, the assault by Chantalle Moore on Ana B. Hoover described below, after which Defendants again took no enforcement action.

465. Defendant YMCA of the East Bay commenced an action against Plaintiff on April 13, 2023, Case No. 23CV031079. It did not abandon it. On October 13, 2023, YMCA amended that action to seek money from Plaintiff. On June 25, 2025, they obtained summary adjudication. On August 4, 2025, they obtained an amended judgment awarding them $19,950 and $4,476.83 in costs against Plaintiff.

466. Each of those acts was taken by Defendants against Plaintiff. The summary adjudication of June 25, 2025 and the amended judgment of August 4, 2025 each occurred within two years of the filing of this action, and the amended judgment is the last occurrence of the practice. The enforcement campaign alleged in this complaint did not end when Plaintiff vacated on July 31, 2023. Defendants prosecuted it against him for more than two years afterward and reduced it to a money judgment.

467. The proceedings Defendants brought against Plaintiff were baseless. The first workplace violence petition, filed March 21, 2022, was dismissed on Defendants' own application on August 2, 2022 without any finding against Plaintiff, because Goree no longer worked for Defendants. The second, filed August 26, 2022, was denied on November 3, 2022 for failure of proof. The first unlawful detainer action, Case No. 23CV025513, was never served. The second, Case No. 23CV031079, commenced April 13, 2023, was predicated on alleged nuisance rather than rent, and rent became the theory only after Plaintiff had vacated and Defendants amended their pleading to seek money.

468. No court ever found that Plaintiff did what Defendants accused him of. No prosecutor ever filed a charge. Defendants nonetheless pressed the proceedings for more than three years and obtained a money judgment against him.

469. Defendants brought four separate proceedings against Plaintiff between March 2022 and April 2023. Of the three that were resolved on their merits or abandoned, one was dismissed on Defendants' own application without any finding, one was denied for failure of proof, and one was never served. Defendants commenced them without regard to whether they could be sustained.

470. The money judgment Defendants obtained is not final. Plaintiff appealed it, and Appeal No. A174186 is pending in the Court of Appeal, First Appellate District, where Plaintiff contends the judgment rests on an error of law and on a motion that never carried its burden.

471. Defendants' verified discovery responses of May 8, 2023 stated as to fifty-three separate requests that no responsive documents had ever existed, including requests for documents describing any use of force by Defendant Goree against any person and all video of the February 4, 2022 incident. Defendant Goree had sworn on March 1, 2022 that the incident was captured by security cameras, and on March 23, 2022 Defendants lodged a thumb drive containing that footage with the Alameda County Superior Court. Defendants maintained their contrary representations through at least the 2024 third-party subpoena production.

E.2, The same discriminatory practice continued at the facility

472. The practice alleged in this complaint is the differential application of Defendants' housing-enforcement apparatus: enforcement against Hispanic residents who complain, and protection for non-Hispanic residents who are complained of. That practice continued after Plaintiff vacated, and Plaintiff alleges each of the following occurrences as an act of discrimination and retaliation, not merely as an incident at the property.

473. On May 15, 2024 Helton Carvalho, the Hispanic tenant of 2001 Allston Way identified above, wrote to the City of Berkeley Rent Stabilization Board, copying Plaintiff, and stated that the landlord's "illegal conversion of the hostel into a Halfway House continues to generate Hate Crimes on Hispanic Americans after 6 years," that "Director Dorsey adamantly enables the bullies in discriminatory fashion," and that "Director Goree assaulted 2 Hispanic American tenants in the premises; habitually ignored police reports; doctored CCTV footage when sued." Mr. Carvalho cited this action by name. He further described the landlord keeping five of the ten rooms on his hallway vacant for ninety percent of the preceding four years, and a defective elevator suspended by the State for six years. The communication is attached as Exhibit K and incorporated by reference.

474. In the same communication Mr. Carvalho stated that the landlord had "served me with a 3-Day Notice in retaliation for whistleblowing to the FTC, FBI and IRS." Mr. Carvalho is Hispanic, and he had reported Defendants' conduct. He was served with a three-day notice. The residents complained of, none of whom is Hispanic, were served with nothing.

475. The communication was received by Rent Board staff and circulated internally among the Board's legal staff on May 15, 2024. Plaintiff obtained it from the City of Berkeley through a public records request, production 24-1431, and it is a record of the City of Berkeley.

476. The statement that Ms. Dorsey "adamantly enables the bullies in discriminatory fashion" was made by a tenant independent of Plaintiff, to a public agency, in May 2024, and describes the same discriminatory enforcement by facility management alleged above.

477. On May 10, 2024, two YMCA employees went to the Berkeley Police Department to report the conduct of Kevin Edward Haynes, a non-Hispanic resident. Berkeley Police Department Case Nos. 2024-00021370 and 2024-00021351. Defendants served Mr. Haynes with no cease notice, no three-day notice, and no workplace violence petition, and commenced no unlawful detainer action against him.

478. On August 21, 2024, Mr. Haynes committed a felony battery causing serious bodily injury on Juan E. Bonilla, a Hispanic tenant whose ethnicity is recorded as Hispanic in the police report. Berkeley Police Department Case No. 2024-00038343. Mr. Bonilla had complained to Defendants of harassment and threats since 2020. Defendants still took no enforcement action against Mr. Haynes.

479. In December 2025, Chantalle Moore, a non-Hispanic resident, assaulted Ana B. Hoover, a Hispanic resident of Mexican ancestry. Defendants took no enforcement action against Ms. Moore. Plaintiff alleges that occurrence as a further application of the same practice: a non-Hispanic resident harmed a Hispanic resident and Defendants did nothing.

480. Across the entire period alleged, from 2020 through December 2025, every resident of the facility on whom Defendants served a cease notice, a three-day notice, a workplace violence petition, or an unlawful detainer action was Hispanic and had complained of Defendants' conduct. They are Plaintiff and Mr. Carvalho. Not one of the non-Hispanic residents complained of, including Mr. Haynes, Mr. Bigsbee, Mr. McNeil, Ms. Moore, Tenant Bigbee, Tenant Cumbo, and Tenant Schroyer, was served with any of them.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows: A. Compensatory damages according to proof, including damages for physical injury, emotional distress, loss of housing stability, loss of quiet enjoyment, and rent paid under false pretenses; B. Punitive damages against Defendants Gallati, Goree, Rose Acosta, Antonio Acosta, and Maltais under California Civil Code Section 3294 for malice, oppression, and fraud, in that Defendants' conduct was carried out with a willful and conscious disregard of the rights and safety of Plaintiff; C. Punitive damages under 42 U.S.C. Section 3613(c)(1) for Defendants' violations of the Fair Housing Act; D. Statutory damages and attorney-fee shifting where authorized by statute, including under 42 U.S.C. Section 3613(c) and Government Code Section 12955; E. Declaratory relief that Defendants' conduct violated Plaintiff's rights under the Fair Housing Act, Title VI, 42 U.S.C. Sections 1981, 1982, and 1985, the California Fair Employment and Housing Act, and California law; F. Equitable relief under 42 U.S.C. Section 3613(c)(1), Government Code Section 12989.2, and Civil Code Section 1942.5, including restoration of Plaintiff's tenancy or an equivalent unit at the facility, and an order restraining Defendants from further retaliation against Plaintiff for the assertion of the rights at issue in this action; G. Restitution of monies acquired by means of the unfair, unlawful, and fraudulent business practices alleged, pursuant to California Business and Professions Code Section 17203; H. Costs of suit and prejudgment and post-judgment interest as allowed by law; I. Leave to amend if needed to conform to proof; J. Such other and further relief as the Court deems just and proper.

## VIII. INDEX OF EXHIBITS

The following exhibits are filed with this Second Amended Complaint and are incorporated by reference pursuant to Federal Rule of Civil Procedure 10(c).

Exhibit A. Email chain among City of Berkeley and Downtown Berkeley Association personnel, June 25 and 26, 2014, produced by the City of Berkeley in response to Public Records Act Request No. 24-34.

Exhibit B. Declaration of Lance Goree, executed March 1, 2022, filed in Alameda County Superior Court Case No. 22CV008690.

Exhibit C. Letter from Lance Goree and Rose Acosta to Plaintiff, January 24, 2022.

Exhibit D. Reporter's transcript of proceedings, August 2, 2022, Alameda County Superior Court Case No. 22CV008690, Hon. Jocelyn Jones presiding.

Exhibit E. Defendants' Separate Statement of Undisputed Material Facts in support of motion for summary judgment, April 4, 2025.

Exhibit F. Declaration of Michael A. Slater, September 12, 2022, filed in Alameda County Superior Court Case No. 22CV008690.

Exhibit G. Berkeley Fire Department NFIRS-1 incident reports for 2001 Allston Way, Incident No. 2021-008958 (September 3, 2021) and Incident No. 2022-012632 (October 20, 2022), produced by the City of Berkeley in response to Public Records Act Request No. 26-106.

Exhibit H. Plaintiff's verified responses to Defendants' form interrogatories in Alameda County Superior Court Case No. 23CV031079, filed by Defendants as Exhibit C to the Declaration of Katherine S. Catlos in support of their motion for summary judgment.

Exhibit I. Certified criminal records search issued by the Alameda County Superior Court, August 9, 2023.

Exhibit J. Alameda County Coroner's Bureau investigation reports for Brett Elliott Schnaper, Coroner Case No. 2022-02843, and Michael Robert Surryhne, Coroner Case No. 2022-04114.

Exhibit K. Communication of tenant Helton Carvalho to the City of Berkeley Rent Stabilization Board, May 15, 2024, produced by the City of Berkeley in response to Public Records Act Request No. 24-1431.

Exhibit L. Meet and confer correspondence of Michael A. Slater to Defendants' counsel concerning Defendants' May and June 2023 discovery responses, Letters Nos. 2, 3 and 4.

Exhibit M. Plaintiff's Requests for Production of Documents, Set One, propounded on Defendant YMCA of the East Bay on March 10, 2023.

## IX. JURY DEMAND

481. Plaintiff demands trial by jury on all issues so triable.

DATED: August 5, 2026

/s/ Arnaud Cammas

ARNAUD CAMMAS

Plaintiff In Pro Per

201 13th St #32231

Oakland, CA 94612

Email: xqtp8374@gmail.com

**VERIFICATION**

I, Arnaud Cammas, am the Plaintiff in this action. I have read the foregoing Second Amended Complaint. The matters stated in it are true of my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 5, 2026, at Oakland, California.

/s/ Arnaud Cammas

ARNAUD CAMMAS, Plaintiff In Pro Per